**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| STRUCTURLAM MASS TIMBER U.S., INC., *et al.*, | Case No. 23-10497 (CTG) |
| Debtors. | (Jointly Administered) |
| HEATHER L. BARLOW AS LIQUIDATING TRUSTEE OF THE STRUCTURLAM LIQUIDATING TRUST, | Adversary No. 25-51040 (CTG) |
| Plaintiff, | |
| v. | |
| BRIAN HOOPER, CINDI MARSIGLIO, AND CHRISTINE ALLEN, | |
| Defendants. | |

**APPENDIX OF INTERNATIONAL AUTHORITY CITED
IN DEFENDANTS' OPENING BRIEF IN SUPPORT
OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

| Tab | Authority |
|-----|-----------|
| 1.  | *Arbutus Inv. Mgmt. Ltd. v. Russell*,<br>    2022 BCSC 72 (Can.) |
| 2.  | *Grant Thornton LLP v. New Brunswick*,<br>    2021 SCC 31 (Can.) |
| 3.  | *Meng Estate v. Liem*,<br>    2019 BCCA 127 (Can.) |
| 4.  | *Peoples Dep't Stores Inc. v. Wise*,<br>    2004 SCC 68 (Can.) |
| 5.  | Canada Business Corporations Act, R.S.C. 1985 c C-44, § 122. |
| 6.  | Province of British Columbia Limitation Act, S.B.C. 2012, c 13 (Can.) |

# **TAB 1**

*Arbutus Inv. Mgmt. Ltd. v. Russell*, 2022 BCSC 72 (Can.)

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Citation:        *Arbutus Investment Management Ltd. v.*
                 *Russell,*
                 2022 BCSC 72

Date: 20220117
Docket: S1810076
Registry: Vancouver

Between:

## Arbutus Investment Management Ltd.

Plaintiff

And

## Daniel J. Russell

Defendant

Corrected Judgment:  The text of the judgment was corrected on the front page on
January 20, 2022.

Before: The Honourable Justice Branch

## Reasons for Judgment

| | |
|---|---|
| Counsel for the Plaintiff: | A. Macdonald |
| Counsel for the Defendant: | T. Clifford |
| Place and Date of Hearing: | Vancouver, B.C.<br>June 28-30, July 7, 2021 and<br>October 19, 2021 |
| Place and Date of Judgment: | Vancouver, B.C.<br>January 17, 2022 |

2022 BCSC 72 (CanLII)

# Table of Contents

I.  **INTRODUCTION** ......................................................................... **3**

II.  **BACKGROUND** ......................................................................... **3**

General History ....................................................................................... 3

Allegations of Misconduct...................................................................... 10

    RBC ................................................................................................. 11

    PHN ................................................................................................. 12

    Vancouver Foundation..................................................................... 13

    Polar Capital Corporation................................................................ 16

Alleged Participation in a Competitive Business.................................... 16

III.  **ANALYSIS** ............................................................................. **17**

A. Suitability for Summary Trial ........................................................... 17

B. Analysis of the Merits ..................................................................... 21

    1. The Allegations ........................................................................... 21

    2. The Legal Framework .................................................................. 23

    3. Application of the Framework ....................................................... 25

        RBC/PHN................................................................................... 26

        Vancouver Foundation .............................................................. 28

        Polar Capital.............................................................................. 29

        Alleged Involvement in Competitive Businesses ..................... 29

        Damages................................................................................... 31

        Injunctive and Other Relief ...................................................... 36

C. Limitations........................................................................................ 37

V.  **CONCLUSION** ....................................................................... **40**

2022 BCSC 72 (CanLII)

## I.      INTRODUCTION

[1]      The plaintiff's effort to create an investment fund by securitizing life insurance policies failed in or about 2012. The question in this summary trial is whether any part of that failure can be laid at the feet of the defendant. For the reasons expressed below, I find that it cannot.

## II.      BACKGROUND

### General History

[2]      The plaintiff, Arbutus Investment Management Ltd.'s ("AIM's") plan to create an investment fund specializing in the life settlement sector was conceived by Mark Hrehorsky. Mr. Hrehorsky first attempted to launch such a fund using the corporate vehicle Arbutus Asset Management Limited ("AAML") in 2002.

[3]      Through to 2009, AAML continued to develop the concept while the life settlement sector went through a prolonged period of instability. In January 2009, AIM was incorporated to move the plan forward. In general terms, the "pitch" for the investment was as follows:

   a)  individuals who own a transferrable life insurance policy ("owners") may decide that they do not want to continue paying premiums for their policies;

   b)  a buyer would offer to pay a price to the owner, and then arrange to maintain the policy by paying the required premiums;

   c)  the buyer would name new beneficiaries controlled by the buyer; and

   d)  purchased policies would be bundled by the buyer and securitized into investments that can be sold to others.

[4]      In 2010, Mr. Hrehorsky, in his role as president and director of AIM, approached the defendant, Daniel Russell, for help in implementing this plan. Mr. Russell was a former partner at the investment firm Phillips, Hager & North ("PHN"),

which is owned by the Royal Bank of Canada ("RBC"). Mr. Russell was asked to consider an equity investment in AIM, and also to help raise capital for AIM's pooled investment fund (the "Fund").

[5]     According to Mr. Russell, Mr. Hrehorsky represented to him that AIM had access to life insurance policies on elderly Americans that did not expire, had a fixed minimum annual premium schedule, and could be purchased at a price expected to result in an attractive investment return. AIM denies making such representations.

[6]     On February 10, 2010, Mr. Russell entered into a non-disclosure agreement with AIM (the "NDA"). The NDA states, in material part, as follows:

> **WHEREAS**:
>
> (A)     The Recipient has received and will receive various confidential and proprietary information in respect of [AIM] and its subsidiaries and affiliates including the nature of their technology, operations and management (the **"Business"**) for the purpose of entering into a business relationship with [AIM] or its subsidiaries or affiliates and/or for the purpose of assessing potential investment in [AIM] or its subsidiaries or affiliates (collectively, the "Purpose");
>
> …
>
> **1.      Disclosure**. [AIM] has furnished or may furnish the Recipient information with respect to its Business which is confidential or proprietary to [AIM] or otherwise not generally available to the public (the "**Confidential Information**")…
>
> …
>
> **3.      Obligations and Exceptions**
>
>  (i)    **Obligations**. The Recipient will keep the Confidential Information strictly confidential and will not use it for any purpose other than for the Purpose…
>
>  (ii)   **Exceptions**. The parties further agree that Confidential Information may be disclosed where
>
>             (i)         [AIM] consents in writing…
>
> …
>
> **8.      Indemnity**. The Recipient shall be responsible for any breach of this Agreement by it or any of its personnel or consultants (if any), and shall reimburse, indemnify and hold harmless [AIM] from any damage, loss or expense suffered or incurred by it as a result of any such breach, including, without restriction, for all legal costs and expenses to enforce any of such party's rights and remedies under or with respect to this Agreement.

9.    **Relief and Notification**

(a) **Injunctive Relief**. The Recipient acknowledges that a breach by the Recipient of any of the covenants or provisions of this Agreement will cause [AIM] to suffer loss and irreparable harm and that [AIM] may, in addition to any other remedy for relief, seek to enforce the performance of these covenants or provisions by injunction, specific performance or other equitable relief, upon application to any court of competent jurisdiction without proof of actual damage…

…

10.    **Non Waiver, etc**. No failure or delay by a party in exercising any right, remedy power or privilege under this Agreement shall operate as a waiver of any portion of this Agreement or of any such rights, remedies, powers or privileges of such party, nor shall any single or partial exercise of such rights, remedies, powers or privileges by such party preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege under or with respect to this Agreement.

[7]    On or about March 23, 2010, Mr. Russell executed a subscription agreement through which he invested $1 million in AIM in return for 2,250 Class B common shares.

[8]    Mr. Russell also entered into a shareholders' agreement dated March 1, 2020 (the "Shareholders' Agreement"). The Shareholders' Agreement contains the following material terms:

a) AIM's "Confidential Information" was defined to include "any and all information, knowledge, data and databases, that relate in any way form or manner to the Business of the Company…"

b) AIM's "Business" was defined as follows:

**3.1** The Company shall carry on the business of the acquisition and disposition of life insurance contracts and management of portfolios of life insurance contracts, including the creation and management of pooled investment funds to invest in portfolios of life insurance contracts...

c) The non-compete covenant was on the following terms:

**6.2** The Shareholders each covenant and agree that they shall not, subject to §6.3, either individually or in partnership, whether by way of trust, agency or otherwise, jointly or in connection with any person or persons, including without limitation any individual, firm, association, syndicate, company, corporation or other business enterprise, as

principal, agent, shareholder, director, officer, employee, or in any other manner whatsoever:

(a)      in the case of a Shareholder, for so long as the Shareholder owns any shares in the capital of the Company and for a period of 5 years after ceasing to own Shares,

(i)      except in connection with carrying on the Business and affairs of the Company, carry on or be engaged in or be concerned with or interested in or advise, lend money to, guarantee the debts or obligations of or permit the Principal's name to be used or employed by any individual, firm, syndicate, corporation or other business enterprise engaged in or concerned with the Business anywhere in Canada or the United States,

(ii)     attempt to solicit any business or investors away from the Company or its Affiliates, or

(iii)    do any act, the probable effect of which would be detrimental to the business of the Company or any of its Affiliates or would be to impair relations between the Company and its Affiliates and any of their investors, employees or contractors, and

(b)      subject to §7, at any time, use or disclose to any person, except as required in the conduct of the Business and affairs of the Company, any Confidential Information.

d)   The scope of each shareholders' duties to protect against the disclosure of Confidential Information was defined as follows:

**Acknowledgment**

**7.1**      The Shareholders acknowledge that they and their respective employees, nominees, advisors, agents or other representatives (collectively, "representatives") will have access to and will be entrusted with Confidential Information relating to the present and contemplated operations of the Company and its Affiliates (collectively referred to in this Part 7 as the "**Fund Group**"), the disclosure of any of which Confidential Information to competitors of the Fund Group or to the general public would be highly detrimental to the best interests of the Fund Group. The Shareholders acknowledge and agree that the right to maintain the confidentiality of such Confidential Information and the right to preserve the goodwill of the Fund Group constitute proprietary rights which the Company is entitled to protect.

**Covenants**

**7.2**      Each Shareholder hereby agrees with each of the other Shareholders and with the Company that neither they nor any of their respective representatives shall:

2022 BCSC 72 (CanLII)

(a)    subject to §7.3, at any time disclose any Confidential Information to any person nor use the same for any purpose other than the purposes of the Fund Group, nor disclose or use for any purpose other than those of the Fund Group the private affairs of the Fund Group or any other non-public information relating to the business and affairs of the Fund Group which they may acquire as a result of being a Shareholder, employee or director of any member of the Fund Group, provided, however, that any party may disclose any information (i) to the extent required by law, regulation or by valid order of a governmental body, regulatory board, administrative tribunal or comparable entity, or (ii) to any of its Affiliates or legal, accounting or financial advisors who need to know such information and such Affiliates or advisors are either bound by law to maintain the confidentiality of such information or have delivered to the Fund Group a confidentiality agreement, in form and content satisfactory to the Fund Group, acting reasonably, by which the Affiliate or advisor, as the case may be, has agreed not to disclose such information to any person, not to use such information for any purposed other than to provide advice to the Shareholder and, forthwith upon request, to return to the Company all tangible evidence of such information; …

### Exceptions

**7.3**    The restriction set out in §7.2(a) shall not preclude disclosure of Confidential Information in response to a request by a potential purchaser of a Shareholder's Shares; provided, however, that such disclosure shall not be made without the approval of the Board of Directors and until the potential purchaser has delivered to the Company a confidentiality agreement, in form and content satisfactory to the Company, acting reasonably, by which the potential purchaser agrees:

(a)    not to disclose such information to any person other than its legal and financial advisors, subject in each case to such legal and financial advisors agreeing prior to any such disclosure to them to be bound by such confidentiality agreement;

(b)    not to use such information for any purpose other than to determine whether to purchase the Shareholder's Shares; and

(c)    forthwith upon request, to return to the Company or the selling  Shareholder all tangible evidence of such information.

### Restrictions Reasonable

**7.4**    The Shareholders hereby agree that all restrictions contained in this Part 7 are reasonable and valid and waive all defences to the strict enforcement thereof to the fullest extent permitted by law.

[9]     On or about March 1, 2010, Mr. Russell became a director and the Chief Investment Officer of AIM. He held these positions until 2012.

[10]    AIM viewed the provision of a solid credit rating as key to its business plan. AIM provided an affidavit from Jan Buckler of the rating firm DBRS, who engaged in discussions about this issue with Mr. Hrehorsky and Mr. Russell in 2009–2010. Ms. Buckler felt that "if AIM had continued its engagement with DBRS to rate their transaction and the potential security that AIM would create thereby, I would have recommended to the Committee that the AIM program was deserving of a provisional AAA rating". She concludes:

> Given the events in 2012 regarding Mr. Russell's departure from AIM and the company's inability to raise funds as a result, my current view is that it is highly unlikely that AIM could presently obtain such a provisional AAA rating.

[11]    Mr. Russell says that he was unable to raise the sums needed in to move the plan forward in part due to a lack of supply of underlying life insurance products. He became discouraged about the company's prospects. He started to absent himself from AIM's offices in early to mid-2012. He sent AIM an email formally resigning his offices on October 15, 2012.

[12]    Almost three years later, on September 25, 2015, Mr. Russell sent Mr. Hrehorsky information about an ex-colleague trying to launch an investment structure similar to AIM's. He concludes saying, "Thought you might find it interesting". Mr. Hrehorsky replied, stating:

> Thanks for thinking to send this news.
>
> It's great your ex colleague was able to raise some funds to purchase policies. They must have had the right contacts or context.
>
> [AIM] has left many opportunities – due to under financing and [being] un[defended] legally.
>
> If you wish to make good on what was started let me know, [w]e would be willing to reconsider your early departure.
>
> (the "Colleague Email")

2022 BCSC 72 (CanLII)

2022 BCSC 72 (CanLII)

[13]     In November 2016, there was another exchange (collectively, the "2016 Inquiry"):

   a)  On November 6, 2016, Mr. Russell inquired of Mr. Hrehorsky as follows:

        Hope everything is going well Mark. For financial reasons I am writing
        to ask if [AIM] is currently active in any way?

   b)  This email seems to have made Mr. Hrehorsky suspicious that Mr. Russell
       had somehow breached his duties to AIM. He responded on November 7,
       2016:

        I realize that you are most likely seeking to write off AIM. AIM and [its]
        IP/Opinion and contract agreements are valuable. [It] has come [to]
        my attention that our model is being used in the market currently.
        AIM's share structure was created for you. Am I correct regarding the
        nature of your inquiry?

   c)  Mr. Russell responded that same day:

        My inquiry was based upon a need to place a value on the company.
        A write off is something I have been meaning to discuss with my
        account[ant] as well. May happen in the future.

   d)  On November 18, 2016, Mr. Hrehorsky asked Mr. Russell whether he was
       in contact with former shareholders or associates. Mr. Russell responded
       the same day, stating, "I spoke to someone who I guess could have been
       an associated party to [AAML]."

   e)  On November 21, 2016, Mr. Russell clarified that he could not recall who
       he spoke to, and that, in any event, he had "no idea who [the] former
       shareholders [were]".

   f)  Mr. Hrehorsky replied reminding Mr. Russell of his legal duties and stating
       further:

        Regretfully your personal agreement of confidentially with a former
        shareholder(s) of [AAML] is not as important as the position of
        AIM/[AAML]. As one of the acting directors of both companies it's my
        fiduciary responsibility to inform all shareholders that the company
        has identified a conflict of Interest. Unfortunately this is the situation
        until such time as AIM is restored and repositioned to conduct

> business. The company agreed to let you try to raise the required
> capital without a bond rating. Now the companies IP is tied up in a
> non operational company that was manipulated and mislead by a
> director and shareholder, stolen from by an insurance company /
> capital company / lawyer. The company was put in a position of
> weakness by divulging its proprietary investment strategies and know
> how, when it should have been marketing a rated financial
> investment. Your credibility was not a replacement.

[14]    On March 16, 2017, AIM sent a letter to Mr. Russell alleging that he had acted in breach of his fiduciary duties. This action was filed on September 17, 2018.

[15]    AIM filed an expert report prepared by an actuary, Glenn Smith (the "Smith Report"). The report assumed "the purchase of $38 billion of life insurance over a 5-year period with such purchases starting on January 1, 2010", and relied upon a "Cash-Flow Model" provided by AIM. AIM summarizes the report as follows:

> The Plaintiff has provided the Defendant with an expert's report estimating
> that the present value of the revenues that would have been earned by AIM if
> it had received a yearly $1 billion USD investment through 2010-2014
> according to its business plan. Predicated on the assumption that AIM had
> received these yearly investments, this report estimates that AIM's present
> value as at early 2010 would have been $4.2 billion USD.
>
> [Emphasis added.]

**Allegations of Misconduct**

[16]    Although AIM's allegations have shifted somewhat over time, by the time of the hearing, the particulars of Mr. Russell's alleged breaches were generally constrained to issues arising from his interactions with the following:

    a)  RBC;

    b)  PHN;

    c)  Polar Capital Corporation; and

    d)  the Vancouver Foundation.

[17]    AIM also alleges that Mr. Russell engaged in a business of similar nature to AIM's and solicited business and investors away from AIM.

2022 BCSC 72 (CanLII)

[18]    The evidence said to support these allegations is as follows.

### *RBC*

[19]    At the outset of their dealings, Mr. Russell advised Mr. Hrehorsky that he had a non-competition agreement with RBC (the "RBC Non-Competition Agreement"). Mr. Russell did not provide AIM with a copy of the RBC Non-Competition Agreement. The RBC Non-Competition Agreement was not in the record before me, as Mr. Russell says that he did not keep a copy.

[20]    Mr. Russell also advised Mr. Hrehorsky that he had to check with RBC about his potential involvement with AIM. He asked Mr. Hrehorsky to describe AIM's business to RBC. Mr. Hrehorsky did so via an email dated February 25, 2010. Notably, Mr. Hrehorsky concluded this email stating:

> As far as I know RBC is not involved in the life settlement market in any form. However, in the future there may be an opportunity to work with RBC Dominion for the distribution of our companies securities.

[21]    After receiving this information, Tom Smee, RBC Senior Vice President and Deputy General Counsel, replied in a March 1, 2010 email to Mr. Russell:

> We have considered the description you and Mark Hrehorsky have provided about the current activities of Arbutus Asset Management and your proposed role with company. Based upon what we have been told, we do not believe that this would breach the non competition covenant at this time. It is important to remember, though, that the non-competition covenant is a continuing obligation for its term and that any future or other activities of you or Arbutus could constitute a breach of the covenant. As a result, we will monitor the company's activities for the duration of the non-competition covenant and will pursue all available remedies if we believe that you or the business have undertaken any activities that breach the covenant.
>
> ("Smee Email")

[22]    There is no evidence that Mr. Russell ever provided the Smee Email to Mr. Hrehorsky.

[23]    On October 25, 2010, Mr. Russell wrote to Mike Lee at RBC about the fact that he was "involved with a new firm which is launching a new alterative investment fund", and seeking "a US cash/short-term fixed income manager" (the "Lee Email").

### *PHN*

[24]    In a recently produced June 3–8, 2010 email conversation between Mr. Russell and his former partner at PHN, Bruce Hoeschen (the "Hoeschen Emails"), Mr. Russell wrote as follows:

> a)  June 3, 2010:
>
> I have been thinking [a lot] about your meeting with my old clients. I had thought the non-compete would preclude [PHN] clients from being involved. But, it seems obvious to me that this is a better asset than all of the add-on investments I have seen that group get involved in. Do you think there is [any] way to involve those clients? Can you and I be involved? Can it be win-win-win? Should we get together with some of the gatekeepers?
>
> b)  June 8, 2010:
>
> I had always assumed that AIM needs to never be seen as competing for assets with Big Blue [RBC] and accordingly I have been focused on the large public service operations who manage their own fixed income. You got me thinking that owning this asset in a [PHN] managed portfolio like Mortgage Fund One might be okay, but it looks like it might be a tightrope. Reading between the lines, the RBC lawyer I corresponded with seemed to be saying AIM would not violate the non-compete because the bank is not involved in similar assets. I think I would only engage lawyers if we have indicated demand from someone we might need to worry about.

[25]    There was a later interaction between Mr. Russell and Brent Sutton, another former colleague of Mr. Russell's at PHN. In October 2010, Mr. Russell met with Mr. Sutton to discuss a potential investment in AIM. There is no evidence that Mr. Russell obtained an NDA prior to this discussion. After the meeting, on October 20, 2010, Mr. Sutton provided an email outlining his thoughts and recommendations about locating investors for AIM. Mr. Russell did forward that email to Mr. Hrehorsky.

[26]    Finally, in a February 11, 2019 email exchange with Mr. Hoeschen, Mr. Russell responded to a link entitled "Betting on Death is Turning Out Better Than Expected for Hedge Fund", by stating "[t]heir experience is slightly better than mine".

2022 BCSC 72 (CanLII)

### *Vancouver Foundation*

[27]     The Vancouver Foundation is a community foundation that solicits donations, maintains an endowment fund (the "Endowment Fund"), and disburses money to other charitable organizations.

[28]     In or around 2010, Mr. Russell and Mr. Hrehorsky had a meeting with Diane Fulton of the Vancouver Foundation to discuss a potential investment in AIM. Although Mr. Russell did not retain a copy following his departure from AIM, he believes that he and Mr. Hrehorsky had Ms. Fulton execute an NDA prior to the meeting.

[29]     In 2010, Tom Bradley, a member of Vancouver Foundation's Investment Committee (the "VFIC"), and Mr. Russell's former partner at PHN, met with AIM representatives. However, Mr. Bradley says he attended this meeting in his personal capacity rather than wearing his "Vancouver Foundation hat". Mr. Bradley cannot recall if he executed an NDA and he cannot recall if Mr. Russell was even present at the meeting.

[30]     The VFIC is responsible for investing the Endowment Fund. The VFIC's primary activity is determining an appropriate asset mix strategy for the Endowment Fund and identifying external investment managers to execute that strategy (the "Fund Managers"). Other than day-to-day management of cash, the Vancouver Foundation does not arrange its own direct investments. The Fund Managers are hired to do the actual investing, and each is given a well-defined mandate outlining the scope of investments allowed.

[31]     In the fall of 2012, Mr. Russell became a member of the VFIC. Mr. Russell's appointment to the VFIC was noted on the Vancouver Foundation's website. It was a volunteer position. The September 25, 2012 VFIC meeting minutes record Mr. Russell's introduction as follows:

> Tom [Bradley, Chair of the Investment Committee] welcomed Dan Russell to the meeting. Dan started his career at Yorkshire Trust Co. and worked for the Province of BC and retired from PH&N 3 years ago. Dan recently started a new investment fund investing in structured life insurance products...

2022 BCSC 72 (CanLII)

[32]    Mr. Russell asserts that this introduction was referring to his position with AIM, and not any potential AIM competitor.

[33]    Mr. Russell asserts that after he joined VFIC, having the Vancouver Foundation make an investment in life insurance in a manner contemplated by AIM was never discussed. The Vancouver Foundation never directly invested in life insurance and has never given the Fund Managers an investment mandate direction similar to the investment concept contemplated by AIM.

[34]    Mr. Bradley also provided evidence that the Vancouver Foundation has not, either directly or indirectly, engaged in the acquisition and disposition of life insurance contracts, or the management of portfolios of life insurance contracts.

[35]    AIM alleges that a breach of Mr. Russell's duties is revealed by the following exchange from Mr. Russell's examinations for discovery on April 17 and November 28, 2019, as well as by the following extract from the Vancouver Foundation's 2017 Financial Statements:

> **April 17, 2019 Discovery**
>
> Q. To your knowledge, has the Vancouver Foundation invested in any pooled life insurance products?
>
> A. No.
>
> Q. Any life settlement funds?
>
> A. No.
>
> Q. Does it have any investment or any interest in any life insurance policies?
>
> A. Policies?
>
> Q. Yes.
>
> A. No. Oh, sorry, the fund itself? Or the Vancouver Foundation?
>
> Q. The Vancouver Foundation.
>
> A. Yes, it would have a lot of – a lot of exposure to insurance policies.
>
> Q. And how does that work?
>
> A. Many individuals name the foundation as a beneficiary of their life insurance policies?
>
> Q. How about the fund?
>
> A. No…

**November 28, 2019 Discovery**

Q. What steps have you taken to ensure that the Vancouver Foundation is not engaged in the acquisition and disposition of life insurance contracts and management of portfolios of life insurance contracts?

A. One of the roles of the investment committee is to identify and cause to be hired the investment managers who manage the endowment fund. If there was ever a possibility that- well, there's never been an instance where we have considered hiring a manager that was stated in their strategy that they were investing in portfolios of life insurance policies. So there's never been an inkling of there ever being an issue with my activities with the foundation and this agreement.

Q. Now, to be fair, that's just half of the definition of business. The other half is the acquisition and disposition of life insurance contracts. Are you similarly comfortable that none of your investment managers are engaged in the acquisition and disposition of life insurance contracts?

A. Yes.

Q. And that's based entirely on the strategy that they provide to the investment committee at the hiring stage?

A. An ongoing review of their strategies yes.

Q. Can you describe what sort of ongoing review you do.

A. The investment managers report quarterly on their performance and what their strategies are. I have never, again, had an inkling of any of our managers being at all interested or involved in any of the activities stated in that clause.

Q. When they report quarterly, do you get a report of what assets they have under management?

A. It's available to me. I don't routinely review every asset and every fund.

Q. And, in fact, you don't really know whether or not they're engaged in the acquisition or disposition of life insurance contracts or the management of portfolios, do you?

A. I can make an informed decision that they're not. But to confirm that they're not would require an audit of every portfolio every month, and I don't do that, no.

Q. And you said an informed decision. What you're really referring to is an informed assumption. You assume they're not based on the information you have received, but you can't necessarily satisfy yourself that they're not, or you haven't satisfied yourself that they're not. Is that fair?

A. Yes, that's fair.

Q. Who are the external investment managers of the Vancouver Foundation?

A. The ones that could possibly be involved in this industry? Well, actually, I shouldn't – because the way you've asked that question, I'd have to…Phillips Hager & North or RBC Global Asset Management. PIMCO, Fidelity,

2022 BCSC 72 (CanLII)

Burgundy, COV – GOV—I can't remember the rest of their name – Toronto investment manager.

**Vancouver Foundation 2017 Financial Statements**

The Foundation manages equity market risk by allocating the equities component of the investment portfolio across a number of investment managers, with different investment styles and mandates. Equities are valued using published market quotations.

The Foundation is also invested in three multi-strategy funds structured to provide absolute returns not highly correlated to the performance of the public equity and bond markets….

The Foundation is the owner and beneficiary of life insurance policies with face values totaling [$16,386,000] at December 31, 2017. The cash surrender value of these life insurance policies is recorded as an asset.

### *Polar Capital Corporation*

[36]     On October 11, 2011, Mr. Russell sent a confidential copy of AIM's Positive Settlement Fund PowerPoint presentation to Reid Drury of Polar Capital Corporation without having first obtained a signed NDA from Mr. Drury (the "Polar Email"). Mr. Drury indicated a willingness to sign an NDA. Mr. Hrehorsky was aware of Mr. Russell's efforts to engage with Mr. Drury, reflected by the fact that he provided the conference call number for their meeting.

### **Alleged Participation in a Competitive Business**

[37]     AIM alleges that Mr. Russell also breached his duties by establishing a competing business. Mr. Russell denies this.

[38]     AIM's evidence is very thin on this point. AIM's counsel sought to introduce a website printout during the course of the hearing, which counsel suggested was evidence that PHN/RBC had a fund that was competitive with what AIM had intended to create.

[39]     I conclude that this document should not be admitted into evidence. It was not attached to an affidavit, creating both authentication and relevancy problems. There was no reasonable explanation for why it could not have been produced earlier. Furthermore, the late production was clearly prejudicial to Mr. Russell, as he was unable to perform any investigation to confirm whether the noted fund was doing

anything similar to that contemplated by AIM. In any event, on its face, I could see no evidence that the document reflected the establishment of a competitive business. Indeed, the document does not even use the term "life insurance". Given the evidentiary failings, the prejudice to the defendant, and its lack of relevance, the document was not added to the record.

## III.    ANALYSIS

### A. Suitability for Summary Trial

[40]    AIM argued that the case was not appropriate for summary determination. Rule 9-7(15)(a) of the *Supreme Court Civil Rules*, B.C. Reg. 168/2009 (the "Rules"), states:

> (15) On the hearing of a summary trial application, the court may
>
>> (a) grant judgment in favour of any party, either on an issue or generally, unless
>>
>>> (i) the court is unable, on the whole of the evidence before the court on the application, to find the facts necessary to decide the issues of fact or law, or
>>>
>>> (ii) the court is of the opinion that it would be unjust to decide the issues on the application…

[41]    The purpose of a summary trial was enunciated by Chief Justice McEachern in *Inspiration Management Ltd. v. McDermid St. Lawrence Ltd.* (1989)*,* 36 B.C.L.R. (2d) 202 (C.A.) [*Inspiration Management*]. He found that the rule was formulated to expedite the early resolution of cases by authorizing a judge in chambers to deliver judgment in cases in which it was possible for that judge to decide disputed questions of fact based on affidavits, unless it would be unjust to do so: *Inspiration Management* at 211.

[42]    Among the factors a chambers judge may consider in deciding whether it would be unjust to grant judgment on a R. 9-7 application are:

    a)  the amount involved,

    b)  the complexity of the matter,

c)  its urgency,

d)  any  prejudice  likely to arise by reason of delay,

e)  the cost of taking the case forward to a conventional trial in relation to the amount involved,

f)  the course of the proceedings,

g)  any other matters which may arise for consideration;

h)  the risk of wasted time and effort; and

i)  whether credibility is a crucial factor.

*Inspiration Management* at 214; *Xu v. Farden*, 2021 BCSC 1639 at para. 19.

[43]    This list of factors is not exhaustive.

[44]    The fact that there may be a dispute on credibility does not mean that the matter cannot be dealt with by way of summary trial. In *Inspiration Management*, the court stated at 217:

> Notwithstanding the fact that the conflict between these  two deponents could not be resolved on affidavits, the chambers  judge was not required to dismiss the application and  leave  the action to be tried in the usual way. She could have required McGowan and Wheeler to be cross-examined on their affidavits because  such cross-examination would put her in a position to decide this  crucial question and all other questions which would  dispose  of the action, or she could have exercised any one or more of  the  other jurisdictions conferred by R. 18A(5) in an endeavour to bring this relatively straightforward litigation to an early and inexpensive disposition…

[45]    In this particular case, I find the most relevant factors to consider in assessing the test to be as follows:

a)  The matter is not overly complex. At its core, it simply asks whether Mr. Russell communicated confidential information, or commenced a competing business.

2022 BCSC 72 (CanLII)

b) There are limited points of conflict in the evidence.

c) In any event, these issues are not dispositive of any of the key issues. Many of the "credibility issues" raised by AIM relate to the accuracy of statements made by Mr. Russell about the completeness of his document production. This is a hotly contested case. It is not unusual that document production issues will arise, nor that pressure by AIM would result in additional document production even after Mr. Russell first declared his production to be complete. I find that these allegations do not create a credibility issue of sufficient magnitude to undercut the suitability for a summary trial.

d) Although AIM complains that the document production is still not complete, the record before me suggests that production has been comprehensive. I note that AIM raised the status of document production as a basis for an application to adjourn this summary trial. Master Muir rejected the adjournment request. AIM argued that Mr. Russell had not respected Master Harper's October 28, 2020 document production order, but Master Muir disagreed. This decision was not appealed. I find that any attempt to relitigate that issue before me is subject to issue estoppel. The document production issue was squarely at issue between the same parties during the application to adjourn, and AIM's failure to appeal renders that decision final: *British Columbia (Workers' Compensation Board) v. Figliola*, 2011 SCC 52 at para. 27.

e) The cost of a conventional trial will be high, as the parties project a need for a 15-day trial. This length of trial will also create substantial delay, as the parties were considering a March 2023 trial window.

f) The large claim for damages asserted by the plaintiff does favour a full trial. However, I find the weight of this factor is moderated by my analysis of this issue below (i.e., that AIM has provided essentially no proof of harm). Furthermore, the fact that a claim is large is not fatal to its

suitability for summary trial: *Canadian Imperial Bank of Commerce v. Charbonnages de France International S.A.* (1994), 95 B.C.L.R. (2d) 104 (C.A.) at para. 108. Finally, this factor is generally intended to protect the interest of the <u>defendant</u> from being prejudiced by a substantial damages award, not the interests of the <u>plaintiff</u> in proving entitlement to such an award: *British Columbia (Minister of Crown Lands) v. Cressey Development Corp.* (1992), 66 B.C.L.R. (2d) 146 (S.C.) at para. 8. To preclude a defendant from seeking to resolve a matter through summary trial because of a plaintiff's outsized assertion of damages effectively grants the plaintiff a "respondent's veto", contrary to Chief Justice McEachern's caution in *Inspiration Management* at 214.

[46]    Balancing these factors, I find that the court is in a position to make a just and fair determination by way of a summary trial, accepting my responsibility to be "careful but courageous": *Zhao v. Ma*, 2013 BCSC 2174 ["*Zhao*"] at para. 7, citing *Mariotto v. Waterman* (1996), 32 B.C.L.R. (3d) 125 (C.A.) at 126-127.

[47]    With this determination made, it is important to review the obligations of the parties on any such application.

[48]    This is a trial. The parties need to treat it as a trial: *Bayview Construction Ltd. v. Warner*, 2018 BCSC 2576 at paras. 19 and 27. There is no tomorrow. Each party must put their best foot forward: *Council of Canadians with Disabilities v. British Columbia (Attorney General)*, 2020 BCCA 241 at para. 64; *Gichuru v. Pallai,* 2013 BCCA 60 at para. 32; *Everest Canadian Properties Ltd. v. Mallmann*, 2008 BCCA 275 [*Everest Canadian Properties*] at para. 34; *1050017 B.C. Ltd. v. Lee*, 2019 BCSC 1512 at para. 8; *Player v. Janssen-Ortho Inc.*, 2014 BCSC 1122 at para. 165.

[49]    Its adjournment application having failed, AIM was required to put all its cards on the table. At a summary trial, evidence can be weighed: *The Bank of Nova Scotia v. Robertson*, 2001 BCCA 580 at para. 11. Conflicts in the evidence can be resolved: *Zhao* at para. 6. At that point, there was no time left for AIM to collect further evidence or further documents. As the court stated in *Canadian Western*

*Bank Leasing Inc. v. SSC Ventures (No. 98) Ltd.*, 2016 BCSC 223, "where a
respondent fails to make use of pre-trial procedures and frustrates the proper
functioning of the summary trial, they take a serious risk that the court will grant
judgment relying upon the evidence it does have": para. 36. Where an application is
brought by one party, the other may not simply insist on a full trial in the hopes that,
with the benefit of *viva voce* evidence, "something might turn up": *Everest Canadian
Properties* at para. 34.

[50]    AIM's failure to meet its evidentiary burden permeates throughout the
analysis that follows.

### B. Analysis of the Merits

#### 1. The Allegations

[51]    The plaintiff claims for breach of fiduciary duty and contract. In the Amended
Notice of Civil Claim ("ANOCC"), AIM alleges that Mr. Russell breached his duties
by:

    a.    failing to act in the best interest of AIM;

    b.    failing to disclose a material conflict of interest;

    c.    unlawfully disclosing AIM's confidential information for his own
        benefit and in a manner adverse to AIM;

    d.    failing to take steps to mitigate the damage caused by his unlawful
        disclosure of AIM's confidential information;

    e.    engaging in a business similar in nature that that of Arbutus; and

    f.    soliciting business and investors away from Arbutus.

[52]    AIM also alleges Mr. Russell breached the NDA and the Shareholders'
Agreement by:

    a)  unlawfully disclosing AIM's confidential information for his own benefit and
       in a manner adverse to AIM;

    b)  failing to take steps to mitigate the damage caused by his unlawful
       disclosure of AIM's confidential information;

    c)  engaging in a business similar in nature that of AIM; and

2022 BCSC 72 (CanLII)

d)  soliciting business and investors away from AIM.

[53]    AIM summarized the alleged breaches as follows:

a)  the defendant failed to act in the best interests of AIM by disclosing its confidential information;

b)  the defendant disclosed confidential information relating to AIM's business, including financial information, business plans, actuarial modeling, financial projections and tax advice;

c)  the defendant disclosed the aforementioned confidential information to John Russell, Dwight Jefferson, Lily Leung, Brent Sutton, Jason McLean, and the Vancouver Foundation;

d)  the defendant placed himself in a material conflict of interest by joining the investment committee of the Vancouver Foundation; and

e)  the defendant received a financial benefit from the aforementioned disclosure of confidential information.

[54]    In its brief for the summary trial, AIM described its case as follows:

[The] Plaintiff has produced uncontroverted evidence supporting the following propositions:

a.  The Defendant breached his fiduciary duties to the Plaintiff, and the Plaintiff's Shareholders' Agreement, by disclosing confidential information to third parties without first obtaining an executed NDA.

b.  The Defendant breached his fiduciary duties to the Plaintiff, and the Plaintiff's Shareholders' Agreement, by sharing the company's business plans with RBC.

c.  The Defendant breached his fiduciary duties to the Plaintiff, and the Plaintiff's Shareholders' Agreement, by secretly directing the company's affairs such that it did not compete with RBC.

d.  The Defendant breached his fiduciary duties, and the Plaintiff's Shareholders' Agreement, by joining the Vancouver Foundation Investment Committee when the foundation owned insurance policies, and invested in "multi-strategy" / "non-correlated funds similar in design to the Plaintiff's and falling within the definition of its "Business" as defined by the Shareholder's Agreement.

e.  In respect to his involvement in life settlement funds in conflict with the Plaintiff Shareholder's Agreement, in February 2019 the Defendant confirmed in respect to a European life settlement hedge fund's 2018 9.9 % annual return: *"Their experience is slightly better than mine."*

[55]    I note that AIM offered no evidence of improper communications with John Russell, Dwight Jefferson, Lily Leung, or Jason McLean. Mr. Russell denied any improper communication with these individuals. He denied knowing anyone named John Russell. He denied disclosing Confidential Information to Mr. Jefferson or Mr. McLean, and Mr. McLean confirms this evidence. Mr. Russell provided evidence that Ms. Leung signed an NDA. Given the absence of contrary evidence, I find that there is no basis to allege any breach as it relates to these individuals. However, the interactions with the other noted parties are more complex and are therefore addressed in greater detail below.

### 2. The Legal Framework

[56]    A director and officer has the duties established by s. 142 of the *Business Corporations Act*, S.B.C. 2002, c. 57*:*

> 142    (1) A director or officer of a company, when exercising the powers and performing the functions of a director or officer of the company, as the case may be, must
>
>> (a) act honestly and in good faith with a view to the best interests of the company,
>>
>> (b) exercise the care, diligence and skill that a reasonably prudent individual would exercise in comparable circumstances,
>>
>> (c) act in accordance with this Act and the regulations, and
>>
>> (d) subject to paragraphs (a) to (c), act in accordance with the memorandum and articles of the company.

[57]    A fiduciary who negligently or even innocently breaches their duties may still be held liable: *Can. Aero v. O'Malley*, [1974] S.C.R. 592 at 608; *Borrelli v. Chan*, 2018 ONSC 1429 at paras. 1032-1034.

[58]    In terms of establishing a breach of fiduciary duty, in *Pirani v. Pirani*, 2020 BCSC 974, the court stated:

> [160]   The burden is on the plaintiffs to establish the breach of fiduciary duty. However, they submit they have established a *prima facie* breach, and therefore the burden shifts to the Defendants to demonstrate their actions were in the plaintiffs' best interests. They rely on *Louie* at para. 21:
>
>> … there is clear authority to the effect that once a *prima facie* case of conflict of interest has been shown, the onus generally shifts to the

2022 BCSC 72 (CanLII)

> defendant to show that he or she was acting in the best interests of the plaintiff (in this case, the Band.)…

[59]    In terms of the burden of proof in relation to damages for breach of fiduciary duty, the court in *Osborne v. Harper*, 2005 BCSC 1683 stated:

> [6]    In determining the appropriate assessment of damages, I have considered a number of authorities referred to by Mr. Cadman, which indicate that, when the breach of fiduciary duty involves investments which were unsuitable, the court has often awarded the amount of the capital loss and interest but has not awarded damages for lost opportunity to place the capital more effectively.  However, there is some flexibility in determining the proper measure: see, for example, *Huff v. Price* (1990), 76 D.L.R. (4th) 138 (B.C.C.A.) In that case the court said at 149:
>
> > Not only are damages for fraud and breach of fiduciary duty the same for the purposes of calculation, they are also the same for the purposes of the treatment they should receive in relation to the issues of causation and remoteness and they are the same with respect to the discharge of the burden of proof.  <u>Once the fraud or breach of fiduciary duty is shown, then the court assessing damages will not be exacting in requiring proof of the precise loss in circumstances where all reasonable efforts have been made by the plaintiff to establish the amount of the loss and the cause of the loss.  The burden of leading the evidence to disprove the amount of the loss and the cause of the loss will then fall on the defendant who has been found to have been fraudulent or in breach of fiduciary duty.</u>
>
> [Emphasis added.]

[60]    It is also helpful to consider the analysis of this issue in *Huff v. Price* (1990), 51 B.C.L.R. (2d) 282 (C.A.) at 295-296 itself:

> The principle is much the same as the principle discussed in the reasons of Mr. Justice Sopinka, for the Supreme Court of Canada, in *Snell v. Farrell*, [1990] 2 S.C.R. 311, 72 D.L.R. (4th) 289, 107 N.B.R. (2d) 94, 267 A.P.R. 94, 110 N.R. 200, that all the circumstances should be considered, and that if the circumstances justify it a very slight amount of evidence led on the part of the plaintiff will shift the evidentiary burden to the defendant. <u>In a case where fraud or breach of fiduciary duty has been established, the burden of proof in relation to causation and damages will readily be discharged, at least in a *prima facie* way, by the plaintiff.</u>
>
> [Emphasis added.]

[61]    In *Encorp Pacific (Canada) v. Rocky Mountain Return Center Ltd.,* 2008 BCSC 779, Justice Griffin, as she then was, stated as follows:

[128]    The plaintiff cites the maxim that in assessing damages "everything is presumed against the spoiler or wrongdoer", or *omnia praesumuntur contra spoliatorem.* The authorities indicate that where the nature of the wrong itself makes it difficult for the plaintiff to establish a loss or where the critical facts are peculiarly within the defendant's knowledge, this maxim will be invoked for the plaintiff's benefit: *Ticketnet Corp v. Air Canada* (1997), 154 D.L.R. (4th) 271 at para. 85, 105 O.A.C. 87 (Ont. C.A.), leave to appeal to S.C.C. refused, 161 D.L.R. (4th) viii.

[129]    Although the general burden of proof lies upon a plaintiff to prove the loss for which compensation is claimed, courts have consistently held that if a plaintiff establishes that a loss has been suffered, the difficulty of determining the amount of it does not excuse the wrongdoer from paying damages…

[Emphasis added.]

[62]    In Peter M. Neumann and Jeffrey Sack, Q.C.'s, *eText on Wrongful Dismissal and Employment Law* (2020), Lancaster House, 2012 CanLIIDocs 1, the authors state at para.16.4:

The courts have recognized two different approaches to the assessment of damages for breach of fiduciary duty in the employment context:

1. an accounting (disgorging) of the benefits (profits) wrongfully acquired by the defendant fiduciary; or

2. restoring the plaintiff to the position he or she would have been in if the breach had not occurred.

The first approach focuses on the defendant's gain; the second on the plaintiff's loss. The plaintiff may elect between the two…

According to general rules of evidence the party claiming damages for breach of fiduciary duty normally bears the burden of proofing his or her losses on a balance of probabilities: *Reservoir Group Partnership v. 1304613 Ontario Ltd.*, 2009 ONCA 278 (CanLII), at para. 4, citing *Martin v. Goldfarb* 1998 CanLII 4150 (ON CA), at para. 67. There is authority, however, for the proposition that the court assessing damages in cases of fraud and breach of fiduciary duty will not require proof of the precise loss where the plaintiff has made all reasonable efforts to establish the amount and cause of the loss, and that the evidentiary burden may then shift to the defendant to disprove the plaintiff's loss…

[Emphasis added.]

### 3. Application of the Framework

[63]    I conclude that AIM has failed to establish a viable claim for breach of fiduciary duty or breach of contract.

2022 BCSC 72 (CanLII)

### *RBC/PHN*

[64]    It is arguable that Mr. Russell breached his NDA or the Shareholders' Agreement through his interaction with Mr. Sutton in 2010, given that there is no evidence of Mr. Sutton having been required to sign an NDA, as should have been done. However, this particular allegation does not support a claim for damages, as there is no evidence that Mr. Sutton did anything with this information. Nor does this claim survive the application of the limitation period, as discussed below.

[65]    In terms of the Smee Email, AIM was already aware there was a RBC Non-Competition Agreement before the Smee Email issued. AIM should have understood that this agreement might restrict Mr. Russell in certain ways. There is nothing about the content of the Smee Email that required it to be delivered to Mr. Hrehorsky. The fact that RBC would be monitoring compliance with its own agreement is obvious. AIM should have expected this.

[66]    Although AIM alleges that "it is clear that [Mr. Russell] agreed to cooperate with RBC to ensure that AIM was not competing with RBC due to his personal non-competition agreement with the bank", I see no evidence of such cooperation. All parties acted appropriately: Mr. Russell in terms of making sure he was onside with his agreement; Mr. Hrehorsky in providing sufficient detail for RBC to make an informed declaration in that regard; and RBC in confirming that it was comfortable, but that it would maintain a "watching brief". I see no breach arising from the Smee Email.

[67]    I also find that no breach is created by the Hoeschen Emails. Mr. Russell had no obligation to copy Mr. Hrehorsky on every email he sent seeking to expand AIM's business. In this interaction, Mr. Russell was actually seeking to push the limits of his RBC Non-Competition Agreement <u>for AIM's benefit</u>. He was seeing if there might be some way to get any AIM security into an RBC or PHN investment fund. The fact that Mr. Russell was willing to push the boundaries of his agreement <u>advanced</u> AIM's business objectives; it did not <u>breach</u> Mr. Russell's duties to AIM. The worst that could be said is that Mr. Russell did not realize that he could or should push the

boundaries of his agreement <u>sooner</u>. But such a complaint would properly be in the nature of a negligence allegation, which AIM has not advanced.

[68]    Not every breach of duty is a breach of a fiduciary duty. There must generally be some self-interest or breach of loyalty underpinning the claim. It is not intended to be used for claims that the employee simply did not perform their job as effectively as they should have. The B.C. Court of Appeal discusses this point in *Meng Estate v. Liem*, 2019 BCCA 127:

> [33]    Even though Mr. Liem was in a fiduciary relationship with the Mengs, not every potential breach of duty is a breach of fiduciary duty. As Madam Justice Southin (as she then was) reminded us in *Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 at 362 (S.C.), a fiduciary may breach duties owed in contract or negligence without those breaches being transformed into breaches of fiduciary duty:
>
>> Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word "fiduciary" is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But "fiduciary" comes from the Latin "fiducia" meaning "trust". Thus, the adjective, "fiduciary" means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words. The obligation of a solicitor of care and skill is the same obligation of any person who undertakes for reward to carry out a task. One would not assert of an engineer or physician who had given bad advice and from whom common law damages were sought that he was guilty of a breach of fiduciary duty. Why should it be said of a solicitor? I make this point because an allegation of breach of fiduciary duty carries with it the stench of dishonesty — if not of deceit, then of constructive fraud. See *Nocton v. Lord Ashburton*, [1914] A.C. 932 (H.L.). Those who draft pleadings should be careful of words that carry such a connotation.
>
> [34]    The important principle Southin J. articulated has received much favourable judicial comment including by Mr. Justice La Forest in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574 at 597 and by Lord Justice Millett in *Bristol & West Building Society v. Mothew*, [1996] EWCA Civ 533, [1998] Ch. 1 at 16 commenting:

In this sense it is obvious that not every breach of duty by a fiduciary is a breach of fiduciary duty.

[35]    The soundness of the proposition found in *Girardet* is not in doubt. It is not necessary to canvass the principles that serve to distinguish between breaches by a fiduciary that are breaches of fiduciary duty rather than an act of negligence or a breach of contract. Typically, a breach of fiduciary duty captures circumstances in which there is a breach of the duty of loyalty owed by the fiduciary and includes circumstances involving acting in the face of a conflict, preferring a personal interest, taking a secret profit, acting dishonestly or in bad faith, or a variety of similar or related circumstances…

[36]    Counsel for the Mengs drew our attention to a number of cases that suggest that a breach of fiduciary duty does not always require dishonesty or the pursuit of a personal benefit. These cases included, *McMullen*; *Gaudet v. Barrett*, 1998 NSCA 109; *B. (V.) v. Cairns* (2003), 65 O.R. (3d) 343 (Sup. Ct. J.); *Capannelli v. Muroff* (2003), 32 B.L.R. (3d) 178 (Ont. Sup. Ct. J.), aff'd (2004), 3 B.L.R. (4th) 268 (Ont. C.A.); *Annapolis Valley First Nations Band v. Toney*, 2004 FC 1728. I do not disagree with the broad proposition the Mengs advance, but in each of the cases relied on, there were additional features sufficient to establish a breach of fiduciary duty; such as, thwarting a beneficiary's wishes, effectively in bad faith; acting in the face of a conflict; self-dealing; preferring personal interests; or failing to honour the duty of loyalty.

[69]    See also: *Wang v. Laura W. Zhao Personal Real Estate Corporation*, 2021 BCCA 97 at para. 28; *Boal v. International Capital Management Inc.*, 2021 ONSC 651 at paras. 89-100.

[70]    Furthermore, Mr. Hrehorsky's own email to Mr. Smee, dated February 25, 2010, had already expressed largely the same objective as the Hoeschen Emails (i.e., that RBC would potentially put the AIM security into its own funds).

[71]    Finally, even if it was a breach not to forward the Hoeschen Emails to Mr. Hrehorsky to illustrate how Mr. Russell was interpreting the RBC Non-Competition Agreement, I can see no damage that occurred as a result of this breach. I discuss this further below in the context of the damages claim generally.

### *Vancouver Foundation*

[72]    In terms of the 2010 interaction with the Vancouver Foundation's Ms. Fulton, Mr. Russell gives evidence that he believes that an NDA was signed. There is no contrary evidence. As such, I find no breach in this respect.

[73]   In terms of Mr. Russell's role on the VFIC:

a)   In terms of any possible disclosure of Confidential Information, Mr. Russell relies on his position in relation to damages and limitations, considered below.

b)   In terms of the alleged involvement in a competing business, evidence was provided that VFIC never discussed or contemplated that the Vancouver Foundation would make an investment in life insurance through a similar vehicle to that contemplated by AIM. The possibility that the Vancouver Foundation may have held non-correlated funds does not mean that they were in competition with AIM's proposed life insurance securitization business. Mr. Bradley provided evidence that the Vancouver Foundation has not, either directly or indirectly, acquired or disposed of life insurance contracts or managed portfolios of life insurance contracts. In oral argument, AIM accepted that the Vancouver Foundation itself could not be viewed as a competitor, the only thread of evidence proffered by AIM relates to Mr. Russell's potential involvement with competing businesses through his contact with investment managers hired by the VFIC. I address this further below.

### Polar Capital

[74]   The evidence suggests that AIM was aware Mr. Russell was interacting with Polar Capital about a potential investment. AIM should have had the capacity to determine from its own records whether an NDA was signed. Although perhaps a technical breach of the Shareholders' Agreement, I find that this allegation does not support a claim for damages, as discussed below.

### Alleged Involvement in Competitive Businesses

[75]   AIM has failed to show, through documentary evidence or otherwise, that Mr. Russell engaged in a business similar to AIM's, or that he solicited business and investors away from AIM.

2022 BCSC 72 (CanLII)

[76]    Mr. Russell, Mr. Bradley, and Mr. Sutton have each sworn that they did not engage in any business similar to AIM's. That evidence stands up convincingly against AIM's lack of evidence.

[77]    In terms of the Lee Email, I find that Mr. Russell must have been referring to AIM itself, and not a competitor.

[78]    In relation to the Vancouver Foundation, AIM's counsel agreed that the Vancouver Foundation itself cannot reasonably be viewed as a competitor. It was the potential beneficiary of donors' life insurance policies, but it was not involved in any efforts to securitize life insurance policies.

[79]    In terms of the discovery evidence about the Vancouver Foundation's investment advisors, it is clear to me that Mr. Russell was simply being careful in providing his answers. The questions were essentially asking whether it was possible that the investment managers held life insurance investments. There is little that can be drawn from his response, which was essentially, "it's possible". Counsel asked whether Mr. Russell could be sure they had no such investments, and Mr. Russell quite properly said that he could not. The burden is on the plaintiff at first instance to show a breach of duty. It is not for Mr. Russell to prove a negative. There is no evidence that the investment managers were in fact engaged in a competitive business, let alone a competitive business in which Mr. Russell had any involvement.

[80]    In terms of the Colleague Email, which seems to be the genesis of AIM's suspicions of competitive conduct, there is simply nothing in Mr. Russell's email that justified that suspicion. If anything, the email could be seen as helpful to AIM in terms of keeping AIM informed about developments in the industry.

[81]    As for the 2016 Inquiry, again I find no evidence that Mr. Russell was engaged in a competitive business. It is not unusual that Mr. Russell would make inquiries about the status of a company in which he held shares originally priced at $1 million.

[82]    Mr. Russell's February 2019 email commented on the returns of a life settlement hedge fund, in which he stated, "[t]heir experience is slightly better than mine". The logical inference is that he was speaking about his experience <u>with AIM itself</u>, through which he had lost $1 million, and not his experience with a competitor company.

[83]    One would expect that if there were a Russell-backed competitor preventing AIM from becoming the multi-billion dollar enterprise AIM asserts it should have been, AIM would know who that competitor was. Their evidentiary silence on this point is deafening. When Commodore Business Machines met its demise, it was surely with the name "Apple…" falling from its lips. When Blockbuster was killed, all eyes turned to Netflix as the prime suspect. AIM alleges that its business was effectively murdered, but it has no clue who did it. There is not a scrap of evidence showing who this mystery competitor was or, more importantly, how Mr. Russell was behind any corporate assassination.

### Damages

[84]    AIM has failed to show, though documentary evidence or otherwise, that Mr. Russell received any financial benefit from the alleged improper disclosure of confidential information, or from starting a competitive business. There is no evidence of a secret profit that needs to be disgorged.

[85]    AIM has failed to show even the required *prima facie* case of damages arising from a breach of duty by Mr. Russell.

[86]    Where a plaintiff has proved a breach of fiduciary duty, foreseeability does not serve to limit the compensable damages, but liability is not unlimited: *Canson Enterprises Ltd. v. Boughton & Co.*, [1991] 3 S.C.R. 534 at 551 per McLachlin J. (as she was then); *Bronson v. Hewitt*, 2013 BCCA 367 at para. 80. Foreseeability is not a concern in assessing compensation, but it is essential that the losses made good are only those which, on a common sense view of causation, were caused by the breach: *Canson Enterprises* at 556.

[87]    This principle was recently confirmed in the Supreme Court of Canada decision, *Southwind v. Canada*, 2021 SCC 28 . The court stated that "the phrase 'common sense' clarifies that the rules developed in legal causation, such as foreseeability, do not readily apply in equity" and that courts must instead "look to the policy behind compensation for breach of fiduciary duty and determine what remedies will best further that policy": *Southwind* at paras. 73-75. Quoting *Canson*, the court explained as follows at para. 75:

> … "The requirement that the loss must result from the breach of the relevant equitable duty does not negate the fact that 'causality' in the legal sense as limited by foreseeability at the time of breach does not apply in equity" (*Canson*, at p. 552). Professor Rotman explains the same point as follows:
>
>> Each starts with the idea of "but for," "cause-in-fact," or "*sine qua non*," causation. This generally satisfies Equity, but the common law requires more; it demands a finding of materiality or substantial cause to link the impugned activity with the harm to the plaintiff. Further, the common law imports ideas of foreseeability (or reasonable contemplation) and remoteness into its assessment of causality. . . . These other considerations do not readily enter into Equity's assessment of fiduciary accountability.
>
> (*Fiduciary Law* (2005), at p. 634).

[88]    Accordingly, for a court to award damages for a breach of fiduciary obligations, "there must be factual causation: <u>the fiduciary's breach must have caused, in fact, the plaintiff's lost opportunity</u>" (emphasis added): *Southwind* at para. 70. The court stated that "[t]his basic principle, that equitable compensation restores the lost opportunity caused in fact by the fiduciary's breach, is uncontroversial": *Southwind* at para. 70.

[89]    AIM has failed to establish entitlement to relief even applying a broader common sense view of causation of any damages:

a)    There is no evidence of anyone, including the noted representatives of Polar Capital, RBC, PHN, or the Vancouver Foundation doing anything with any Confidential Information.

b)    In relation to the Smee Email:

(i)    there is no evidence that AIM could or would have done anything differently even if it had been made aware of the Smee Email; and

(ii)    there is no direct evidence of Mr. Russell failing to approach former clients out of fear of violating the RBC Non-Competition Agreement.

c)  In relation to the Hoeschen Emails, there is no evidence that Mr. Russell could have obtained further investors even had he interpreted his RBC Non-Competition Agreement more narrowly at the outset.

d)  There is no evidence of investors or life insurance policy owners having been lost to a separate, competing venture in which Mr. Russell was involved.

e)  AIM asserts that the Smith Report is supportive of its damages claim. Mr. Russell raises serious objections to the report, including that it fails to properly set out the factual basis that leads to its ultimate conclusion: R. 11-6(1)(f)(i); *R. v. Gibson*, 2008 SCC 16 at para. 58; *Mazur v. Lucas*, 2010 BCCA 473 at para. 42; *Cowichan Tribes v. Canada (Attorney General)*, 2019 BCSC 1986 at paras. 23-31. The report is very cursory. I agree that it is difficult to assess the basis upon which the conclusion was reached. However, even assuming that the Smith Report is admissible, I find that it would not be adequate support for a damages claim, even at the *prima facie* level. It is a bare present value calculation of an assumed income stream. There is no analysis and no evidence to support how AIM could have achieved the assumed stream of income absent Mr. Russell's breaches. There is no analysis of the reasonableness of the "Cash Flow Report" that AIM provided to Mr. Smith. The complete lack of analysis in the report, and the lack of evidence to support its assumptions, means that it is really not evidence at all: *Ganges Kangro Properties Ltd. v. Shepard*, 2013 BCSC 2536 at paras. 26-27; *Brodeur v. Provincial Health*

> *Services Authority*, 2016 BCSC 968 at paras. 133-136; *Nguyen v. Bhatti*,
> 2017 BCSC 1537 at para. 100; *Cambie Surgeries Corporation v. British*
> *Columbia (Attorney General)*, 2020 BCSC 1310 at paras. 1675-1677.

> f) The weight of the Jan Buckler affidavit is similarly restricted. The reality is
> that AIM never obtained the necessary funding to support its desired
> rating, and so her projections are purely speculative. Further, her affidavit
> was not advanced as an expert opinion. Finally, her conclusion about the
> effect of Mr. Russell's conduct is just that: an opinion or inference on an
> issue that it is ultimately for the court to decide: *R. v. Mohan*, [1994] 2
> S.C.R. 9 at 24-25; *Cogar Estate v. Central Mountain Air Services Ltd.*
> (1993), 72 B.C.L.R. (2d) 292 at para. 26 (C.A.); *Cambie* at paras. 1084.

[90]    Even if AIM's initial evidentiary burden on damages was successfully shifted
to Mr. Russell, Mr. Russell has offered positive evidence regarding the lack of other
competitors, and the limits on the extent of his disclosures. Hence, in the alternative,
I find that his evidence was sufficient to meet any shifted burden.

[91]    AIM argues that it is not necessary for it to establish any damages from its
alleged breaches, as it is in a position to at least advance a claim for nominal
damages, or to rely on the right to recover pursuant to the terms of the
Shareholders' Agreement.

[92]    In its ANOCC, AIM pleads as follows:

> 21. Russell has breached the NDA and the Shareholders Agreement by:
>
> a. unlawfully disclosing AIM's confidential information for his own benefit
>    and in a manner adverse to AIM;
>
> b. failing to take steps to mitigate the damage caused by his unlawful
>    disclosure of AIM's confidential information;
>
> c. engaging in a business similar in nature that that of Arbutus; and
>
> d. soliciting business and investors away from Arbutus.

[93]    I have rejected the allegations in (c) and (d) regarding competitors. In terms of
the disclosure allegation in (a), I find that any improper disclosures were not "for [Mr.

Russell]'s own benefit" and were not made "in a manner adverse to AIM". Hence, that claim is rejected. In relation to (b), I find that there is no duty to mitigate any damages caused since no damage was caused. This disposes of each of the breaches pleaded by the plaintiff.

[94]    To the extent that this conclusion is incorrect, or if the pleading can fairly be read as extending to certain alleged failures to secure an NDA, the court does have the power to award nominal damages : *Canson* at 573; *Bendix Home Systems Ltd. v. Clayton*, [1977] 5 W.W.R. 10 at 30, 35 (B.C.S.C.); *Martin v. Goldfard* (1998), 163 D.L.R. (4th) 639 at para. 75 (Ont. C.A.); *Moser v. Chernoff*, 2017 SKQB 25 at para. 204; *Atlantic Lottery Corp. Inc. v. Babstock*, 2020 SCC 19 at para. 105; *Sharp v. Royal Mutual Funds Inc.*, 2021 BCCA 307 at paras. 161-165. However, such an award is at the court's discretion: *Serban v. Egolf* (1983), 43 B.C.L.R. 209 at 214; *Setoguchi v Uber B.V.*, 2021 ABQB 18 at para. 55; *Place Concorde East Limited Partnership v. Shelter Corporation of Canada* (2006), 270 D.L.R. (4th) 181 (Ont. C.A.) at para. 76; *RINC Consulting Inc. (Roustan Capital) v. Grant Thornton LLP*, 2020 ONCA 182 at paras. 51–55.

[95]    In *RINC Consulting*, the Ontario Court of Appeal discussed the role of nominal damages:

> [52]    It is well established that nominal damages may be awarded where a breach of contract has been established but damages flowing from that breach have not. Nominal damages are a trivial amount – typically one dollar – and serve a symbolic rather than a compensatory purpose: they mark a breach of contract in the same way that a declaration would.,,,

> [53]    The award of nominal damages might be important in some cases. For example, in the context of an ongoing contract in order to clarify future performance obligations, or to vindicate a party's rights. But there are no such special circumstances in this case. The appellants did not bring their action merely to seek a judicial statement or declaration that the respondent had breached the contract; they brought their action with the intention of claiming over $9 million in damages as compensation for losses they claim to have suffered as a result of the respondent's breach of contract.

> [54]    The trial judge declined to exercise his discretion to award nominal damages on the basis that the appellants failed to prove that the respondent's breach of contract caused their losses. The trial judge appears to have thought that the court's discretion to award nominal damages depends on the existence of unquantified damages. It does not.

> [55]    But the trial judge's error is of no moment, for the award of nominal damages would have served no purpose in this case.

[96]    In *Place Concorde East Limited Partnership*, the court found that an award of nominal damages would have been appropriate where the defendant breached the "majority of the commitments that it made" and where breaches were "egregious": paras. 77-78.

[97]    I do not find that any alleged breaches were "egregious", nor did Mr. Russell breach the "majority of the commitments" that he made. I see no special circumstances requiring such an award. An award of nominal damages would serve no purpose here. I would exercise my discretion not to make an award for nominal damages in relation to any allegations. Nominal damages should not be used to sustain or reward an otherwise hopelessly flawed case where the "loss or harm is wholly non-existent": *Setoguchi* at para. 55. I find that such an award would be "contrary to justice, common sense and authority": *Serban* at 214.

### Injunctive and Other Relief

[98]    Although AIM made little reference to this prayer for relief in its submissions, the relief sought includes a request for an injunction restraining Mr. Russell from "further disclosing AIM's confidential information to any third parties…". They also seek a constructive trust and a tracing remedy. I find no basis upon which the court could issue such equitable remedies. Whether to issue an injunction is always an exercise of the court's discretion: *Google Inc. v. Equustek Solutions Inc.*, 2017 SCC 34 at paras. 22-25; *Hirakawa v. Bonner*, 2021 BCCA 304 at para. 34. Here, equity does not support issuing such a forward-looking injunction given that any past breaches are technical and stale: *Chief Mtn. v. H.M.T.Q.*, 2000 BCSC 659 at paras. 15, 30-35; *West Moberly First Nations v. British Columbia*, 2018 BCSC 1835 at paras. 317-324.

[99]    This staleness leads naturally into the next defence raised by Mr. Russell, being the application of the relevant limitation period.

2022 BCSC 72 (CanLII)

### C. Limitations

[100]   Mr. Russell argues in the alternative that most of the claims advanced are barred by a limitation period.

[101]   Both parties agree that the new *Limitation Act*, S.B.C. 2012, c. 13 ("*Limitation Act, 2012*") applies to claims discovered after June 1, 2013, regardless of whether the impugned act or omission occurred prior to the effective date. For claims discoverable before that date, the old *Limitation Act,* R.S.B.C. 1996, c. 266 ("*Limitation Act, 1996*") would apply, which provides for a six-year limitation period.

[102]   The *Limitation Act, 2012* establishes a basic two-year period,  which begins on the day on which a claim is discovered: s. 6(1). A claim is discovered by a person on the first day on which the person knew <u>or reasonably ought to have known</u> all of the following:

> (a) that injury, loss or damage had occurred;
>
> (b) that the injury, loss or damage was caused by or contributed to by an act or omission;
>
> (c) that the act or omission was that of the person against whom the claim is or may be made;
>
> (d) that, having regard to the nature of the injury, loss or damage, a court proceeding would be an appropriate means to seek to remedy the injury, loss or damage.
>
> *Limitation Act, 2012*, s. 8.

[103]   AIM commenced its action in September 2018, almost six years after Mr. Russell resigned his positions with the company.

[104]   Although the limitation period does not begin to run until the claimant knows the material facts upon which a cause of action is founded, the claimant must be diligent in discovering those facts. Willful blindness as to the existence of damages will not be an effective answer to a limitation defence: *Roberts v. E. Sands & Associates Inc.,* 2014 BCCA 122 at para. 34.

2022 BCSC 72 (CanLII)

[105]   The material facts underpinning the plaintiff's allegations, subject to certain limited exceptions, were discoverable at points in time that trigger the limitation period defence. Specifically:

a)   The fact that Mr. Russell was bound by the RBC Non-Competition Agreement was known to AIM as early as 2010. By definition, this agreement restricted what Mr. Russell could do. AIM could have requested a copy of the agreement. AIM could also have discussed with Mr. Russell how he was interpreting that agreement at any time. This claim was discoverable prior to September 2012, and hence is barred under the *Limitation Act, 1996*.

b)   Mr. Russell's interaction with Mr. Sutton was in October 2010. Mr. Hrehorsky was forwarded a copy of an email during that interaction that should have put him on notice that there had been a disclosure of at least some information. Mr. Hrehorsky had the ability to discover from AIM's files at that time, or at any time prior to September 2016, whether an NDA had been signed. This claim is barred regardless of which *Limitation Act* applies.

c)   Any disclosure of Confidential Information to John Russell, Dwight Jefferson, Lily Leung, or Jason McLean would presumably have occurred prior to the end of Mr. Russell's tenure in October 2012. There is no evidence that any disclosures happened between September 17, 2012, and his October 2012 departure, during which period the *Limitation Act, 1996* would have applied and arguably would have come within the six year limitation period, given the September 17, 2018 filing. Mr. Russell stopped working for AIM in 2012. I find that AIM would have been in a position to verify the presence or absence of any NDAs for any of the parties to whom it has been alleged that Confidential Information was provided by at least September 17, 2012, and hence any claim arising therefrom is outside the old six year limitation period.

d)  To the extent that any alleged wrongful conduct in relation to the
    Vancouver Foundation may have occurred in the September 2012-June
    2013 period, these claims would not be barred by the old limitation period.
    That said, I have rejected the claim relating to the Vancouver Foundation
    on other grounds.

e)  To the extent that any involvement in a competing business occurred
    between September 2012 and June 2013, while that claim may not be
    barred by the old limitation period, I have rejected the claim on the merits
    above.

f)  In relation to conduct after June 2013, the new two-year limitation period
    would apply.

g)  Mr. Russell's work with the Vancouver Foundation was publicly known,
    and could have been discovered with due diligence well before September
    2016, the date which is two years before AIM's filing. The activities of any
    potential competitors who were working as investment managers for the
    Vancouver Foundation would have been discoverable at any point from
    the beginning of Mr. Russell's tenure on the Investment Committee. There
    is no evidence that any of these Fund Managers were hiding competitive
    business activities.

h)  AIM suggests that it was only with the 2016 Inquiry that it could have
    discovered that it had a claim. I disagree. As noted above, I have found
    that the material facts supporting almost all of AIM's claims were
    discoverable by 2013. As recently noted by Moldaver J. in *Grant Thornton
    LLP v. New Brunswick*, 2021 SCC 31, "a claim is discovered when a
    plaintiff has knowledge, actual or constructive, of the material facts upon
    which a plausible inference of liability… can be drawn": para. 42.
    Particularly given AIM's claims for nominal damages and injunctive relief,
    it was not necessary for AIM to wait for actual damage to occur before
    commencing litigation: *Sohal v. Lezama*, 2019 BCSC 1709 at para. 49,

2022 BCSC 72 (CanLII)

aff'd 2021 BCCA 40. In any event, there is no evidence that AIM engaged in active business development after September 2016. As such, any damage to its business presumably occurred and been discoverable prior to that date, which would put the claims outside the two year limitation period.

i)   There is no fraud claim, no claim to recover trust property, and no viable allegation of wilful concealment or wilful misleading on Mr. Russell's part that might extend the limitation period: *Limitation Act*, *2012,* s. 12. In any event, AIM did not advance an argument that s. 12 applied.

j)   AIM presented no evidence of Mr. Russell's participation in a competitive business that could only have been discovered after September 2016.

k)   The Smee, Hoeschen, and Polar Emails were only provided to AIM after September 2016, as part of this litigation. As such, it is arguable that any claims arising from this material would not be barred by a limitation period. However, I have found either no breach or no damage created by these interactions.

## V.    CONCLUSION

[106]  All of AIM's claims fail due to either:

a)   a lack of evidence of breach;

b)   a lack of evidence of damage; or

c)   the application of the relevant limitation period.

[107]  As such, the claim must be dismissed.

[108]  If the parties are unable to agree on costs, they may make written submissions of 10 pages or less on the following schedule:

a)   AIM: within 30 days;

b)  Mr. Russell: within 30 days of delivery of AIM's submissions; and

c)  AIM's Reply: within 15 days of delivery of Mr. Russell's submissions.

_____
"The Honourable Mr. Justice Branch"

## **TAB 2**

*Grant Thornton LLP v. New Brunswick*, 2021 SCC 31 (Can.)

# Supreme Court Judgments

## Grant Thornton LLP v. New Brunswick

|  |  |
|---|---|
| Collection: | Supreme Court Judgments |
| Date: | 2021-07-29 |
| Neutral citation: | 2021 SCC 31 |
| Report: | [2021] 2 SCR 704 |
| Case number: | 39182 |
| Judges: | Moldaver, Michael J.; Karakatsanis, Andromache; Côté, Suzanne; Brown, Russell; Rowe, Malcolm; Martin, Sheilah; Kasirer, Nicholas |
| On appeal from: | New Brunswick |
| Notes: | Case in Brief<br>SCC Case Information |



**SUPREME COURT OF CANADA**

**CITATION:** Grant Thornton LLP *v.* New Brunswick, 2021 SCC 31, [2021] 2 S.C.R. 704

**APPEAL HEARD:** March 24, 2021
**JUDGMENT RENDERED:** July 29, 2021
**DOCKET:** 39182

**BETWEEN:**

### Grant Thornton LLP and Kent M. Ostridge
Appellants

and

### Province of New Brunswick
Respondent

**AND BETWEEN:**

### Grant Thornton International Ltd.
Appellant

and

### Province of New Brunswick
Respondent

- and -

### Chartered Professional Accountants of Canada
Intervener

**CORAM:** Moldaver, Karakatsanis, Côté, Brown, Rowe, Martin and Kasirer JJ.

**REASONS FOR JUDGMENT:**
(paras. 1 to 64)

Moldaver J. (Karakatsanis, Côté, Brown, Rowe, Martin and Kasirer JJ. concurring)

_____

**Grant Thornton LLP and Kent M. Ostridge**

*Appellants*

*v.*

**Province of New Brunswick**

*Respondent*

- and -

**Grant Thornton International Ltd.**

*Appellant*

*v.*

**Province of New Brunswick**                                    *Respondent*

and

**Chartered Professional Accountants of Canada**                 *Intervener*

**Indexed as: Grant Thornton LLP *v.* New Brunswick**

**2021 SCC 31**

File No.: 39182.

2021: March 24; 2021: July 29.

Present: Moldaver, Karakatsanis, Côté, Brown, Rowe, Martin and Kasirer JJ.

ON APPEAL FROM THE COURT OF APPEAL FOR NEW BRUNSWICK

       *Limitation of actions — Discoverability — Requisite degree of knowledge to discover claim — Negligence — Province delivering loan guarantees to company based on auditor's report — Company running out of working capital months after receiving loan from bank — Province paying out guarantees — Province commencing negligence claim against auditor — Auditor seeking summary judgment on basis that claim commenced after two-year statutory limitation period — Standard to be applied in determining whether plaintiff has requisite degree of knowledge to discover claim — Whether province discovered negligence claim against auditor — Whether claim statute-barred — Limitation of Actions Act, S.N.B. 2009, c. L-8.5, s. 5(1)(a), (2).*

       In 2008, a New Brunswick-based company sought loans from a bank, but it needed loan guarantees from the province. The province agreed to $50 million in loan guarantees, conditional upon the company

subjecting itself to an external review of its assets by its auditor. The auditor opined in a report that the company's financial statements presented fairly, in all material respects, the company's financial position in accordance with generally accepted accounting principles. Relying upon that report, the province executed and delivered the loan guarantees, which, in turn, enabled the company to borrow funds from the bank. When the company ran out of working capital four months after receiving the loan guarantees from the province, the bank called on the province to pay out the loan guarantees, which it did on March 18, 2010. The province then retained another accounting and auditing firm to review the company's financial position. The other firm's report was issued in draft on February 4, 2011, and opined that the company's financial statements had not, in fact, been prepared in conformity with generally accepted accounting principles. Specifically, the other firm estimated that the company's assets and net earnings were overstated by a material amount. Those misstatements had not been identified by the auditor in its report.

On June 23, 2014, the province commenced a claim against the auditor, alleging negligence. The auditor moved for summary judgment to have the claim dismissed as statute-barred by virtue of the limitation period under s. 5(1)(a) of the provincial *Limitation of Actions Act* ("*LAA*"), which provides that no claim shall be brought after two years from the day on which the claim was discovered. The motions judge held that, properly interpreted, s. 5(2) of the *LAA*, which sets out when a claim is discovered, required that the province knew or ought to have known that it had *prima facie* grounds to infer that it had a potential cause of action against the auditor. He granted summary judgment and struck the province's action, finding that the province had the requisite knowledge by March 18, 2010, more than two years before it commenced its claim. The Court of Appeal allowed the province's appeal and set aside the motion judge's judgment. It rejected the standard used by the motions judge and held that the governing standard was whether a plaintiff knows or ought reasonably to have known facts that confer a legally enforceable right to a remedy, which the court found can only exist if the plaintiff has knowledge of each constituent element of the claim. Applying that standard, it found that the limitation period had not been triggered because the province had not yet discovered its claim.

*Held*: The appeals should be allowed and the motions judge's judgment restored.

The standard to be applied in determining whether a plaintiff has the requisite degree of knowledge to discover a claim under s. 5(2) of the *LAA*, thereby triggering the two-year limitation period in s. 5(1)(a), is

whether the plaintiff has knowledge, actual or constructive, of the material facts upon which a plausible inference of liability on the defendant's part can be drawn. Applying this standard in the present case, the province discovered its claim against the auditor on February 4, 2011. By then, it knew or ought to have known that a loss occurred and that the loss was caused in whole or in part by conduct which the auditor had been retained to detect. This was sufficient to draw a plausible inference that the auditor had been negligent. Since the province did not bring its claim until June 23, 2014, more than two years later, its claim is therefore statute-barred.

In order to properly set the standard, two distinct inquiries are required. The first inquiry asks whether, in determining if a statutory limitation period has been triggered, the plaintiff's state of knowledge is to be assessed in the same manner as the common law rule of discoverability. Under that rule, a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence. The common law rule of discoverability does not apply to every statutory limitation period. Rather, it is an interpretive tool for construing limitations statutes and, as such, it can be ousted by clear legislative language. Assessing whether a legislature has codified, limited or ousted the common law rule is a matter of statutory interpretation. Section 5(1)(a) and (2) of the *LAA* does not contain any language ousting or limiting the common law rule; rather, it codifies it. This interpretation is supported by the words of s. 5, read in their entire context and in their grammatical and ordinary sense harmoniously with the *LAA*'s scheme and object, and the intention of the legislature. Accordingly, as established by the rule of discoverability and the *LAA*, the limitation period is triggered when the plaintiff discovers or ought to have discovered, through the exercise of reasonable diligence, the material facts on which the claim is based.

The second inquiry relates to the particular degree of knowledge required to discover a claim. A claim is discovered when a plaintiff has knowledge, actual or constructive, of the material facts upon which a plausible inference of liability on the defendant's part can be drawn. This approach remains faithful to the common law rule of discoverability, which recognizes that it is unfair to deprive a plaintiff from bringing a claim before it can reasonably be expected to know the claim exists. It also accords with s. 5 of the *LAA*, promotes consistency and ensures that the degree of knowledge needed to discover a claim is more than mere suspicion or speculation. At the same time, it ensures the standard does not rise so high as to require certainty of liability or

perfect knowledge. A plausible inference of liability is enough; it strikes the equitable balance of interests that the common law rule of discoverability seeks to achieve.

The material facts that must be actually or constructively known are generally set out in the limitation statute. In the *LAA*, they are listed in s. 5(2)(a) to (c). A claim is discovered when the plaintiff has actual or constructive knowledge that: (a) the injury, loss or damage occurred; (b) the injury loss or damage was caused by or contributed to by an act or omission; and (c) the act or omission was that of the defendant. This list is cumulative. In assessing the plaintiff's state of knowledge, both direct and circumstantial evidence can be used. A plaintiff will have constructive knowledge when the evidence shows that the plaintiff ought to have discovered the material facts by exercising reasonable diligence. Finally, the governing standard requires the plaintiff to be able to draw a plausible inference of liability on the part of the defendant from the material facts that are actually or constructively known. This means that in a negligence claim, a plaintiff does not need knowledge that the defendant owed it a duty of care or that the defendant's act or omission breached the applicable standard of care. All that is required is actual or constructive knowledge of the material facts from which a plausible inference can be made that the defendant acted negligently.

In the instant case, the province had actual or constructive knowledge of the material facts — namely, that a loss occurred and that the loss was caused or contributed to by an act or omission of the auditor — when it received the draft report from the other firm on February 4, 2011. The auditor's act or omission was issuing its report with respect to the company's financial statements, despite those statements not being prepared in accordance with generally accepted accounting principles and not fairly representing, in all material respects, the company's financial position. This act or omission caused or contributed to the province's loss because the province executed the $50 million in loan guarantees in reliance on the auditor's representations. Nothing more was needed to draw a plausible inference of negligence. The province's claim is therefore statute-barred by s. 5(1)(a) of the *LAA*.

**Cases Cited**

Referred to: *Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147; *Kamloops (City of) v. Nielsen*, [1984] 2 S.C.R. 2; *Ryan v. Moore*, 2005 SCC 38, [2005] 2 S.C.R. 53; *M. (K.) v. M. (H.)*, [1992] 3 S.C.R. 6;

*Peixeiro v. Haberman*, [1997] 3 S.C.R. 549; *Pioneer Corp. v. Godfrey*, 2019 SCC  42, [2019] 3 S.C.R. 295; *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27; *Galota v. Festival Hall Developments Ltd.*, 2016 ONCA 585, 133 O.R. (3d) 35; *De Shazo v. Nations Energy Co.*, 2005 ABCA 241, 48 Alta. L.R. (4th) 25; *Jardine v. Saskatoon Police Service*, 2017 SKQB 217; *Crombie Property Holdings Ltd. v. McColl-Frontenac Inc.*, 2017 ONCA 16, 406 D.L.R. (4th) 252; *Brown v. Wahl*, 2015 ONCA 778, 128 O.R. (3d) 583; *Lawless v. Anderson*, 2011 ONCA 102, 276 O.A.C. 75; *Insurance Corporation of British Columbia v. Mehat*, 2018 BCCA 242, 11 B.C.L.R. (6th) 217; *Kowal v. Shyiak*, 2012 ONCA 512, 296 O.A.C. 352; *Hill v. South Alberta Land Registration District* (1993), 8 Alta. L.R. (3d) 379; *HOOPP Realty Inc. v. Emery Jamieson LLP*, 2018 ABQB 276, 27 C.P.C. (8th) 83; *K.L.B. v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403.

**Statutes and Regulations Cited**

*Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3.

*Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36.

*Limitation of Actions Act*, S.N.B. 2009, c. L-8.5, ss. 1(1) "claim", 5.

**Authors Cited**

New Brunswick. Legislative Assembly. *Journal of Debates (Hansard)*, 3rd Sess., 56th Assem., June 17, 2009, p. 50.

New Brunswick. Office of the Attorney General. *Commentary on Bill 28: Limitation of Actions Act*, January 2009 (online: https://www.gnb.ca/legis/bill/pdf/56/3/Limitations-e.pdf; archived version: https://www.scc-csc.ca/cso-dce/2021SCC-CSC31_1_eng.pdf).

APPEALS from a judgment of the New Brunswick Court of Appeal (Drapeau, Quigg and Green JJ.A.), 2020 NBCA 18, 54 C.P.C. (8th) 271, [2020] N.B.J. No. 70 (QL), 2020 CarswellNB 140 (WL Can.), setting aside a decision of Grant J., 2019 NBQB 36, [2019] N.B.J. No. 76 (QL), 2019 CarswellNB 151 (WL Can.). Appeals allowed.

*Peter Griffin* and *Anthony S. Richardson*, for the appellants Grant Thornton LLP and Kent M. Ostridge.

*Steven R. Barnett*, *Q.C.*, and *J. Charles Foster*, *Q.C.*, for the appellant Grant Thornton International Ltd.

*Josie H. Marks* and *Frederick C. McElman*, *Q.C.*, for the respondent.

*Guy J. Pratte*, for the intervener.

The judgment of the Court was delivered by

Moldaver J. —

I.     Overview

[1]        On June 23, 2014, the Province of New Brunswick ("Province") filed a statement of claim against Grant Thornton LLP, Kent M. Ostridge and Grant Thornton International Ltd. (collectively, "Grant Thornton"), seeking damages for negligence. In response, Grant Thornton brought summary judgment motions to have the Province's claim dismissed as statute-barred by virtue of the two-year limitation period under s. 5(1)(a) of the *Limitation of Actions Act*, S.N.B. 2009, c. L-8.5 ("*LAA*").

[2]        The motions judge granted summary judgment in favour of Grant Thornton. He found that s. 5(1) (a) barred the claim because the Province knew or ought to have known that it had *prima facie* grounds to infer that it had a potential claim against Grant Thornton more than two years before commencing its claim. The Court of Appeal overturned that decision. It rejected the "*prima facie* grounds" standard used by the motions judge and held instead that the governing standard is whether a plaintiff knows or ought reasonably to have known facts that confer a legally enforceable right to a remedy. That right, the court explained, only exists if the plaintiff has knowledge of each constituent element of the claim. Applying this standard, the court held that the two-year limitation period in s. 5(1)(a) had not been triggered because the Province had not yet discovered its claim (even though the Province had issued a 106-paragraph statement of claim almost six years before receiving the reasons of the Court of Appeal). Grant Thornton now appeals to this Court.

[3]         This case turns on the standard to be applied in determining whether a plaintiff has the requisite degree of knowledge to discover a claim under s. 5(2), thereby triggering the two-year limitation period in s. 5(1)(a). Respectfully, the Court of Appeal adopted too high a standard. In my view, a claim is discovered when the plaintiff has knowledge, actual or constructive, of the material facts upon which a plausible inference of liability on the defendant's part can be drawn. It follows from this standard that a plaintiff does not need knowledge of all the constituent elements of a claim to discover that claim.

[4]         In the present case, I am satisfied that the Province discovered its claim against Grant Thornton on February 4, 2011. By then, the Province knew or ought to have known that a loss occurred and that the loss was caused in whole or in part by conduct which Grant Thornton had been retained to detect. This was sufficient to draw a plausible inference that Grant Thornton had been negligent. Although the Province had this knowledge by February 4, 2011, it did not bring its claim until June 23, 2014, more than two years later. The claim is therefore statute-barred by s. 5(1)(a) of the *LAA*. I would accordingly allow the appeal brought by Grant Thornton LLP and Kent M. Ostridge and the appeal brought by Grant Thornton International Ltd., set aside the Court of Appeal's judgment, and restore the motions judge's judgment.

II.     Statement of Facts

[5]         In the fall of 2008, the Atcon Group of Companies ("Atcon") — a New Brunswick-based provider of construction, energy, industrial and waste management services — was having difficulties meeting its financial obligations. The company sought loans from the Bank of Nova Scotia, but it needed loan guarantees from the Province to obtain them.

[6]         On April 24, 2009, the Province agreed to a total of $50 million in loan guarantees, conditional upon Atcon subjecting itself to an external review of its assets by an auditing firm. The Province agreed that Atcon's auditor, Grant Thornton, could perform the external review.

[7]         A month later, on May 19, 2009, Grant Thornton delivered a letter to the Province ("Opinion Letter") detailing the work it had done in performing its audit of Atcon's consolidated financial statements for the fiscal year ending January 31, 2009 ("F2009"). In the letter, Grant Thornton stated that it was carrying out its

audit in accordance with Generally Accepted Auditing Standards and that it had some outstanding matters to complete before issuing its audit report ("Unqualified Auditors' Report").

[8]        The Unqualified Auditors' Report was delivered to the Province on June 18, 2009. In it, Grant Thornton confirmed that it had reviewed Atcon's financial statements for F2009 in accordance with Generally Accepted Auditing Standards, which among other things, required it to "plan and perform [the] audit to obtain reasonable assurance whether the financial statements [were] free of material misstatement" (R.R., at p. 26). Having done so, Grant Thornton opined that Atcon's statements presented "fairly, in all material respects, the financial position of [Atcon] as at January 31, 2009 and the results of its operations and its cash flows for the year then ended in accordance with Canadian generally accepted accounting principles" (*ibid*.). Grant Thornton attached Atcon's audited financial statements for F2009 to the report.

[9]        That satisfied the Province. On June 30, 2009, relying upon the Opinion Letter, the Unqualified Auditors' Report and the audited financial statements for F2009, the Province executed and delivered the loan guarantees in the amount of $50 million to Atcon, which, in turn, enabled the company to borrow funds from the Bank of Nova Scotia.

[10]        Atcon's financial difficulties persisted. Operating losses and the shutdown of the company's Western Canada operations resulted in Atcon running out of working capital by October 2009 — a mere four months after receiving the loan guarantees from the Province.

[11]        Shortly thereafter, the Bank of Nova Scotia applied for a receivership order with respect to Atcon under the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c. B-3, and sought relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36. On March 1, 2010, the New Brunswick Court of Queen's Bench granted the Bank's applications. A few days later, the Bank called on the Province to pay out the loan guarantees. On March 18, 2010, the Province did — all $50 million.

[12]        The proceedings against Atcon and the Bank's call on the loan guarantees concerned the Province. Accordingly, in June 2010, it retained RSM Richter Inc. ("Richter"), an accounting and auditing firm, to review Atcon's financial position for F2009, and to issue a report on its findings ("Richter Report").

[13]         The Richter Report was issued in draft on February 4, 2011, and finalized on November 30, 2012. Save for some grammatical corrections, the final report was identical to the draft report.

[14]         The findings in the Richter Report differed from those in the Unqualified Auditors' Report produced by Grant Thornton. Importantly, unlike Grant Thornton, Richter opined that Atcon's financial statements for F2009 had not, in fact, been prepared in conformity with Generally Accepted Accounting Principles. Richter formed this opinion based on what it described to be a "systematic approach" by Atcon's management to "overstate assets, revenues and profits, [and] understate liabilities, expenses and losses" (A.R., vol. II, at p. 207). Specifically, the report identified various errors in the financial statements, which were considered to be "material" because it is "probable" that the errors would have influenced the decision of the person relying on the financial statements (*ibid*., at p. 136 (emphasis deleted)). In that regard, Richter estimated that Atcon's F2009 assets and net earnings were overstated by a material amount, ranging between $28.3 million and $35.4 million. Notably, in Grant Thornton's audit of Atcon, materiality was set at $1.2 million, which placed the misstatements identified by Richter far in excess of the materiality set by Grant Thornton for its audit. Those misstatements, however, had not been identified by Grant Thornton in the Unqualified Auditors' Report.

[15]         This information triggered a response from the Deputy Minister of Economic Development. In a letter to the New Brunswick Institute of Chartered Accountants dated December 21, 2012, the Deputy Minister advised the Institute that the Province was proceeding with a formal complaint against Grant Thornton. A copy of the Richter Report was attached.

[16]         A year and a half later, on June 23, 2014, the Province commenced its claim alleging negligence against Grant Thornton. In its defence, Grant Thornton denied the allegations. Further, it moved to have the Province's claim summarily dismissed on the basis that it was barred by the two-year limitation period under s. 5(1)(a) of the *LAA*.

III.    Relevant Statutory Provisions

[17]         The relevant provisions of the *LAA* are:

**Definitions and interpretation**

**1**(1) The following definitions apply in this Act.

"claim" means a claim to remedy the injury, loss or damage that occurred as a result of an act or omission.

. . .

**General limitation periods**

**5**(1) Unless otherwise provided in this Act, no claim shall be brought after the earlier of

    (a) two years from the day on which the claim is discovered, and

    (b) fifteen years from the day on which the act or omission on which the claim is based occurred.

**5**(2) A claim is discovered on the day on which the claimant first knew or ought reasonably to have known

    (a) that the injury, loss or damage had occurred,

    (b) that the injury, loss or damage was caused by or contributed to by an act or omission, and
    (c) that the act or omission was that of the defendant.

<u>IV.    Proceedings Below</u>

A.    *Court of Queen's Bench of New Brunswick, 2019 NBQB 36 (Grant J.)*

[18]         The main issue before the motions judge was when, if ever, the Province discovered its claim against Grant Thornton under s. 5 of the *LAA*. The answer, in his view, lay in the proper interpretation of s. 5(2).

[19]         Under s. 5(2), the question, as he saw it, was whether the Province "knew or ought to have known that it had *prima facie* grounds to infer that it had a potential cause of action against the defendants" (para. 108 (CanLII)). If the Province had this knowledge more than two years before commencing its claim on June 23, 2014, then the claim was statute-barred by operation of the two-year limitation period applicable under s. 5(1) (a).

[20]         In the opinion of the motions judge, the Province had the requisite knowledge by March 18, 2010. By then, it had suffered a loss by paying $50 million to the Bank of Nova Scotia and it could reasonably have inferred that Grant Thornton caused or contributed to the act or omission giving rise to this loss. This, in the

motions judge's view, gave the Province *prima facie* grounds to infer the existence of a potential claim against Grant Thornton. In the alternative, he found that the Province had the requisite knowledge after it received the draft Richter Report on February 4, 2011. Either way, he concluded that the Province had failed to commence its claim within the two-year limitation period applicable under s. 5(1)(a). Hence, the claim was statute-barred.

[21]         In the result, the motions judge granted summary judgment in favour of Grant Thornton and dismissed the Province's claim.

B.      *Court of Appeal of New Brunswick, 2020 NBCA 18, 54 C.P.C. (8th) 271 (Drapeau, Quigg and Green JJ.A.)*

[22]         The Court of Appeal unanimously allowed the appeal. It held that the motions judge "applied the wrong legal test for s. 5(1)(a) purposes" and "made a palpable and overriding error in finding the Province discovered its claim more than two years before proceedings were commenced" (paras. 81 and 127).

[23]         Regarding the legal test, the court rejected the motions judge's test — "*prima facie* grounds to infer . . . a potential cause of action" — on the basis that it was not stringent enough (paras. 6-7 (emphasis deleted), quoting trial reasons, at para. 108). Instead, the court set out what it believed to be the correct and "more exacting" test, namely that "the two-year limitation period begins to run the day after the plaintiff knows or ought reasonably to have known facts that confer a legally enforceable right to a remedy" (para. 7). In claims for negligence, the court explained, "that right only exists if the defendant was under a relevant duty of care and its loss-causing act or omission fell below the applicable standard of care" (para. 7).

[24]         Applying that test, the court found that the two-year limitation period under s. 5(1)(a) had not been triggered because the Province had not yet discovered its claim. Specifically, the Province could not know whether Grant Thornton's audit of Atcon's financial statements for F2009 fell below the applicable standard of care by failing to comply with Generally Accepted Auditing Standards. According to the court, this essential component of the Province's negligence claim could not be known unless and until Grant Thornton produced its audit-related files for the Province's inspection — something it had consistently refused to do. Without those files, "the Province may suspect and allege, but it does not know, actually or constructively, the F2009 audit was non-compliant with Generally Accepted Auditing Standards" (para. 8). The motions judge's failure to consider

the absence of evidence on that issue constituted a "palpable and overriding error in the assessment of the evidential record" (*ibid*.). This accounted for his erroneous finding that the Province discovered its claim on either March 18, 2010, or February 4, 2011.

[25]        On this basis, the court allowed the appeal and set aside the summary judgment order.

## V.    Issues

[26]        I would state the main issues in this case as follows:

(1)        What is the standard to be applied in determining whether a plaintiff has the requisite degree of knowledge to discover a claim under s. 5(2), so as to trigger the limitation period in s. 5(1)(a)?

(2)        When, if ever, did the Province discover its negligence claim against Grant Thornton?

## VI.    Analysis

### A.    *The Applicable Standard*

[27]        Section 5(1)(a) of the *LAA* sets out the limitation period that controls this case: a claim must be commenced two years from the day on which the claim is discovered. As the text of s. 5(2) makes plain, a claim is discovered when a plaintiff knows or ought reasonably to have known that an injury, loss or damage occurred, which was caused or contributed to by an act or omission of the defendant.

[28]        This case turns on the standard to be applied in determining whether and when a plaintiff has the requisite degree of knowledge to discover a claim under s. 5(2), thereby triggering the two-year limitation period under s. 5(1)(a). In order to properly set the standard, two distinct inquiries are required. First, in assessing if the limitation period in s. 5(1)(a) has been triggered, is the plaintiff's state of knowledge to be assessed in the same manner as the common law rule of discoverability? Second, what is the particular degree of knowledge required to discover a claim under s. 5(2)?

<u>(1)</u>    <u>Codification of the Common Law Rule of Discoverability</u>

[29]        Section 5 of the *LAA* operates against the backdrop of a common law discoverability rule that is well-established. Under that rule, "a cause of action arises for purposes of a limitation period when the material facts on which it is based have been discovered or ought to have been discovered by the plaintiff by the exercise of reasonable diligence" (*Central Trust Co. v. Rafuse*, [1986] 2 S.C.R. 147, at p. 224, citing *Kamloops (City of) v. Nielsen*, [1984] 2 S.C.R. 2; see also *Ryan v. Moore*, 2005 SCC 38, [2005] 2 S.C.R. 53, at paras. 2 and 22). This rule has its origins in equity. In particular, it seeks to balance the three rationales for imposing limitation periods — the guarantee of repose, the desire to foreclose claims based on stale evidence and the expectation that a plaintiff will start a claim in a timely manner (*M. (K.) v. M. (H.)*, [1992] 3 S.C.R. 6, at pp. 29-30) — with the need to avoid the injustice of precluding a claim before the plaintiff even has knowledge of its existence (*Peixeiro v. Haberman,* [1997] 3 S.C.R. 549, at para. 36).

[30]        Though a "general rule", the common law rule does not apply to every statutory limitation period (*Ryan*, at para. 23, quoting *Rafuse*, at p. 224). Rather, it is an interpretive tool for construing limitations statutes and, as such, it can be ousted by clear legislative language (*Pioneer Corp. v. Godfrey*, 2019 SCC 42, [2019] 3 S.C.R. 295, at para. 32). In that regard, "many provincial legislatures have chosen to enact statutory limitation periods that codify, limit or oust entirely discoverability's application" (*ibid.*). Assessing whether a provincial legislature has codified, limited or ousted the common law rule is a matter of statutory interpretation (*ibid.*, at para. 42, citing *Rizzo & Rizzo Shoes Ltd. (Re)*, [1998] 1 S.C.R. 27, at para. 21).

[31]        In this case, Grant Thornton argues that s. 5(1)(a) and (2) ousts or, at least, limits the common law discoverability rule. In its view, the New Brunswick legislature provided for the limitation period set out in s. 5(1)(a) to begin running when a plaintiff has a lower degree of knowledge than the common law rule requires, namely "a sufficient basis, including by making reasonable inferences based on their knowledge of having suffered a loss, to plead an action against the defendant and start the civil litigation process" (A.F., Grant Thornton LLP and Kent M. Ostridge, at para. 87).

[32]        With respect, I disagree. In my view, the New Brunswick legislature chose to codify the common law rule in s. 5(1)(a) and (2) of the *LAA*. This interpretation is supported by the words of s. 5, read in their entire

context and in their grammatical and ordinary sense harmoniously with the scheme of the *LAA*, the object of the *LAA*, and the intention of the legislature (see *Rizzo & Rizzo*, at para. 21).

[33]        As set out at para. 17 above, the text of s. 5 of the *LAA* reads as follows :

**General limitation periods**

**5**(1) Unless otherwise provided in this Act, no claim shall be brought after the earlier of

(a) two years from the day on which the claim is discovered, and

(b) fifteen years from the day on which the act or omission on which the claim is based occurred.

**5**(2) A claim is discovered on the day on which the claimant first knew or ought reasonably to have known

(a) that the injury, loss or damage had occurred,

(b) that the injury, loss or damage was caused by or contributed to by an act or omission, and

(c) that the act or omission was that of the defendant.

[34]        The plain words of this provision are unambiguous. Section 5(1)(a) provides that no claim shall be brought after two years from the day on which the claim is "discovered". Section 5(2) further specifies that a claim is discovered on the day that a claimant knew or ought reasonably to have known the facts that are material, namely the occurrence of an injury, loss or damage that was caused or contributed to by an act or omission of the defendant. As evidenced by the words of the provision, there is no clear legislative language ousting or limiting the common law rule; in fact, quite the opposite. The event triggering the limitation period in s. 5(1)(a) is linked to the state of the plaintiff's knowledge in the same manner as the common law rule.

[35]        Moreover, there is nothing in the legislative scheme or the object of the *LAA* that alters the governing principles set out in the common law rule. The New Brunswick legislature enacted the general limitation period scheme in s. 5 to simplify the law of limitation periods. In doing so, it expressly modeled s. 5 on similar limitation provisions found in Ontario, Saskatchewan and Alberta (New Brunswick, Office of the Attorney General, *Commentary on Bill 28: Limitation of Actions Act*, January 2009 (online), at pp. 1 and 4), all

of which have been found to codify the common law rule of discoverability (see, e.g., *Galota v. Festival Hall Developments Ltd.*, 2016 ONCA 585, 133 O.R. (3d) 35, at para. 15; *De Shazo v. Nations Energy Co.*, 2005 ABCA 241, 48 Alta. L.R. (4th) 25, at para. 26; *Jardine v. Saskatoon Police Service*, 2017 SKQB 217, at para. 36 (CanLII)). The legislature's express intention to replicate provisions that codify the common law rule is compelling evidence that New Brunswick intended to follow suit.

[36]      In arguing that the legislature ousted the common law rule, Grant Thornton points to some linguistic differences between the common law rule and s. 5. It emphasizes the fact that the common law rule uses the term "cause of action", whereas s. 5 uses the term "claim". According to Grant Thornton, these concepts are distinct: the former refers to a set of facts entitling a plaintiff to a remedy from the court, while the latter is "purely a limitations concept" with "only two factual components (wrongful conduct and resulting damage)" (A.F., Grant Thornton LLP and Kent M. Ostridge, at para. 65, quoting D. Zacks, "Claims, Not Causes of Action: The Misapprehension of Limitations Principles" (2018), 48 *Advocates' Q.* 165, at p. 165).

[37]      I recognize that the distinction between "claim" and "cause of action" could be meaningful in some circumstances; but in my view, it is not so here. In fact, the *LAA*'s own wording shows that the use of "claim" does not rule out a shared meaning with "cause of action". Section 1(1) defines a claim as a "claim to remedy the injury, loss or damage that occurred as a result of an act or omission". In short, s. 1(1) indicates that the legislature's use of the term "claim" focuses on a set of facts giving rise to a remedy, which is the same meaning that Grant Thornton attributes to the term "cause of action".

[38]      This interpretation is supported by the French text of s. 5(2) of the *LAA*, which reads in part as follows: "*[l]es faits ayant donné naissance à la réclamation sont découverts le jour où le réclamant a appris ou aurait dû normalement apprendre*". In addition, the French text of s. 1(1) defines "*réclamation*" as "*[r]éclamation pour obtenir réparation de préjudices, de pertes ou de dommages survenus par suite d'un acte ou d'une omission*". As is apparent, the wording of the French text supports my interpretation of the English text, and confirms that "claim" in s. 5 means "cause of action", namely: discovering the facts giving rise to a claim to obtain relief for the injury, loss or damage that resulted from an act or omission. This is the legal equivalent of "a set of facts entitling a plaintiff to a remedy", the definition of a "cause of action" put forward by Grant Thornton.

[39]        More probative are the Hansard Debates preceding the enactment of the *LAA*. When asked why the statute uses the term "claim" instead of "cause of action", the Minister of Justice explained:

> In a sense, it is really just semantics. Tim Rattenbury, who works for the Office of the Attorney General, and I had a good discussion. The word "claim" is just another way to characterize bringing forward your matter for purposes of litigation. "Cause of action" is the same thing. The standardization of these particular ways of characterizing an action before the courts is simply semantics.

(New Brunswick, Legislative Assembly, *Journal of Debates (Hansard)*, 3rd Sess., 56th Assem., June 17, 2009, at p. 50 (Hon. Mr. Burke))

In other words, according to the Minister, using "claim" instead of "cause of action" amounts to a distinction without a difference. While not in itself determinative, the Minister's statement can hardly be taken as evidencing the "clear legislative language" needed to oust or limit the common law rule (see *Godfrey*, at para. 32). If anything, it demonstrates the opposite.

[40]         In sum, I am satisfied that s. 5(1)(a) and (2) codifies the common law rule of discoverability. As established by that rule and the *LAA*, the limitation period is triggered when the plaintiff discovers or ought to have discovered through the exercise of reasonable diligence the material facts on which the claim is based. Having so found, I turn now to ascertaining the particular degree of knowledge required to discover a claim under s. 5.

### (2)    The Requisite Degree of Knowledge

[41]          As noted, the Court of Appeal disagreed with the motions judge on the extent of knowledge required to discover a claim under s. 5. The motions judge held that a plaintiff needs to know only enough facts to have *prima facie* grounds to infer the existence of a potential claim. The Court of Appeal, on the other hand, held that discovery of a claim requires actual or constructive knowledge of facts that confer a legally enforceable right to a judicial remedy, which includes knowledge of every constituent element of the cause of action being pled. Thus, on the Court of Appeal's interpretation, in addition to knowledge of a loss and causation, a claim in negligence would include knowledge of a duty of care as well as knowledge of a breach of the standard of care.

[42]        In my respectful view, neither approach accurately describes the degree of knowledge required under s. 5(2) to discover a claim and trigger the limitation period in s. 5(1)(a). I propose the following approach instead: a claim is discovered when a plaintiff has knowledge, actual or constructive, of the material facts upon which a plausible inference of liability on the defendant's part can be drawn. This approach, in my view, remains faithful to the common law rule of discoverability set out in *Rafuse* and accords with s. 5 of the *LAA*.

[43]        By way of explanation, the material facts that must be actually or constructively known are generally set out in the limitation statute. Here, they are listed in s. 5(2)(a) to (c). Pursuant to s. 5(2), a claim is discovered when the plaintiff has actual or constructive knowledge that: (a) the injury, loss or damage occurred; (b) the injury loss or damage was caused by or contributed to by an act or omission; and (c) the act or omission was that of the defendant. This list is cumulative, not disjunctive. For instance, knowledge of a loss, without more, is insufficient to trigger the limitation period.

[44]        In assessing the plaintiff's state of knowledge, both direct and circumstantial evidence can be used. Moreover, a plaintiff will have constructive knowledge when the evidence shows that the plaintiff ought to have discovered the material facts by exercising reasonable diligence. Suspicion may trigger that exercise (*Crombie Property Holdings Ltd. v. McColl-Frontenac Inc.*, 2017 ONCA 16, 406 D.L.R. (4th) 252, at para. 42).

[45]        Finally, the governing standard requires the plaintiff to be able to draw a plausible inference of liability on the part of the defendant from the material facts that are actually or constructively known. In this particular context, determining whether a plausible inference of liability can be drawn from the material facts that are known is the same assessment as determining whether a plaintiff "had all of the material facts necessary to determine that [it] had *prima facie* grounds for inferring [liability on the part of the defendant]" (*Brown v. Wahl*, 2015 ONCA 778, 128 O.R. (3d) 583, at para. 7; see also para. 8, quoting *Lawless v. Anderson*, 2011 ONCA 102, 276 O.A.C. 75, at para. 30). Although the question in both circumstances is whether the plaintiff's knowledge of the material facts gives rise to an inference that the defendant is liable, I prefer to use the term plausible inference because in civil litigation, there does not appear to be a universal definition of what qualifies as *prima facie* grounds. As the British Columbia Court of Appeal observed in *Insurance Corporation of British Columbia v. Mehat*, 2018 BCCA 242, 11 B.C.L.R. (6th) 217, at para. 77:

As noted in *Sopinka, Lederman & Bryant: The Law of Evidence in Canada*, some cases equate *prima facie* proof to a situation where the evidence gives rise to a permissible fact inference; others equate *prima facie* proof to a case where the evidence gives rise to a compelled fact determination, absent evidence to the contrary. [Citation omitted.]

Since the term *prima facie* can carry different meanings, using plausible inference in the present context ensures consistency. A plausible inference is one which gives rise to a "permissible fact inference".

[46]        The plausible inference of liability requirement ensures that the degree of knowledge needed to discover a claim is more than mere suspicion or speculation. This accords with the principles underlying the discoverability rule, which recognize that it is unfair to deprive a plaintiff from bringing a claim before it can reasonably be expected to know the claim exists. At the same time, requiring a plausible inference of liability ensures the standard does not rise so high as to require certainty of liability (*Kowal v. Shyiak*, 2012 ONCA 512, 296 O.A.C. 352) or "perfect knowledge" (*De Shazo*, at para. 31; see also the concept of "perfect certainty" in *Hill v. South Alberta Land Registration District* (1993), 8 Alta. L.R. (3d) 379, at para. 8). Indeed, it is well established that a plaintiff does not need to know the exact extent or type of harm it has suffered, or the precise cause of its injury, in order for a limitation period to run (*HOOPP Realty Inc. v. Emery Jamieson LLP*, 2018 ABQB 276, 27 C.P.C. (8th) 83, at para. 213, citing *Peixeiro*, at para. 18).

[47]        In my respectful view, endorsing the Court of Appeal's approach that to discover a claim, a plaintiff needs knowledge of facts that confer a legally enforceable right to a judicial remedy, including knowledge of the constituent elements of a claim, would move the needle too close to certainty. A plausible inference of liability is enough; it strikes the equitable balance of interests that the common law rule of discoverability seeks to achieve.

[48]        It follows that in a claim alleging negligence, a plaintiff does not need knowledge that the defendant owed it a duty of care or that the defendant's act or omission breached the applicable standard of care. Finding otherwise could have the unintended consequence of indefinitely postponing the limitation period. After all, knowledge that the defendant breached the standard of care is often only discernable through the document discovery process or the exchange of expert reports, both of which typically occur after the plaintiff has

commenced a claim. As the Court stated in *K.L.B. v. British Columbia*, 2003 SCC 51, [2003] 2 S.C.R. 403, at para. 55:

> Since the purpose of the rule of reasonable discoverability is to ensure that plaintiffs have sufficient awareness of the facts to be able to bring an action, <u>the relevant type of awareness cannot be one that it is possible to lack even after one has brought an action.</u> [Emphasis added.]

Although the Court in *K.L.B.* was dealing with discoverability in a different context, the basic principle is relevant here. The standard cannot be so high as to make it possible for a plaintiff to acquire the requisite knowledge only through discovery or experts. And yet, that is precisely the standard endorsed by the Court of Appeal in the instant case. With respect, that standard sets the bar too high. By the same token, the standard is not as low as the standard needed to ward off an application to strike a claim. What is required is actual or constructive knowledge of the material facts from which a plausible inference can be made that the defendant acted negligently.

## B.    *Application to the Facts*

[49]        With this approach in mind, I turn to the question of determining when, if ever, the Province discovered its claim against Grant Thornton.

[50]        Grant Thornton submits that the Province discovered its claim on February 4, 2011, when it received the draft Richter Report. I agree. At that point, the Province had actual or constructive knowledge of the material facts — namely, that a loss occurred and that the loss was caused or contributed to by an act or omission of Grant Thornton. Nothing more was needed to draw a plausible inference of negligence.

### (1)    The Province Had Knowledge of the Material Facts

[51]        The first aspect of the governing standard requires an assessment of the Province's knowledge of the material facts. It is undisputable that by February 4, 2011, the Province knew that it had suffered a loss. In fact, it knew on March 18, 2010, when it paid out the loan guarantees to the Bank of Nova Scotia — all $50 million. Moreover, based on the record, I am able to conclude that on February 4, 2011, the Province knew or, at

least, ought reasonably to have known, that the loss was caused or contributed to by an act or omission of Grant Thornton.

[52]        The Province's willingness to go along with Atcon's request for loan guarantees totalling $50 million was conditional on Grant Thornton's external audit of Atcon's consolidated financial statements for F2009. After completing its audit, Grant Thornton represented to the Province in the Unqualified Auditors' Report that it had audited Atcon's financial statements in accordance with Generally Accepted Auditing Standards and that, having done so, it was of the opinion that they presented "fairly, in all material respects, the financial position of [Atcon] as at January 31, 2009 and the results of its operations and its cash flows for the year then ended in accordance with Canadian generally accepted accounting principles" (R.R., at p. 26). The Province relied on those representations to execute the loan guarantees.

[53]        Just over four months after receiving the loan guarantees, Atcon ran out of working capital, which led the Bank of Nova Scotia to commence bankruptcy and insolvency proceedings against it. Counsel for the Attorney General of New Brunswick attended some of the hearings and, as a result, the Province became privy to those proceedings. Indeed, the Province was aware that on March 1, 2010, the court granted the Bank's applications and placed Atcon into receivership.

[54]        Shortly thereafter, on March 18, 2010, the Bank called upon the Province to pay out on the loan guarantees. This raised alarm bells for the Province about the true state of Atcon's financial affairs because a few months later, it retained Richter to review and comment on Atcon's financial position for F2009.

[55]        Richter undertook this review and on February 4, 2011, issued the 88-page draft Richter Report. In my view, the Province's knowledge about its potential claim crystallized at this point.

[56]        In this report, Richter opined that Atcon's financial statements for F2009 had not been prepared in conformity with Generally Accepted Accounting Principles in all material respects. Richter formed this opinion based on what it described to be a "systematic approach" by Atcon's management to "overstate assets, revenues and profits, [and] understate liabilities, expenses and losses" (A.R., vol. II, at p. 207). Specifically, Richter identified various errors in the financial statements, which, as Richter explained, were considered to be

"material" because they would likely have influenced the decision of the person relying on the financial statements. In that regard, Richter estimated that Atcon's F2009 assets and net earnings were overstated by an amount ranging between $28.3 million and $35.4 million. Since Richter set the materiality for Atcon's financial statements in the range of $1.3 million to $2.6 million, this placed the misstatements approximately 14 to 22 times greater than the acceptable materiality that was set. For Grant Thornton's audit of Atcon, materiality was set at $1.2 million, which also clearly placed the misstatements well in excess of materiality.

[57]        While Richter's mandate did not include commenting on whether Grant Thornton's audit had been performed in accordance with Generally Accepted Auditing Standards, its mandate was similar to Grant Thornton's: both were retained by the Province to determine whether Atcon's financial statements had been prepared in accordance with Generally Accepted Accounting Principles. Grant Thornton's conclusion that the statements had been prepared in conformity with Generally Accepted Accounting Principles, which indicated its belief that they were not materially misstated, stands in stark contrast to Richter's findings that not only were the financial statements misstated, those misstatements significantly exceeded the materiality threshold established for the audit. The magnitude of the misstatements — assets and net earnings were overstated by an amount ranging between $28.3 million and $35.4 million — is even more striking when they are considered in the context of loan guarantees totalling $50 million.

[58]        It stands to reason from the findings made in the Richter Report, considered in light of all the surrounding circumstances, that the Province knew or ought to have known that Grant Thornton's act or omission caused or contributed to its loss. Specifically, Grant Thornton's act or omission was issuing the Unqualified Auditors' Report with respect to Atcon's financial statements for F2009, despite those statements not being prepared in accordance with Generally Accepted Accounting Principles and not fairly representing, in all material respects, Atcon's financial position for F2009. This act or omission caused or contributed to the Province's loss because the Province executed the $50 million loan guarantees in reliance on Grant Thornton's representations.

(2)    The Province Could Have Drawn a Plausible Inference of Negligence

[59]        Based on all of the material facts that the Province knew or ought to have known, I am able to conclude that by February 4, 2011, the Province had sufficient knowledge to draw a plausible inference that Grant Thornton had been negligent.

[60]        The Province maintains that the limitation period did not begin to run on February 4, 2011. It contends that, to this day, the limitation period has not yet started to run because it does not have access to Grant Thornton's audit-related files and thus, it cannot know whether Grant Thornton breached the applicable standard of care by failing to conduct the audit in accordance with Generally Accepted Auditing Standards. This, despite the fact that the Province went ahead and filed its claim many years ago, on June 23, 2014, and despite its concession that it did so without learning any new information about Grant Thornton's conduct between that date and February 4, 2011, the date it received the draft Richter Report.

[61]        With respect, I disagree with the Province's position. As I have explained, a plaintiff does not need knowledge of all the constituent elements of negligence to discover its claim. All that is required is knowledge of the material facts, as set out in the *LAA*, from which a plausible inference of liability can be drawn. Contrary to its assertions, the Province did not need access to Grant Thornton's audit-related files to plausibly infer that Grant Thornton had breached the applicable standard of care by failing to conduct the audit in accordance with Generally Accepted Auditing Standards. In particular, from the material misstatements identified in the Richter Report, referred to above at paras. 56-57, the Province could have inferred that the loss was the fruit of an audit that fell below the applicable standards, which require auditors to "plan and perform an audit to obtain reasonable assurance whether the financial statements are free of material misstatement" (R.R., at p. 26).

[62]        In sum, having regard to the material facts that I have identified, which the Province knew or ought to have known, the Province had ample knowledge as of February 4, 2011, to draw a plausible inference that Grant Thornton had acted negligently. This does not mean that Grant Thornton was in fact negligent. That question would have been for trial, had the Province brought its claim within the limitation period.

VII.   Conclusion

[63]        In conclusion, I am satisfied that the Province discovered its claim on February 4, 2011, more than two years before commencing it on June 23, 2014. The Province's claim is therefore statute-barred by s. 5(1)(a) of the *LAA*.

[64]        Accordingly, the appeal brought by Grant Thornton LLP and Kent M. Ostridge and the appeal brought by Grant Thornton International Ltd. are both allowed. The judgment of the Court of Appeal is set aside and the judgment of the motions judge in the Court of Queen's Bench is restored.[1] The appellants are entitled to their costs throughout.

*Appeals allowed with costs throughout.*

*Solicitors for the appellants Grant Thornton LLP and Kent M. Ostridge: Lenczner Slaght Royce Smith Griffin, Toronto; McInnes Cooper, Fredericton.*

*Solicitors for the appellant Grant Thornton International Ltd.: Foster & Company, Fredericton.*

*Solicitors for the respondent: Stewart McKelvey, Fredericton.*

*Solicitors for the intervener: Borden Ladner Gervais, Toronto.*

---

[1] Since I am disposing of these appeals on the basis of evidence that was properly before the motions judge, I decline to consider the Province's proposed disposition (see R.F., at para. 145), to remit the matter back to the Court of Appeal to address the alternative grounds of appeal relating to the motions judge's evidentiary rulings, which were raised before that court but not decided (see C.A. reasons, at paras. 80-81).

# **TAB 3**

*Meng Estate v. Liem*, 2019 BCCA 127 (Can.)

# COURT OF APPEAL FOR BRITISH COLUMBIA

Citation:     *Meng Estate v. Liem*,
              2019 BCCA 127

Date: 20190416
Docket: CA45014

2019 BCCA 127 (CanLII)

Between:

**Estate of Maisie Meng, Deceased, by its litigation representative
Hsiao Chin Stephen Lo and Chyuan-Lih Meng, a person under disability,
by his litigation guardian Hsiao Chin Stephen Lo**

Respondents
(Defendants)

And

**Erwin Liem**

Appellant
(Third Party)

Before:     The Honourable Mr. Justice Harris
            The Honourable Madam Justice Fenlon
            The Honourable Mr. Justice Butler

On appeal from:  An order of the Supreme Court of British Columbia,
dated December 15, 2017 (*Goyal v. Estate of Maisie Meng*, 2017 BCSC 2474,
Vancouver Docket S130014).

| | |
|---|---|
| Counsel for the Appellant: | G.F.T. Gregory<br>L. Zhao, Articled Student |
| Counsel for the Respondent: | M. Ganatra |
| Place and Date of Hearing: | Vancouver, British Columbia<br>February 21, 2019 |
| Written Submissions Received: | March 8, 14 and 20, 2019 |
| Place and Date of Judgment: | Vancouver, British Columbia<br>April 16, 2019 |

**Written Reasons by:**
The Honourable Mr. Justice Harris

**Concurred in by:**
The Honourable Madam Justice Fenlon
The Honourable Mr. Justice Butler

2019 BCCA 127 (CanLII)

***Summary:***

*Mr. Liem appeals an order finding him liable for breach of fiduciary duty when he used his power of attorney given to him and Mr. Tuan by the Mengs to execute a contract of purchase and sale of the Mengs' family home. The basis of the breach was that Mr. Liem failed to ascertain the current wishes of the Mengs and, accordingly, acted contrary to their best interests. Held: Appeal allowed. Even though Mr. Liem was in a fiduciary relationship with the Mengs, not every potential breach of duty is a breach of fiduciary duty: Girardet v. Crease & Co. (1987), 11 B.C.L.R. (2d) 361. The judge and the parties erred in treating this case as involving a breach of fiduciary duty. Rather, the cause of action is negligence. The Mengs did not lead any evidence from which their wishes, at the time, could be determined. Absent that evidence, the action should have been dismissed.*

**Reasons for Judgment of the Honourable Mr. Justice Harris:**

### Introduction

[1]      This is an appeal of a judgment in which Mr. Erwin Liem was found liable for breach of fiduciary duty when he used his power of attorney given to him and Mr. Larry Tuan by Mrs. Whee Yan Maisie Meng and Mr. Chyuan-Lih Meng (the "Mengs") (both of whom are now deceased) to execute a contract of purchase and sale of the Mengs' family home. The basis of the breach was that Mr. Liem failed to ascertain the current wishes of his principals, the Mengs, and, as a result, acted contrary to their best interests in executing the contract. The Mengs refused to complete the contract and became defendants in an action for specific performance. Mr. Liem was ordered to indemnify litigation costs incurred in that action and pay special costs of the action.

[2]      For the reasons that follow, I would allow the appeal.

### Issue on Appeal

[3]      At the outset, I will explain how the issue I consider dispositive of this appeal arose. The argument that led to a finding of liability was grounded in breach of fiduciary duty in relation to the execution of the contract of purchase and sale. The trial involved a number of other issues that were resolved in Mr. Liem's favour. Although Mr. Liem had some legal assistance before trial, he represented himself at trial. His position at trial was that he did not breach his fiduciary duty. He did not

argue that, on the undisputed facts, even though he was a fiduciary, any breach of duty was not a breach of <u>fiduciary</u> duty. The judge was not invited to consider whether his breach was simple negligence, rather than a breach of fiduciary duty. Unsurprisingly, the judge did not turn her mind to this question, and she founded her judgment on the unstated assumption that any breach of duty was a breach of a fiduciary duty.

[4]     On the appeal, though now represented by counsel, Mr. Liem again did not raise the issue whether his breach was a breach of a <u>fiduciary</u> duty. After reserving judgment, this Court asked counsel to address the following question:

> Was it a legal error for the judge to have found Mr. Liem breached a fiduciary duty rather than a common law duty sounding in negligence even if Mr. Liem was a fiduciary? In particular, the Court requests the parties to address the potential relevance of the principles discussed in *Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 (S.C.).

[5]     The Court received submissions addressing this question. This is a new issue on appeal. It was not dealt with by the trial judge. As a general rule, this Court is reluctant to entertain new issues on appeal without the benefit of a considered judgment on the issue rendered by the court appealed from. In considering whether to grant leave to advance an issue for the first time on appeal, the approach of this Court was summarized by Madam Justice Saunders in *Gorenshtein v. British Columbia (Employment Standards Tribunal)*, 2016 BCCA 457:

> [45]     In [*Quan v. Cusson*, 2009 SCC 62] the court adopted the approach in *Wasauksing First Nation v. Wasausink Lands Inc.* (2004), 184 O.A.C. 84 and approached the issue by asking three questions in this sequence: first, is the issue truly "new"; second, is the evidentiary record sufficient; and third, being the question in which the issue of potential prejudice looms large, do the interests of justice support granting an exception to the general rule? This restrained approach is consistently applied in British Columbia, see for example, *Devine v. Devine*, 2012 BCCA 509; *Suen v. Suen*, 2013 BCCA 313.

> [46]     The restrained approach to entertaining new issues engaging the evidentiary record also applies to legal questions that have not been the subject of a reasoned decision. For example, in *R. v. Trieu*, 2010 BCCA 540, this court referred with approval to the observation in *R. v. R. (R.)* (1994), 91 C.C.C. (3d) 193 (Ont. C.A.), that when a court of first instance does not have the opportunity to undertake an analysis, the appellate function is compromised. There is, however, room for the exceptional case where there is no prejudice to the other party: *Braber Equipment Ltd. v. Fraser Surrey Docks Ltd.,* 1999 BCCA 579.

[6]      While I view the issue as a new one, in my opinion the evidentiary record is sufficient to address the point, and I do not think any prejudice arises from considering it. Although we have not had the benefit of a reasoned decision in the court below, counsel have had the opportunity to address the issue and this Court is well-placed to analyse it. On the uncontested evidence at trial, this Court can and should resolve this matter by considering whether Mr. Liem's breach of duty was a breach of a fiduciary duty. I am persuaded that this is an exceptional case in which the interests of justice support dealing with the matter and avoiding the unnecessary expense of sending the matter back for a new trial. This is so because it is not apparent that any additional evidence is available capable of affecting the outcome of the matter.

[7]      In my respectful opinion, the judge was led into error in analysing the breach as a breach of <u>fiduciary</u> duty, rather than a breach of a duty of care sounding in negligence. As a result, she did not examine whether the plaintiffs had discharged their onus of proving the elements of the tort that formed the true nature of their claim as advanced at trial.

## **Background**

[8]      The Mengs granted a power of attorney jointly to Mr. Liem and Mr. Tuan in November 2011. Together, acting under the power of attorney, Mr. Liem and Mr. Tuan executed a contract of purchase and sale of the Mengs' home for $1.4 million in September 2012. The price was substantially lower than both the original listing price, $1.9 million, and a later reduced listing price, $1.7 million. The joint power of attorney was revoked in November 2012.

[9]      In October 2012, the Mengs attempted to avoid the contract for sale and refused to complete it. In January 2013, the purchaser, Mr. Shawn Goyal, sued for specific performance. In defence of his claim, the Mengs asserted, among other things, that the power of attorney was void and the contract of purchase and sale was void on a number of grounds including lack of capacity. They also amended their defence to allege damages were an adequate remedy in the event the contract was binding.

2019 BCCA 127 (CanLII)

[10]    The Mengs added Mr. Liem and Mr. Tuan as third parties to the action, as well as others, including the realtor, Ms. Angie Sun.

[11]    The Mengs were elderly throughout the proceedings. Mrs. Meng died in January 2014. She did so, it seems, without her evidence being preserved and, most importantly, as it related to her wishes concerning the sale of the house at all material times. A committee was appointed in relation to Mr. Meng in October 2014, but he died in July 2017. There is also no direct evidence of Mr. Meng's wishes at the time the contract was entered into.

[12]    In August 2017, the specific performance action was settled and, by consent, the property was ordered to be sold to Mr. Goyal for $1.65 million, approximately $250,000 more than the sale price. It is appropriate to take judicial notice of the rapidly rising real estate market between 2012 and 2017.

[13]    The third party proceedings against parties other than Mr. Liem and Mr. Tuan were also settled. The terms of that settlement were not in evidence. This matter then proceeded to trial. Mr. Tuan, who the Court below was advised was bankrupt, took no part in the trial. The order under appeal affected only Mr. Liem.

[14]    The judge dismissed certain claims against Mr. Liem sounding in fraud but involving other transactions. They are not directly in issue in this appeal, although they are relevant to the costs ordered against Mr. Liem and to his contention on appeal that the Mengs should be ordered to pay him special costs of the proceeding below.

[15]    The evidence at trial consisted of excerpts from Mr. Liem's examination for discovery read in as part of the Mengs' case and documents marked as exhibits. Mr. Liem did not call any evidence, did not testify, and represented himself.

[16]    The judge found that Mr. Liem was in a fiduciary relationship with the Mengs and owed each of them a fiduciary duty. That conclusion was not challenged on appeal, although for reasons I will come to, I think it was an error, in this case, to conceive of the breach of duty as a fiduciary breach rather than a breach sounding in negligence. This conclusion is important to the outcome of the appeal.

[17]    The operative part of the judgment is brief:

> [26]    There is no question Mr. Liem was directly involved, in his capacity as attorney for Mr. Meng, in signing the listing contract. (Ms. Meng signed this herself.)  However, Mr. Liem never communicated in any way at any time with Mr. Meng to determine his wishes. Mr. Liem was also directly involved in signing the necessary document to reduce the listing price. He acknowledged that he never contacted Mrs. Meng to discuss her wishes in that respect or to confirm what he had been told by Ms. Sun. He agreed that, acting in the Mengs' best interests, it was important to independently satisfy himself that the price reduction was appropriate.

> [27]    Finally, Mr. Liem was directly involved in signing the contract of purchase and sale as attorney (with Mr. Tuan) for both the Mengs. By doing so, he committed the Mengs to selling the Cambie Property for $1.4 million, which was below even the reduced listing price. He had no good explanation for why, when the plaintiff's offer came in, Mrs. Meng was not asked to sign it herself. He acknowledged that, so far as he was aware, there was never any urgency with respect to a sale or signing documents. He described how, when he, Mr. Tuan and Ms. Sun met at Starbucks when the plaintiff's offer came in, he asked Mr. Tuan to call Mrs. Meng, essentially to confirm that she was okay to go ahead with the sale at $1.4 million, but Mr. Tuan was not able to reach her. The contract was then signed by him and Mr. Tuan. Mr. Liem acknowledged that, when he found out a few days later that Mrs. Meng disagreed with the price, he instantly regretted that he had signed the offer without taking it to her.

> [28]    In my opinion, in acting in this way, Mr. Liem failed to act in the Mengs' best interests and breached the duty that he owed to them as their attorney. I find that, as a result of Mr. Liem's conduct and his breach of duty as the Mengs' fiduciary, the Mengs were sued in this action and incurred legal expenses to defend themselves.

> [29]    Accordingly, I conclude that the Mengs are entitled to be indemnified for the legal expenses and costs they incurred in relation to this action.

> [30]    I order that the accounts rendered to the defendants by their legal counsel in relation to this action (which I will refer to as the "Bills") be submitted to the Registrar for review, that the procedure under Rule 14-1 of the *Supreme Court Civil Rules* for the assessment of costs and review of bills shall apply to the review of the Bills, and that sections 71, 73, 75 and 76 of the *Legal Profession Act*, S.B.C. 1998, c. 9, shall also apply to the review of the Bills. On the issuance of the Registrar's certificate following the review, I order that Mr. Liem pay to the defendants the amount certified by the Registrar.

2019 BCCA 127 (CanLII)

[18]    Mr. Liem, now represented by counsel, raised the following issues on appeal:

    a)  Did the trial judge err in finding a breach of fiduciary duty?

    b)  Did the trial judge err in ordering an indemnification for legal costs?

    c)  Did the trial judge err in ordering the legal costs be assessed under the *Legal Profession Act*, S.B.C. 1998, c. 9?

    d)  Did the trial judge err in not awarding special costs against the Mengs?

## Discussion

[19]    Before turning to the merits of the appeal, I think it important to highlight some other aspects of the evidence to set the issues into context and to identify evidence the trial judge did not refer to, but that is material to the issues on appeal.

[20]    Mr. Liem was asked to accept the power of attorney as a friend. He volunteered to do so. There is no evidence to support any suggestion that he benefitted from any breach of duty, that he was in a conflict of interest, or that he intentionally or in bad faith failed to protect the best interests of the Mengs as he understood them. There is no evidence that he acted dishonestly or that he preferred his interests to those of the Mengs. He understood he was to act in the Mengs' best interests by exercising due diligence and acting independently. There is nothing to suggest he knowingly breached his duty of loyalty to the Mengs.

[21]    His ability to communicate with the Mengs was limited. He did not speak Mandarin. He needed an interpreter to speak to Mrs. Meng, which he did, for example, through his wife, as well as Ms. Sun and Mr. Tuan. He said he did not know how to communicate with Mr. Meng. He assumed Mr. Meng spoke through Mrs. Meng and that she communicated with him on behalf of both of them.

[22]    Mrs. Meng was involved in the original listing of the home and agreed with the listing price of $1.9 million. Although he did not speak to Mrs. Meng about the reduction in the listing price to $1.7 million, Ms. Sun assured him that Mrs. Meng agreed with the new listing price and that the price was a reasonable one. At the original listing price, the house received only one low offer in what was, even then, an active real estate market.

[23]     The gist of Mr. Liem's evidence was that he relied on what Ms. Sun told him about Mrs. Meng's wishes regarding the price and willingness to sell, and he sought assurances from her about market values and the fairness of the price. As we shall see, he also relied on Ms. Sun and Mr. Tuan to confirm the Mengs' wishes after signing the contract but before it was delivered to the purchaser, Mr. Goyal.

[24]     The evidence about signing the contract of purchase and sale is more complex than set out in the trial judgment. First, Ms. Sun contacted Mr. Liem shortly before the meeting at Starbucks to discuss the contract. He was told the sale price, that the Mengs could remain in the house free for six months, and that Mrs. Meng agreed to the price, which was fair market value. The meeting then took place.

[25]     As I read the evidence, Ms. Sun confirmed to Mr. Liem, Mrs. Meng's agreement and fair value again at the meeting. Mr. Liem suggested that Mr. Tuan phone Mrs. Meng to confirm her wishes. Mr. Tuan tried twice but could not reach her. At Mr. Liem's suggestion, both Mr. Tuan and Ms. Sun agreed to go immediately to the Mengs' house to confirm Mrs. Meng's agreement. As a result of Chinese custom, there were cultural reasons why Mr. Liem could not, at that time, accompany them and visit the house personally. He could have called her and spoken to her by telephone with the aid of an interpreter, however. There is no evidence that Mr. Liem heard anything more from Ms. Sun or Mr. Tuan until receiving a call from Mr. Tuan in the following days, which I describe below.

[26]     Signing the contract did not commit the Mengs to the sale of the house. What committed them was the delivery of the signed contract to Mr. Goyal. There is no evidence Mr. Liem delivered the contract to Mr. Goyal or that it was delivered without Ms. Sun and Mr. Tuan having confirmed the Mengs' wishes.

[27]     Mr. Liem said that some days later, Mr. Tuan contacted him and informed him that Mrs. Meng <u>changed her mind</u> about the price. The evidence was not that she disagreed with the price before the contract was signed or delivered, that is, before the contract became enforceable. Mr. Liem thought, wrongly, that the Mengs could cancel or renegotiate the contract.

[28]    On the admissible evidence, there was no evidence of fair market value and no evidence that the sale was improvident. Accordingly, the judge's finding that Mr. Liem did not act in the Mengs' best interests cannot be supported on the ground that the house was sold for less than fair value. I am not persuaded the judge put her finding on this footing. The judge referred in argument to the absence of evidence about value. Counsel for the Mengs advised the judge that the case was not advanced on an allegation of an improvident sale. Rather, the allegation was that a contract, with which Mrs. Meng disagreed, was signed without determining her current wishes at the time.

[29]    Similarly, while there is no admissible evidence that the Mengs agreed with the price; equally, there is no evidence that they disagreed with it. The evidence of what Mr. Liem says he was told goes only to his state of mind, not to the truth of the facts reported. In my view, there is no basis in the evidence to find that the contract was inconsistent with the Mengs' current wishes. The fact that after the contract was delivered the Mengs refused to complete, is as consistent with them changing their minds from seller's remorse as it is with them disagreeing with the price or sale before the contract was delivered.

[30]    As a result, it seems to me the finding that Mr. Liem breached his fiduciary duty must rest on the conclusion that Mr. Liem failed adequately to confirm that the Mengs agreed with the sale and price and/or, in the absence of proof the sale accorded with the Mengs' wishes, the Court should presume it did not.

[31]    It is common ground on appeal that a person acting under a power of attorney is an agent held to the standard of conduct to which equity holds a fiduciary. Those obligations involve, at least, that even where the attorney acts gratuitously, he or she has a duty to account, to exercise reasonable care as would a typically prudent person managing his or her own affairs, and not to act contrary to the interests of the donor: see e.g., *McMullen v. Webber et al*, 2006 BCSC 1656 at para. 52 [*McMullen*].

[32]    The duties of an attorney are codified in s. 19 of the *Power of Attorney Act*, R.S.B.C. 1996, c. 370:

19  (1)  An attorney must

    (a)  act honestly and in good faith,

    (b)  exercise the care, diligence and skill of a reasonably prudent person,

    (c)  act within the authority given in the enduring power of attorney and under any enactment, and

    (d)  keep prescribed records and produce the prescribed records for inspection and copying at the request of the adult.

  (2)  When managing and making decisions about the adult's financial affairs, an attorney must act in the adult's best interests, taking into account the adult's current wishes, known beliefs and values, and any directions to the attorney set out in the enduring power of attorney.

[33]    Even though Mr. Liem was in a fiduciary relationship with the Mengs, not every potential breach of duty is a breach of fiduciary duty. As Madam Justice Southin (as she then was) reminded us in *Girardet v. Crease & Co.* (1987), 11 B.C.L.R. (2d) 361 at 362 (S.C.), a fiduciary may breach duties owed in contract or negligence without those breaches being transformed into breaches of fiduciary duty:

> Counsel for the plaintiff spoke of this case in his opening as one of breach of fiduciary duty and negligence. It became clear during his opening that no breach of fiduciary duty is in issue. What is in issue is whether the defendant was negligent in advising on the settlement of a claim for injuries suffered in an accident. The word "fiduciary" is flung around now as if it applied to all breaches of duty by solicitors, directors of companies and so forth. But "fiduciary" comes from the Latin "fiducia" meaning "trust". Thus, the adjective, "fiduciary" means of or pertaining to a trustee or trusteeship. That a lawyer can commit a breach of the special duty of a trustee, e.g., by stealing his client's money, by entering into a contract with the client without full disclosure, by sending a client a bill claiming disbursements never made and so forth is clear. But to say that simple carelessness in giving advice is such a breach is a perversion of words. The obligation of a solicitor of care and skill is the same obligation of any person who undertakes for reward to carry out a task. One would not assert of an engineer or physician who had given bad advice and from whom common law damages were sought that he was guilty of a breach of fiduciary duty. Why should it be said of a solicitor? I make this point because an allegation of breach of fiduciary duty carries with it the stench of dishonesty — if not of deceit, then of constructive fraud. See *Nocton v. Lord Ashburton*, [1914] A.C. 932 (H.L.). Those who draft pleadings should be careful of words that carry such a connotation.

[34]    The important principle Southin J. articulated has received much favourable judicial comment including by Mr. Justice La Forest in *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574 at 597 and by Lord Justice Millett in *Bristol & West Building Society v. Mothew*, [1996] EWCA Civ 533, [1998] Ch. 1 at 16 commenting:

> In this sense it is obvious that not every breach of duty by a fiduciary is a breach of fiduciary duty.

[35]    The soundness of the proposition found in *Girardet* is not in doubt. It is not necessary to canvass the principles that serve to distinguish between breaches by a fiduciary that are breaches of fiduciary duty rather than an act of negligence or a breach of contract. Typically, a breach of fiduciary duty captures circumstances in which there is a breach of the duty of loyalty owed by the fiduciary and includes circumstances involving acting in the face of a conflict, preferring a personal interest, taking a secret profit, acting dishonestly or in bad faith, or a variety of similar or related circumstances. This is not an exhaustive list. But however the criteria for distinguishing a breach of fiduciary duty from negligence might be articulated, I am satisfied that the undisputed facts in this case do not permit treating Mr. Liem's breach as anything other than negligence. I can see no proper basis on which it can be said that Mr. Liem failed to discharge his duty of loyalty; the problem is that he was negligent in how he attempted to fulfil it.

[36]    Counsel for the Mengs drew our attention to a number of cases that suggest that a breach of fiduciary duty does not always require dishonesty or the pursuit of a personal benefit. These cases included, *McMullen*; *Gaudet v. Barrett*, 1998 NSCA 109; *B. (V.) v. Cairns* (2003), 65 O.R. (3d) 343 (Sup. Ct. J.); *Capannelli v. Muroff* (2003), 32 B.L.R. (3d) 178 (Ont. Sup. Ct. J.), aff'd (2004), 3 B.L.R. (4th) 268 (Ont. C.A.); *Annapolis Valley First Nations Band v. Toney*, 2004 FC 1728. I do not disagree with the broad proposition the Mengs advance, but in each of the cases relied on, there were additional features sufficient to establish a breach of fiduciary duty; such as, thwarting a beneficiary's wishes, effectively in bad faith; acting in the face of a conflict; self-dealing; preferring personal interests; or failing to honour the duty of loyalty.

[37]     There is no basis in the evidence to suppose that Mr. Liem acted dishonestly or in the face of a conflict of interest, thwarted the wishes of the Mengs, preferred his interests to theirs, or in any way benefitted from signing the contract. As I have said, he attempted to fulfil his duty of loyalty. The gravamen of the complaint is that he failed to exercise the care, diligence, and skill of a reasonably prudent person by negligently failing to ascertain and thereby take into account the Mengs' current wishes resulting in a sale that was not in their best interests because they disagreed with the price. Moreover, there was no evidence that Mr. Liem was on notice that Ms. Sun's representations were untrue or that Ms. Sun and Mr. Tuan would not visit the Mengs immediately after the Starbucks meeting to confirm the Mengs' agreement with the sale.

[38]     Respectfully, I think it was an error to treat this case as involving a breach of fiduciary duty. Rather, the cause of action is negligence. As a result, the ordinary rules applicable to proof of an action apply to this case. The plaintiff carries the burden of proving that a breach of duty caused loss.

[39]     On the evidence described above, the issue of whether Mr. Liem's conduct fell below the standard of care of a reasonably prudent person would have to be analysed taking into account some facts not referred to by the judge. The evidence is that Mr. Liem relied on Ms. Sun's representations to him about the fairness of the contract, including fair market value, as well as the wishes of, at least, Mrs. Meng. He relied on both Mr. Tuan and Ms. Sun to confirm the Mengs' wishes by asking them to visit the Mengs immediately after the Starbucks meeting. The rational inference is that he must be taken to have assumed that if the Mengs objected to the contract, the contract documents would not be delivered to the purchaser and the sale would not proceed. In short, by signing the contract documents, Mr. Liem gave conditional acceptance to the sale and did not commit them to it because the sale was subject to confirmation of the Mengs' agreement. He was relying on Mr. Tuan and Ms. Sun to act in accordance with the Mengs' current wishes. There is no evidence that he had reason to suppose that Mr. Tuan and Ms. Sun would not do what they said they would. Finally, he did not learn subsequently that Mrs. Meng

disagreed with the price; rather, Mr. Tuan told Mr. Liem that she changed her mind about it.

[40]     It is, however, not necessary to make a definitive conclusion on whether in these circumstances Mr. Liem breached the standard of care by failing to take sufficient steps to confirm the Mengs' current wishes. This is so because even if he breached the standard of care, the Mengs' have not proven damage in the sense that they found themselves committed to a sale with which they disagreed.

[41]     In this case, there is no evidence that the contract price was not fair. The case was not argued on the basis that the sale was improvident. More critically, there is no admissible evidence from which one can conclude that the Mengs did not agree with the contract at the time it bound them. Similarly, there seems to be no admissible evidence from which one can conclude they agreed with it at that time. There is no admissible evidence of what their current wishes were. Had any such evidence been available, the parties would have led it in the proceedings. There is no reasonable possibility such evidence could be forthcoming.

[42]     The alleged breach sounds in negligence and the ordinary rules governing the burden of proof apply to make out that cause of action. The plaintiffs, effectively the Mengs in this case, have to prove the elements of the tort including the duty, its breach, and damage resulting from it. It is trite law that a breach of the standard of care that does not cause damage is not actionable. The Mengs did not lead any evidence from which their then current wishes could be determined. As I have said, the fact they attempted to avoid the sale is equally consistent with changing their minds as it is with disagreeing with the sale in the first place. Absent evidence establishing the Mengs did not agree with the sale, rather than subsequently changing their minds about it, the action should have been dismissed.

2019 BCCA 127 (CanLII)

[43]    Given my proposed disposition of the appeal, it is not necessary to canvass the alleged errors in the remedy. I will say only that I doubt, even viewing the remedies as flowing from a breach of fiduciary duty, the remedy of indemnifying the Mengs legal fees for defending the specific performance action adequately addressed the issue whether and to what extent legal fees were incurred reasonably as a result of the breach.

[44]    I turn briefly to the issue of costs. Given my proposed disposition of the appeal, the costs order in the Court below is set aside. Mr. Liem argues, however, that this Court should award him special costs because the Mengs alleged fraud in relation to other transactions knowing that the evidence they would lead was inconsistent with those allegations. Having reviewed the transcript of the evidence and the allegations, I am not persuaded that the way the case was advanced was sufficiently reprehensible to warrant sanction through a special costs award. The case against Mr. Liem was advanced on a legal theory that, while tenuous, could properly have been put forward. I would not accede to his request.

**Disposition**

[45]    I would allow the appeal.


                                                      "The Honourable Mr. Justice Harris"

I AGREE:


"The Honourable Madam Justice Fenlon"


I AGREE:


"The Honourable Mr. Justice Butler"

# **TAB 4**

*Peoples Dep't Stores Inc. v. Wise*, 2004 SCC 68 (Can.)

# Supreme Court Judgments

## Peoples Department Stores Inc. (Trustee of) v. Wise

| | |
|---|---|
| Collection: | Supreme Court Judgments |
| Date: | 2004-10-29 |
| Neutral citation: | 2004 SCC 68 |
| Report: | [2004] 3 SCR 461 |
| Case number: | 29682 |
| Judges: | Iacobucci, Frank; Major, John C.; Bastarache, Michel; Binnie, William Ian Corneil; LeBel, Louis; Deschamps, Marie; Fish, Morris J. |
| On appeal from: | Quebec |
| Subjects: | Bankruptcy and insolvency<br>Commercial law |
| Notes: | SCC Case Information: 29682 |

Peoples Department Stores Inc. (Trustee of) *v.* Wise, [2004] 3 S.C.R. 461, 2004 SCC 68

**IN THE MATTER OF the Bankruptcy of Peoples Department Stores Inc./Magasins à rayons Peoples inc.**

**Caron Bélanger Ernst & Young Inc., in its capacity as Trustee
to the bankruptcy of Peoples Department Stores Inc./
Magasins à rayons Peoples inc.**                                        *Appellant*

*v.*

**Lionel Wise, Ralph Wise and Harold Wise**                           *Respondents*

and

**Chubb Insurance Company of Canada**                                 *Respondent*

**Indexed as:  Peoples Department Stores Inc. (Trustee of)** *v.* **Wise**


**Neutral citation:  2004 SCC 68.**


File No.:  29682.


2004:  May 11; 2004:  October 29.


Present:  Iacobucci,[*] Major, Bastarache, Binnie, LeBel, Deschamps and Fish JJ.

on appeal from the court of appeal for quebec


*Corporations — Directors and officers — Fiduciary duty and duty of care — Directors of bankrupt corporation being sued by trustee — Trustee claiming that directors breached fiduciary duty and duty of care — Whether directors owe fiduciary duty or duty of care to corporation's creditors —* Canada Business Corporations Act, R.S.C. 1985, c. C-44, s. 122(1) *.*


*Bankruptcy and insolvability — Reviewable transactions — Transfer of assets between wholly-owned subsidiary and parent corporation — Wholly-owned subsidiary and parent corporation declaring bankruptcy — Parent corporation's directors sued by trustee of wholly-owned subsidiary — Trustee claiming that certain transactions were reviewable — Whether consideration for impugned transactions conspicuously less than fair market value — Whether directors "privy" to transactions —* Bankruptcy and Insolvency Act, R.S.C. 1985, c. B-3, s. 100 *.*


Wise Stores Inc. ("Wise") acquired Peoples Department Stores Inc. ("Peoples") from Marks and Spencer Canada Inc. ("M & S").  L.W., R.W. and H.W. (the "Wise brothers") were majority shareholders, officers and directors of Wise, and the only directors of Peoples.  Because of covenants imposed by M & S, Peoples could not be merged with Wise until the purchase price had been paid.  Almost from the outset, the joint operation of Wise and Peoples did not function smoothly.  Parallel bookkeeping, combined with shared warehousing arrangements, caused serious problems for both companies.  As a result, their inventory records were increasingly incorrect.  The situation, already unsustainable, was worsening.  L.W. consulted the vice-president of administration and finance of both Wise and

Peoples in an attempt to find a solution.  On his recommendation, the Wise brothers agreed to implement a joint inventory procurement policy whereby the two firms would divide responsibility for purchasing.  Peoples would make all purchases from North American suppliers and Wise would, in turn, make all purchases from overseas suppliers. Peoples would then transfer to Wise what it had purchased for Wise, charging Wise accordingly, and vice versa.  The new policy was implemented on February 1, 1994.  Before the end of the year, both Wise and Peoples declared bankruptcy.  Peoples' trustee filed a petition against the Wise brothers.  The trustee claimed that they had favoured the interests of Wise over Peoples to the detriment of Peoples' creditors, in breach of their duties as directors under s. 122(1)⧉ of the *Canada Business Corporations Act* ⧉ ("CBCA⧉").  In the alternative, the trustee claimed that the Wise brothers had in the year preceding the bankruptcy been privy to transactions in which Peoples' assets had been transferred to Wise for conspicuously less than fair market value within the meaning of s. 100 ⧉ of the *Bankruptcy and Insolvency Act* ⧉ ("BIA ⧉").  The trial judge found the Wise brothers liable on both grounds. The Court of Appeal set aside the trial judge's decision.

*Held*:  The appeal should be dismissed.  The Wise brothers did not breach their duties under s. 122(1)⧉ of the CBCA ⧉, nor were the impugned transactions in violation of s. 100 ⧉ of the BIA ⧉.

The fiduciary duty under s. 122(1) ⧉(*a*) of the CBCA ⧉ requires directors and officers to act in good faith and honestly *vis-à-vis* the corporation.  Here, the trial judge found that there was no fraud or dishonesty in the Wise brothers' attempts to solve the mounting inventory problems of Peoples and Wise.  The Wise brothers considered the serious inventory management problem and implemented a joint inventory procurement policy they hoped would solve it.  In the absence of evidence of a personal interest or improper purpose in the new policy, and in light of the evidence of a desire to make both Wise and Peoples "better" corporations,  the directors did not breach their fiduciary duty under s. 122(1)(*a*).  An honest and good faith attempt to redress a corporation's financial problems does not, if unsuccessful, qualify as such a breach.  The fiduciary duty does not change when a corporation is in the nebulous "vicinity of insolvency".  At all times, they owe their fiduciary obligations to the corporation, and the corporations' interests are not to be confused with the interests of the creditors or those of any other stakeholder.  There is no need to read the interests of creditors into the fiduciary duty set out in s. 122(1)(*a*) in light of the availability under the CBCA ⧉ both of the oppression remedy (s. 241(2)(*c*)) and of an action based on the duty of care (s. 122(1)(*b*)).

Directors and officers will not be held to be in breach of the duty of care under s. 122(1)(*b*) of the CBCA if they act prudently and on a reasonably informed basis. The standard of care is an objective one. The decisions of directors and officers must be reasonable business decisions in light of all the circumstances, including the prevailing socio-economic conditions, about which they knew or ought to have known. While courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are often involved in corporate decision-making, they are capable, on the facts of any case, of determining whether an appropriate degree of prudence and diligence was brought to bear in reaching what is claimed to be a reasonable business decision. In this case, in adopting the joint inventory procurement policy, the directors did not breach their duty of care in respect of Peoples' creditors. The implementation of the new policy was a reasonable business decision made with a view to rectifying a serious and urgent business problem in circumstances in which no solution may have been possible. The trial judge's conclusion that the new policy led inexorably to Peoples' failure and bankruptcy was factually incorrect and constituted a palpable and overriding error. Many factors other than the new policy contributed more directly to Peoples' bankruptcy.

Section 44(2) of the CBCA as it then read (the provision has since been repealed) cannot exempt directors and officers from potential liability under s. 122(1) for any financial assistance given by subsidiaries to the parent corporation. Nor can the Wise brothers successfully invoke good faith reliance on the opinion of the vice-president of administration and finance under s. 123(4)(*b*) of the CBCA. As a non-professional employee, the vice-president did not belong to any of the professional groups named in s. 123(4)(*b*). He was not an accountant, was not subject to the regulatory overview of any professional organization and did not carry independent insurance coverage for professional negligence.

The trustee's claim under s. 100 of the BIA must fail. The relevant transactions are those spanning the period from February to December 1994 when the new procurement policy was in effect. With regard to all the circumstances of this case, a disparity of slightly more than six percent between fair market value and the consideration received does not constitute a conspicuous difference.

While, in light of this conclusion, there is no need to consider whether the Wise brothers would have been "privy" to the transactions, the disagreement between the trial judge and the Court of Appeal on the interpretation of "privy" in s. 100(2) of the BIA warrants the following comments. Since the provision's remedial purpose is to reverse the effects of a transaction that stripped value from the estate of a bankrupt person, the word "privy" should be

given a broad reading to include those who benefit directly or indirectly from, and have knowledge of, a transaction occurring for less than fair market value.  This rationale is particularly apt when those who benefit are the controlling minds behind the transaction.

## Cases Cited

**Applied:**  *373409 Alberta Ltd. (Receiver of) v. Bank of Montreal*, [2002] 4 S.C.R. 312, 2002 SCC 81; **approved:** *Re Olympia & York Enterprises Ltd. and Hiram Walker Resources Ltd.* (1986), 59 O.R. (2d) 254; *Standard Trustco Ltd. (Trustee of) v. Standard Trust Co.* (1995), 26 O.R. (3d) 1; **referred to:** *Automatic Self-Cleansing Filter Syndicate Co. v. Cuninghame*, [1906] 2 Ch. 34; *K.L.B. v. British Columbia*, [2003] 2 S.C.R. 403, 2003 SCC 51; *Canadian Aero Service Ltd. v. O'Malley*, [1974] S.C.R. 592; *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123, aff'd (1991), 3 B.L.R. (2d) 113; *Teck Corp. v. Millar* (1972), 33 D.L.R. (3d) 288; *Brasserie Labatt ltée v. Lanoue*, [1999] Q.J. No. 1108 (QL); *Regent Taxi & Transport Co. v. Congrégation des Petits Frères de Marie*, [1929] S.C.R. 650, rev'd [1932] 2 D.L.R. 70; *Lister v. McAnulty*, [1944] S.C.R. 317; *Hôpital Notre-Dame de l'Espérance v. Laurent*, [1978] 1 S.C.R. 605; *Dovey v. Cory*, [1901] A.C. 477; *In re Brazilian Rubber Plantations and Estates, Ltd.*, [1911] 1 Ch. 425; *In re City Equitable Fire Insurance Co.*, [1925] 1 Ch. 407; *Soper v. Canada*, [1998] 1 F.C. 124; *Maple Leaf Foods Inc. v. Schneider Corp.* (1998), 42 O.R. (3d) 177; *Skalbania (Trustee of) v. Wedgewood Village Estates Ltd.* (1989), 37 B.C.L.R. (2d) 88.

## Statutes and Regulations Cited

*Bankruptcy and Insolvency Act* ⧉, R.S.C. 1985, c. B-3, s. 100(1) ⧉ [repl. 1997, c. 12, s. 81], (2).

*Canada Business Corporations Act* ⧉, R.S.C. 1985, c. C-44, ss. 44(1) ⧉ [rep. 2001, c. 14, s. 26], (2) [*idem*], 102(1) [repl. *idem*, s. 35], 121, 122(1) [am. *idem*, s. 135 (Sch., item 43)], 123(4) [now 123(5)], 185, 238, 239, 240, 241.

*Civil Code of Québec*, S.Q. 1991, c. 64, arts. 300, 311, 1457, 2501.

*Interpretation Act* ⧉, R.S.C. 1985, c. I-21, s. 8.1 ⧉.

## Authors Cited

Allen, William T., Jack B. Jacobs and Leo E. Strine, Jr.  "Function Over Form:  A Reassessment of Standards of Review in Delaware Corporation Law" (2001), 26 *Del. J. Corp. L.* 859.

Beck, Stanley M.  "Minority Shareholders' Rights in the 1980s".  In *Corporate Law in the 80s*, Special Lectures of the Law Society of Upper Canada.  Don Mills, Ont.:  Richard De Boo, 1982, 311.

Brock, Jason. "The Propriety of Profitmaking: Fiduciary Duty and Unjust Enrichment" (2000), 58 *U.T. Fac. L. Rev.* 185.

Crête, Raymonde, et Stéphane Rousseau. *Droit des sociétés par actions: principes fondamentaux.* Montréal: Thémis, 2002.

Dickerson, Robert W. V., John L. Howard and Leon Getz. *Proposals for a New Business Corporations Law for Canada*, vols. I and II. Ottawa: Information Canada, 1971.

Gray, Wayne D. "*Peoples v. Wise* and *Dylex*: Identifying Stakeholder Interests upon or near Corporate Insolvency — Stasis or Pragmatism?" (2003), 39 *Can. Bus. L.J.* 242.

Houlden, L. W., and G. B. Morawetz. *Bankruptcy and Insolvency Law of Canada*, vol. 2, 3rd ed. Toronto: Carswell, 1989 (loose-leaf updated 2003, release 9).

Iacobucci, Edward M. "Directors' Duties in Insolvency: Clarifying What Is at Stake" (2003), 39 *Can. Bus. L.J.* 398.

Iacobucci, Edward M., and Kevin E. Davis. "Reconciling Derivative Claims and the Oppression Remedy" (2000), 12 *S.C.L.R.* (2d) 87.

Martel, Paul. "Le 'voile corporatif' — l'attitude des tribunaux face à l'article 317 du Code civil du Québec" (1998), 58 *R. du B.* 95.

McGuinness, Kevin Patrick. *The Law and Practice of Canadian Business Corporations*. Toronto: Butterworths, 1999.

Thomson, David. "Directors, Creditors and Insolvency: A Fiduciary Duty or a Duty Not to Oppress?" (2000), 58 *U.T. Fac. L. Rev.* 31.

APPEAL from a judgment of the Quebec Court of Appeal, [2003] R.J.Q. 796, 224 D.L.R. (4th) 509, 41 C.B.R. (4th) 225, [2003] Q.J. No. 505 (QL), setting aside a decision of the Superior Court (1998), 23 C.B.R. (4th) 200, [1998] Q.J. No. 3571 (QL). Appeal dismissed.

*Gerald F. Kandestin*, *Gordon Kugler* and *Gordon Levine*, for the appellant.

*Éric Lalanne* and *Martin Tétreault*, for the respondents Lionel Wise, Ralph Wise and Harold Wise.

*Ian Rose* and *Odette Jobin-Laberge*, for the respondent Chubb Insurance Company of Canada.

The judgment of the Court was delivered by

MAJOR AND DESCHAMPS JJ. —

I.    Introduction

1          The principal question raised by this appeal is whether directors of a corporation owe a fiduciary duty to the corporation's creditors comparable to the statutory duty owed to the corporation.  For the reasons that follow, we conclude that directors owe a duty of care to creditors, but that duty does not rise to a fiduciary duty.  We agree with the disposition of the Quebec Court of Appeal.  The appeal is therefore dismissed.

2          As a result of the demise in the mid-1990s of two major retail chains in eastern Canada, Wise Stores Inc. ("Wise") and its wholly-owned subsidiary, Peoples Department Stores Inc. ("Peoples"), the indebtedness of a number of Peoples' creditors went unsatisfied.  In the wake of the failure of the two chains, Caron Bélanger Ernst & Young Inc., Peoples' trustee in bankruptcy ("trustee"), brought an action against the directors of Peoples. To address the trustee's claims, the extent of the duties imposed by s. 122(1) 🔗 of the *Canada Business Corporations Act* 🔗*, R.S.C. 1985, c. C-44* 🔗 ("CBCA 🔗"), upon directors with respect to creditors must be determined; we must also identify the purpose and reach of s. 100 🔗 of the *Bankruptcy and Insolvency Act* 🔗*, R.S.C. 1985, c. B-3* 🔗 ("BIA 🔗").

3          In our view, it has not been established that the directors of Peoples violated either the fiduciary duty or the duty of care imposed by s. 122(1) 🔗 of the CBCA 🔗.  As for the trustee's submission regarding s. 100 🔗 of the BIA 🔗, we agree with the Court of Appeal that the consideration received in the impugned transactions was not "conspicuously" less than fair market value.  The BIA 🔗 claim fails on that basis.

II.    Background

4          Wise was founded by Alex Wise in 1930 as a small clothing store on St-Hubert Street in Montreal.  By 1992, through expansion effected by a mix of internal growth and acquisitions, it had become an enterprise operating at 50 locations with annual sales of approximately $100 million, and it had been listed on the Montreal Stock Exchange in 1986. The stores were, for the most part, located in urban areas in Quebec.  The founder's three sons, Lionel, Ralph and Harold Wise ("Wise brothers"), were majority shareholders, officers, and directors of Wise. Together, they controlled 75 percent of the firm's equity.

5           In 1992, Peoples had been in business continuously in one form or another for 78 years.  It had operated as an unincorporated division of Marks & Spencer Canada Inc. ("M & S") until 1991, when it was incorporated as a separate company.  M & S itself was wholly owned by the large British firm, Marks & Spencer plc. ("M & S plc.").  Peoples' 81 stores were generally located in rural areas, from Ontario to Newfoundland.  Peoples had annual sales of about $160 million, but was struggling financially.  Its annual losses were in the neighbourhood of $10 million.

6           Wise and Peoples competed with other chains such as Canadian Tire, Greenberg, Hart, K-Mart, M-Stores, Metropolitan Stores, Rossy, Woolco and Zellers.  Retail competition in eastern Canada was intense in the early 1990s.  In 1992, M-Stores went bankrupt.  In 1994, Greenberg and Metropolitan Stores followed M-Stores into bankruptcy.  The 1994 entry of Wal-Mart into the Canadian market, with its acquisition of over 100 Woolco stores from Woolworth Canada Inc., exerted significant additional competitive pressure on retail stores.

7           Lionel Wise, the eldest of the three brothers and Wise's executive vice-president, had expressed an interest in acquiring the ailing Peoples chain from M & S as early as 1988.  Initially, M & S did not share Wise's interest for the sale, but by late 1991, M & S plc., the British parent company of M & S, had decided to divest itself of all its Canadian operations.  At this point, M & S incorporated each of its three Canadian divisions to facilitate the anticipated divestiture thereof.

8           The new-found desire to sell coincided with Wise's previously expressed interest in acquiring its larger rival.  Although M & S had initially hoped to sell Peoples for cash to a large firm in a solid financial condition, it was unable to do so.  Consequently, negotiations got underway with representatives of Wise.  A formal share purchase agreement was drawn up in early 1992 and executed in June 1992, with July 16, 1992 as its closing date.

9           Wise incorporated a company, 2798832 Canada Inc., for the purpose of acquiring all of the issued and outstanding shares of Peoples from M & S.  The $27- million share acquisition proceeded as a fully leveraged buyout.

The portion of the purchase price attributable to inventory was discounted by 30 percent. The discount was designed to inject equity into Peoples in the fiscal year following the sale and to make use of some of the tax losses that had accumulated in prior years.

10          The amount of the down payment due to M & S at closing, $5 million, was borrowed from the Toronto Dominion Bank ("TD Bank"). According to the terms of the share purchase agreement, the $22-million balance of the purchase price would be carried by M & S and would be repaid over a period of eight years. Wise guaranteed all of 2798832 Canada Inc.'s obligations pursuant to the terms of the share purchase agreement.

11          To protect its interests, M & S took the assets of Peoples as security (subject to a priority in favour of the TD Bank) and negotiated strict covenants concerning the financial management and operation of the company. Among other requirements, 2798832 Canada Inc. and Wise were obligated to maintain specific financial ratios, and Peoples was not permitted to provide financial assistance to Wise. In addition, the agreement provided that Peoples could not be amalgamated with Wise until the purchase price had been paid. This prohibition was presumably intended to induce Wise to refinance and pay the remainder of the purchase price as early as possible in order to overcome the strict conditions imposed upon it under the share purchase agreement.

12          On January 31, 1993, 2798832 Canada Inc. was amalgamated with Peoples. The new entity retained Peoples' corporate name. Since 2798832 Canada Inc. had been a wholly-owned subsidiary of Wise, upon amalgamation the new Peoples became a subsidiary directly owned and controlled by Wise. The three Wise brothers were Peoples' only directors.

13          Following the acquisition, Wise had attempted to rationalize its operations by consolidating the overlapping corporate functions of Wise and Peoples, and operating as a group. The consolidation of the administration, accounting, advertising and purchasing departments of the two corporations was completed by the fall of 1993. As a consequence of the changes, many of Wise's employees worked for both firms but were paid solely by Wise. The evidence at trial was that because of the tax losses carried-forward by Peoples, it was advantageous for the

group to have more expenses incurred by Wise, which, if the group was profitable as a whole, would increase its after-tax profits.  Almost from the outset, the joint operation of Wise and Peoples did not function smoothly.  Instead of the expected synergies, the consolidation resulted in dissonance.

14              After the acquisition, the total number of buyers for the two companies was nearly halved.  The procurement policy at that point required buyers to deal  simultaneously with suppliers on behalf of both Peoples and Wise.  For the buyers, this nearly doubled their administrative work.  Separate invoices were required for purchases made on behalf of Wise and Peoples.  These invoices had to be separately entered into the system, tracked and paid.

15              Inventory, too, was separately recorded and tracked in the system.  However, the inventory of each company was handled and stored, often unsegregated, in shared warehouse facilities.  The main warehouse for Peoples, on Cousens Street in Ville St-Laurent, was maintained for and used by both firms.  The Cousens warehouse saw considerable activity, as it was the central distribution hub for both chains.  The facility was open 18 hours a day and employed 150 people on two shifts who handled a total of approximately 30,000 cartons daily through 20 loading docks.  It was abuzz with activity.

16              Before long, the parallel bookkeeping combined with the shared warehousing arrangements caused serious problems for both Wise and Peoples.  The actual situation in the warehouse often did not mirror the reported state of the inventory in the system.  The goods of one company were often inextricably commingled and confused with the goods of the other.  As a result, the inventory records of both companies were increasingly incorrect.  A physical inventory count was conducted to try to rectify the situation, to little avail.  Both Wise and Peoples stores experienced numerous shipping disruptions and delays. The situation, already unsustainable, was worsening.

17              In October 1993, Lionel Wise consulted David Clément, Wise's (and, after the acquisition, Peoples') vice-president of administration and finance, in an attempt to find a solution.  In January 1994, Clément recommended and the three Wise brothers agreed that they would implement a joint inventory procurement policy ("new policy") whereby the two firms would divide responsibility for purchasing.  Peoples would make all purchases from North

American suppliers and Wise would, in turn, make all purchases from overseas suppliers.  Peoples would then transfer to Wise what it had purchased for Wise, charging Wise accordingly, and vice versa.  The new policy was implemented on February 1, 1994.  It was this arrangement that was later criticized by certain creditors and by the trial judge.

18          Approximately 82 percent of the total inventory of Wise and Peoples was purchased from North American suppliers, which inevitably meant that Peoples would be extending a significant trade credit to Wise.  The new policy was known to the directors, but was neither formally implemented in writing nor approved by a board meeting or resolution.

19          On April 27, 1994, Lionel Wise outlined the details of the new policy at a meeting of Wise's audit committee.  A partner of Coopers & Lybrand was M & S's representative on Wise's board of directors and a member of the audit committee. He attended the April 27th meeting and raised no objection to the new policy when it was introduced.

20          By June 1994, financial statements prepared to reflect the financial position of Peoples as of April 30, 1994 revealed that Wise owed more than $18 million to Peoples.  Approximately $14 million of this amount resulted from a notional transfer of inventory that was cancelled following the period's end.  M & S was concerned about the situation and started an investigation, as a result of which M & S insisted that the new procurement policy be rescinded.  Wise agreed to M & S's demand but took the position that the former procurement policy could not be reinstated immediately.  An agreement was executed on September 27, 1994, effective July 21, 1994, and it provided that the new policy would be abandoned as of January 31, 1995.  The agreement also specified that the inventory and records of the two companies would be kept separate, and that the amount owed to Peoples by Wise would not exceed $3 million.

21          Another result of the negotiations was that M & S accepted an increase in the amount of the TD Bank's priority to $15 million and a new repayment schedule for the balance of the purchase price owed to M & S.  The

parties agreed to revise the schedule to provide for 37 monthly payments beginning in July 1995.  Each of the Wise brothers also provided a personal guarantee of $500,000 in favour of M & S.

22          In September 1994, in light of the fragile financial condition of the companies and the competitiveness of the retail market, the TD Bank announced its intention to cease doing business with Wise and Peoples as of the end of December 1994.  Following negotiations, however, the bank extended its financial support until the end of July 1995.  The Wise brothers promised to extend personal guarantees in favour of the TD Bank, but this did not occur.

23          In December 1994, three days after the Wise brothers presented financial statements showing disappointing results for Peoples in its third fiscal quarter, M & S initiated bankruptcy proceedings against both Wise and Peoples.  A notice of intention to make a proposal was filed on behalf of Peoples the same day.  Nonetheless, Peoples later consented to the petition by M & S, and both Wise and Peoples were declared bankrupt on January 13, 1995, effective December 9, 1994.  The same day, M & S released each of the Wise brothers from their personal guarantees.  M & S apparently preferred to proceed with an uncontested petition in bankruptcy rather than attempting to collect on the personal guarantees.

24          The assets of Wise and Peoples were sufficient to cover in full the outstanding debt owed to the TD Bank, satisfy the entire balance of the purchase price owed to M & S, and discharge almost all the landlords' lease claims.  The bulk of the unsatisfied claims were those of trade creditors.

25          Following the bankruptcy, Peoples' trustee filed a petition against the Wise brothers.  In the petition, the trustee claimed that they had favoured the interests of Wise over Peoples to the detriment of Peoples' creditors, in breach of their duties as directors under s. 122(1) of the CBCA.  The trustee also claimed that the Wise brothers had, in the year preceding the bankruptcy, been privy to transactions in which property had been transferred for conspicuously less than fair market value within the meaning of s. 100 of the BIA.

26        Pursuant to art. 2501 of the *Civil Code of Québec*, S.Q. 1991, c. 64 ("C.C.Q."), the trustee named Chubb Insurance Company of Canada ("Chubb"), which had provided directors' insurance to Wise and its subsidiaries, as a defendant in addition to the Wise brothers.

27        The trial judge, Greenberg J., relying on decisions from the United Kingdom, Australia and New Zealand, held that the fiduciary duty and the duty of care under s. 122(1) of the CBCA extend to a company's creditors when a company is insolvent or in the vicinity of insolvency.  Greenberg J. found that the implementation, by the Wise brothers *qua* directors of Peoples, of a corporate policy that affected both companies, had occurred while the corporation was in the vicinity of insolvency and was detrimental to the interests of the creditors of Peoples.  The Wise brothers were therefore found liable and the trustee was awarded $4.44 million in damages.  As Chubb had provided insurance coverage for directors, it was also held liable. Greenberg J. also considered the alternative grounds under the BIA advanced by the trustee and found the Wise brothers liable for the same $4.44 million amount on that ground as well.  All the parties appealed.

28        The Quebec Court of Appeal, *per* Pelletier J.A., with Robert C.J.Q. and Nuss J.A. concurring, allowed the appeals by Chubb and the Wise brothers: [2003] R.J.Q. 796, [2003] Q.J. No. 505 (QL).  The Court of Appeal expressed reluctance to follow Greenberg J. in equating the interests of creditors with the best interests of the corporation when the corporation was insolvent or in the vicinity of insolvency, stating that an innovation in the law such as this is a policy matter more appropriately dealt with by Parliament than the courts.  In considering the trustee's claim under s. 100 of the BIA, Pelletier J.A. held that the trial judge had committed a palpable and overriding error in concluding that the amounts owed by Wise to Peoples in respect of inventory "were neither collected nor collectible" (para. 125 QL).  He found that the consideration received for the transactions had been approximately 94 percent of fair market value, and he was not convinced that this disparity could be characterized as being "conspicuously" less than fair market value.  Moreover, he did not accept the broad meaning the trial judge gave to the word "privy".  Pelletier J.A. declined to exercise his discretion under s. 100(2) of the BIA to make an order in favour of the trustee.  In view of his conclusion that the Wise brothers were not liable, Pelletier J.A. allowed the appeal with respect to Chubb.

III.   Analysis

29            At the outset, it should be acknowledged that according to art. 300 C.C.Q. and s. 8.1 of the _Interpretation Act_, R.S.C. 1985, c. I-21, the civil law serves as a supplementary source of law to federal legislation such as the CBCA.  Since the CBCA does not entitle creditors to sue directors directly for breach of their duties, it is appropriate to have recourse to the C.C.Q. to determine how rights grounded in a federal statute should be addressed in Quebec, and more specifically how s. 122(1) of the CBCA can be harmonized with the principles of civil liability: see R. Crête and S. Rousseau, _Droit des sociétés par actions: principes fondamentaux_ (2002), at p. 58.

30            This case came before our Court on the issue of whether directors owe a duty to creditors. The creditors did not bring a derivative action or an oppression remedy application under the CBCA.  Instead, the trustee, representing the interests of the creditors, sued the directors for an alleged breach of the duties imposed by s. 122(1) of the CBCA. The standing of the trustee to sue was not questioned.

31            The primary role of directors is described in s. 102(1) of the CBCA:

>   **102.** (1) Subject to any unanimous shareholder agreement, the directors shall manage, or supervise the management of, the business and affairs of a corporation.

As for officers, s. 121 of the CBCA provides that their powers are delegated to them by the directors:

>   **121.** Subject to the articles, the by-laws or any unanimous shareholder agreement,
>
>   (*a*) the directors may designate the offices of the corporation, appoint as officers persons of full capacity, specify their duties and delegate to them powers to manage the business and affairs of the corporation, except powers to do anything referred to in subsection 115(3);
>
>   (*b*) a director may be appointed to any office of the corporation; and
>
>   (*c*) two or more offices of the corporation may be held by the same person.

Although the shareholders are commonly said to own the corporation, in the absence of a unanimous shareholder agreement to the contrary, s. 102 ⧉ of the CBCA ⧉ provides that it is not the shareholders, but the directors elected by the shareholders, who are responsible for managing it. This clear demarcation between the respective roles of shareholders and directors long predates the 1975 enactment of the CBCA: see *Automatic Self-Cleansing Filter Syndicate Co. v. Cuninghame*, [1906] 2 Ch. 34 (C.A.); see also art. 311 C.C.Q.

32          Section 122(1) ⧉ of the CBCA ⧉ establishes two distinct duties to be discharged by directors and officers in managing, or supervising the management of, the corporation:

> **122.** (1) Every director and officer of a corporation in exercising their powers and discharging their duties shall
>
> (*a*) act honestly and in good faith with a view to the best interests of the corporation; and
>
> (*b*) exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

The first duty has been referred to in this case as the "fiduciary duty". It is better described as the "duty of loyalty". We will use the expression "statutory fiduciary duty" for purposes of clarity when referring to the duty under the CBCA ⧉. This duty requires directors and officers to act honestly and in good faith with a view to the best interests of the corporation. The second duty is commonly referred to as the "duty of care". Generally speaking, it imposes a legal obligation upon directors and officers to be diligent in supervising and managing the corporation's affairs.

33          The trial judge did not apply or consider separately the two duties imposed on directors by s. 122(1). As the Court of Appeal observed, the trial judge appears to have confused the two duties. They are, in fact, distinct and are designed to secure different ends. For that reason, they will be addressed separately in these reasons.

A.    *The Statutory Fiduciary Duty: Section 122(1) ⧉(a) of the CBCA ⧉*

34          Considerable power over the deployment and management of financial, human, and material resources is vested in the directors and officers of corporations. For the directors of CBCA ⧉ corporations, this power originates

in s. 102 of the Act.  For officers, this power comes from the powers delegated to them by the directors.  In deciding to invest in, lend to or otherwise deal with a corporation, shareholders and creditors transfer control over their assets to the corporation, and hence to the directors and officers, in the expectation that the directors and officers will use the corporation's resources to make reasonable business decisions that are to the corporation's advantage.

35        The statutory fiduciary duty requires directors and officers to act honestly and in good faith *vis-à-vis* the corporation.  They must respect the trust and confidence that have been reposed in them to manage the assets of the corporation in pursuit of the realization of the objects of the corporation.  They must avoid conflicts of interest with the corporation.  They must avoid abusing their position to gain personal benefit.  They must maintain the confidentiality of information they acquire by virtue of their position.  Directors and officers must serve the corporation selflessly, honestly and loyally: see K. P. McGuinness, *The Law and Practice of Canadian Business Corporations* (1999), at p. 715.

36        The common law concept of fiduciary duty was considered in *K.L.B. v. British Columbia*, [2003] 2 S.C.R. 403, 2003 SCC 51.  In that case, which involved the relationship between the government and foster children, a majority of this Court agreed with McLachlin C.J. who stated, at paras. 40-41 and 49:

> Fiduciary duties arise in a number of different contexts, including express trusts, relationships marked by discretionary power and trust, and the special responsibilities of the Crown in dealing with aboriginal interests. . . .
>
> What . . . might the content of the fiduciary duty be if it is understood . . . as a private law duty arising simply from the relationship of discretionary power and trust between the Superintendent and the foster children?  In  *Lac Minerals Ltd. v. International Corona Resources Ltd.*, [1989] 2 S.C.R. 574, at pp. 646-47, La Forest J. noted that there are certain common threads running through fiduciary duties that arise from relationships marked by discretionary power and trust, such as loyalty and "the avoidance of a conflict of duty and interest and a duty not to profit at the expense of the beneficiary".  However, he also noted that "[t]he obligation imposed may vary in its specific substance depending on the relationship" (p. 646). . . .
>
> . . .
>
> . . . concern for the best interests of the child informs the parental fiduciary relationship, as La Forest J. noted in *M. (K.) v. M. (H.)*, *supra*, at p. 65.  But the duty imposed is to act loyally, and not to put one's own or others' interests ahead of the child's in a manner that abuses the child's trust. . . . The parent who exercises undue influence over the child in economic matters for his own gain has put his own interests

ahead of the child's, in a manner that abuses the child's trust in him.  The same may be said of the parent who uses a child for his sexual gratification or a parent who, wanting to avoid trouble for herself and her household, turns a blind eye to the abuse of a child by her spouse.  The parent need not, as the Court of Appeal suggested in the case at bar, be consciously motivated by a desire for profit or personal advantage; nor does it have to be her own interests, rather than those of a third party, that she puts ahead of the child's.  It is rather a question of disloyalty — of putting someone's interests ahead of the child's in a manner that abuses the child's trust. <u>Negligence, even aggravated negligence, will not ground parental fiduciary liability unless it is associated with breach of trust in this sense.</u>  [Emphasis added.]

37        The issue to be considered here is the "specific substance" of the fiduciary duty based on the relationship of directors to corporations under the CBCA ⬀.

38         It is settled law that the fiduciary duty owed by directors and officers imposes strict obligations: see *Canadian Aero Service Ltd. v. O'Malley*, [1974] S.C.R. 592, at pp. 609-10, *per* Laskin J. (as he then was), where it was decided that directors and officers may even have to account to the corporation for profits they make that do not come at the corporation's expense:

> The reaping of a profit by a person at a company's expense while a director thereof is, of course, an adequate ground upon which to hold the director accountable. <u>Yet there may be situations where a profit must be disgorged, although not gained at the expense of the company, on the ground that a director must not be allowed to use his position as such to make a profit even if it was not open to the company, as for example, by reason of legal disability, to participate in the transaction.</u>  An analogous situation, albeit not involving a director, existed for all practical purposes in the case of *Phipps v. Boardman* [[1967] 2 A.C. 46], which also supports the view that liability to account does not depend on proof of an actual conflict of duty and self-interest.  Another, quite recent, illustration of a liability to account where the company itself had failed to obtain a business contract and hence could not be regarded as having been deprived of a business opportunity is *Industrial Development Consultants Ltd. v. Cooley* [[1972] 2 All E.R. 162], a judgment of a Court of first instance. There, the managing director, who was allowed to resign his position on a false assertion of ill health, subsequently got the contract for himself.  That case is thus also

illustrative of the situation where a director's resignation is prompted by a decision to obtain for himself the business contract denied to his company and where he does obtain it without disclosing his intention. [Emphasis added.]

A compelling argument for making directors accountable for profits made as a result of their position, though not at the corporation's expense, is presented by J. Brock, "The Propriety of Profitmaking: Fiduciary Duty and Unjust Enrichment" (2000), 58 *U.T. Fac. L. Rev.* 185, at pp. 204-5.

39        However, it is not required that directors and officers in all cases avoid personal gain as a direct or indirect result of their honest and good faith supervision or management of the corporation.  In many cases the interests of directors and officers will innocently and genuinely coincide with those of the corporation.  If directors and officers are also shareholders, as is often the case, their lot will automatically improve as the corporation's financial condition improves.  Another example is the compensation that directors and officers usually draw from the corporations they serve.  This benefit, though paid by the corporation, does not, if reasonable, ordinarily place them in breach of their fiduciary duty.  Therefore, all the circumstances may be scrutinized to determine whether the directors and officers have acted honestly and in good faith with a view to the best interests of the corporation.

40        In our opinion, the trial judge's determination that there was no fraud or dishonesty in the Wise brothers' attempts to solve the mounting inventory problems of Peoples and Wise stands in the way of a finding that they breached their fiduciary duty.  Greenberg J. stated:

> We hasten to add that in the present case, the Wise Brothers derived no direct personal benefit from the new domestic inventory procurement policy, albeit that, as the controlling shareholders of Wise Stores, there was an indirect benefit to them. Moreover, as was conceded by the other parties herein, in deciding to implement the new domestic inventory procurement policy, there was no dishonesty or fraud on their part.

> ((1998), 23 C.B.R. (4th) 200, at para. 183)

The Court of Appeal relied heavily on this finding by the trial judge, as do we.  At para. 83 QL, Pelletier J.A. stated that:

[TRANSLATION]  In regard to fiduciary duty, I would like to point out that the brothers were driven solely by the wish to resolve the problem of inventory procurement affecting both the operations of Peoples Inc. and those of Wise. [This is a] motivation that is in line with the pursuit of the interests of the corporation within the meaning of paragraph 122(1)(a) C.B.C.A. and that does not expose them to any justified criticism.

41          As explained above, there is no doubt that both Peoples and Wise were struggling with a serious inventory management problem.  The Wise brothers considered the problem and implemented a policy they hoped would solve it.  In the absence of evidence of a personal interest or improper purpose in the new policy, and in light of the evidence of a desire to make both Wise and Peoples "better" corporations, we find that the directors did not breach their fiduciary duty under s. 122(1)(a) of the CBCA.  See *820099 Ontario Inc. v. Harold E. Ballard Ltd.* (1991), 3 B.L.R. (2d) 123 (Ont. Ct. (Gen. Div.)) (aff'd (1991), 3 B.L.R. (2d) 113 (Ont. Div. Ct.)), in which Farley J., at p. 171, correctly observes that in resolving a conflict between majority and minority shareholders, it is safe for directors and officers to act to make the corporation a "better corporation".

42          This appeal does not relate to the non-statutory duty directors owe to shareholders.  It is concerned only with the statutory duties owed under the CBCA.  Insofar as the statutory fiduciary duty is concerned, it is clear that the phrase the "best interests of the corporation" should be read not simply as the "best interests of the shareholders".  From an economic perspective, the "best interests of the corporation" means the maximization of the value of the corporation: see E. M. Iacobucci, "Directors' Duties in Insolvency: Clarifying What Is at Stake" (2003), 39 *Can. Bus. L.J.* 398, at pp. 400-1.  However, the courts have long recognized that various other factors may be relevant in determining what directors should consider in soundly managing with a view to the best interests of the corporation.  For example, in *Teck Corp. v. Millar* (1972), 33 D.L.R. (3d) 288 (B.C.S.C.), Berger J. stated, at p. 314:

> A classical theory that once was unchallengeable must yield to the facts of modern life.  In fact, of course, it has.  If today the directors of a company were to consider the interests of its employees no one would argue that in doing so they were not acting *bona fide* in the interests of the company itself.  Similarly, if the directors were to consider the consequences to the community of any policy that the company intended to pursue, and were deflected in their commitment to that policy as a result, it could not be said that they had not considered *bona fide* the interests of the shareholders.

I appreciate that it would be a breach of their duty for directors to disregard entirely the interests of a company's shareholders in order to confer a benefit on its employees: *Parke v. Daily News Ltd.*, [1962] Ch. 927. But if they observe a decent respect for other interests lying beyond those of the company's shareholders in the strict sense, that will not, in my view, leave directors open to the charge that they have failed in their fiduciary duty to the company.

The case of *Re Olympia & York Enterprises Ltd. and Hiram Walker Resources Ltd.* (1986), 59 O.R. (2d) 254 (Div. Ct.), approved, at p. 271, the decision in *Teck*, *supra*. We accept as an accurate statement of law that in determining whether they are acting with a view to the best interests of the corporation it may be legitimate, given all the circumstances of a given case, for the board of directors to consider, *inter alia*, the interests of shareholders, employees, suppliers, creditors, consumers, governments and the environment.

43          The various shifts in interests that naturally occur as a corporation's fortunes rise and fall do not, however, affect the content of the fiduciary duty under s. 122(1)(*a*) of the CBCA. At all times, directors and officers owe their fiduciary obligation to the corporation. The interests of the corporation are not to be confused with the interests of the creditors or those of any other stakeholders.

44          The interests of shareholders, those of the creditors and those of the corporation may and will be consistent with each other if the corporation is profitable and well capitalized and has strong prospects. However, this can change if the corporation starts to struggle financially. The residual rights of the shareholders will generally become worthless if a corporation is declared bankrupt. Upon bankruptcy, the directors of the corporation transfer control to a trustee, who administers the corporation's assets for the benefit of creditors.

45          Short of bankruptcy, as the corporation approaches what has been described as the "vicinity of insolvency", the residual claims of shareholders will be nearly exhausted. While shareholders might well prefer that the directors pursue high-risk alternatives with a high potential payoff to maximize the shareholders' expected residual claim, creditors in the same circumstances might prefer that the directors steer a safer course so as to maximize the value of their claims against the assets of the corporation.

46          The directors' fiduciary duty does not change when a corporation is in the nebulous "vicinity of insolvency". That phrase has not been defined; moreover, it is incapable of definition and has no legal meaning. What it is obviously intended to convey is a deterioration in the corporation's financial stability. In assessing the actions of directors it is evident that any honest and good faith attempt to redress the corporation's financial problems will, if successful, both retain value for shareholders and improve the position of creditors. If unsuccessful, it will not qualify as a breach of the statutory fiduciary duty.

47          For a discussion of the shifting interests and incentives of shareholders and creditors, see W. D. Gray, "*Peoples v. Wise* and *Dylex*: Identifying Stakeholder Interests upon or near Corporate Insolvency — Stasis or Pragmatism?" (2003), 39 *Can. Bus. L.J.* 242, at p. 257; E. M. Iacobucci and K. E. Davis, "Reconciling Derivative Claims and the Oppression Remedy" (2000), 12 *S.C.L.R.* (2d) 87, at p. 114. In resolving these competing interests, it is incumbent upon the directors to act honestly and in good faith with a view to the best interests of the corporation. In using their skills for the benefit of the corporation when it is in troubled waters financially, the directors must be careful to attempt to act in its best interests by creating a "better" corporation, and not to favour the interests of any one group of stakeholders. If the stakeholders cannot avail themselves of the statutory fiduciary duty (the duty of loyalty, *supra*) to sue the directors for failing to take care of their interests, they have other means at their disposal.

48          The Canadian legal landscape with respect to stakeholders is unique. Creditors are only one set of stakeholders, but their interests are protected in a number of ways. Some are specific, as in the case of amalgamation: s. 185 of the CBCA. Others cover a broad range of situations. The oppression remedy of s. 241(2)(*c*) of the CBCA and the similar provisions of provincial legislation regarding corporations grant the broadest rights to creditors of any common law jurisdiction: see D. Thomson, "Directors, Creditors and Insolvency: A Fiduciary Duty or a Duty Not to Oppress?" (2000), 58 *U.T. Fac. L. Rev.* 31, at p. 48. One commentator describes the oppression remedy as "the broadest, most comprehensive and most open-ended shareholder remedy in the common law world": S. M. Beck, "Minority Shareholders' Rights in the 1980s", in *Corporate Law in the 80s* (1982), 311, at p. 312. While Beck was concerned with shareholder remedies, his observation applies equally to those of creditors.

49        The fact that creditors' interests increase in relevancy as a corporation's finances deteriorate is apt to be relevant to, *inter alia*, the exercise of discretion by a court in granting standing to a party as a "complainant" under s. 238 (*d*) of the CBCA as a "proper person" to bring a derivative action in the name of the corporation under ss. 239 and 240 of the CBCA, or to bring an oppression remedy claim under s. 241 of the CBCA.

50        Section 241(2)(*c*) authorizes a court to grant a remedy if

> (*c*) the powers of the directors of the corporation or any of its affiliates are or have been exercised in a manner

that is oppressive or unfairly prejudicial to or that unfairly disregards the interests of any security holder, creditor, director or officer . . . .

A person applying for the oppression remedy must, in the court's opinion, fall within the definition of "complainant" found in s. 238 of the CBCA:

> (*a*) a registered holder or beneficial owner, and a former registered holder or beneficial owner, of a security of a corporation or any of its affiliates,
>
> (*b*) a director or an officer or a former director or officer of a corporation or any of its affiliates,
>
> (*c*) the Director, or
>
> (*d*) any other person who, in the discretion of a court, is a proper person to make an application under this Part.

Creditors, who are not security holders within the meaning of para. (*a*), may therefore apply for the oppression remedy under para. (*d*) by asking a court to exercise its discretion and grant them status as a "complainant".

51        Section 241 of the CBCA provides a possible mechanism for creditors to protect their interests from the prejudicial conduct of directors.  In our view, the availability of such a broad oppression remedy undermines any

perceived need to extend the fiduciary duty imposed on directors by s. 122(1)🔗(*a*) of the CBCA🔗 to include creditors.

52          The Court of Appeal, at paras. 98-99 QL, referred to *373409 Alberta Ltd. (Receiver of) v. Bank of Montreal*, [2002] 4 S.C.R. 312, 2002 SCC 81, as an indication by this Court that the interests of creditors do not have any bearing on the assessment of the conduct of directors.  However, the receiver in that case was representing the corporation's rights and not the creditors' rights; therefore, the case has no application in this appeal.  *373409 Alberta* involved an action taken by the receiver on behalf of the corporation against a bank for the tort of conversion.  The sole shareholder, director and officer of 373409 Alberta Ltd., who was also the sole shareholder, director and officer of another corporation, Legacy Holdings Ltd., had deposited a cheque payable to 373409 Alberta Ltd. into the account of Legacy.  While it was recognized, at para. 22, that the diversion of money from 373409 Alberta Ltd. to Legacy "may very well have been wrongful *vis-à-vis* [373409 Alberta Ltd.]'s creditors" (none of whom were involved in the action), no fraud had been committed against the corporation itself and the bank, acting on proper authority, had not wrongfully interfered with the cheque by carrying out the deposit instructions.  The statutory duties of the directors were not at issue, nor were they considered, and no assessment of the creditors' rights was made.  With respect, Pelletier J.A.'s broad reading of *373409 Alberta* was misplaced.

53          In light of the availability both of the oppression remedy and of an action based on the duty of care, which will be discussed below, stakeholders have viable remedies at their disposal.  There is no need to read the interests of creditors into the duty set out in s. 122(1)🔗(*a*) of the CBCA🔗.  Moreover, in the circumstances of this case, the Wise brothers did not breach the statutory fiduciary duty owed to the corporation.

B.     *The Statutory Duty of Care: Section 122(1)🔗(b) of the CBCA🔗*

54          As mentioned above, the CBCA🔗 does not provide for a direct remedy for creditors against directors for breach of their duties and the C.C.Q. is used as suppletive law.

55          In Quebec, directors have been held liable to creditors in respect of either contractual or extra-contractual obligations.  Contractual liability arises where the director personally guarantees a contractual obligation of the company.  Liability also arises where the director personally acts in a manner that triggers his or her extra-contractual liability.  See P. Martel, "Le 'voile corporatif' — l'attitude des tribunaux face à l'article 317 du Code civil du Québec" (1998), 58 *R. du B.* 95, at pp. 135-36; *Brasserie Labatt ltée v. Lanoue*, [1999] Q.J. No. 1108 (QL) (C.A.), *per* Forget J.A., at para. 29.  It is clear that the Wise brothers cannot be held contractually liable as they did not guarantee the debts at issue here.  Extra-contractual liability is the remaining possibility.

56          To determine the applicability of extra-contractual liability in this appeal, it is necessary to refer to art. 1457 C.C.Q.:

> <u>Every person</u> has a duty to abide by the <u>rules of conduct</u> which lie upon him, according to the circumstances, usage or law, so as not to cause injury to <u>another</u>.
>
> Where he is endowed with reason and fails in this duty, he is responsible for any injury he causes to another person by such fault and is liable to reparation for the injury, whether it be bodily, moral or material in nature.
>
> He is also liable, in certain cases, to reparation for injury caused to another by the act or fault of another person or by the act of things in his custody.  [Emphasis added.]

Three elements of art. 1457 C.C.Q. are relevant to the integration of the director's duty of care into the principles of extra-contractual liability: who has the duty ("every person"), to whom is the duty owed ("another") and what breach will trigger liability ("rules of conduct"). It is clear that directors and officers come within the expression "every person". It is equally clear that the word "another" can include the creditors.  The reach of art. 1457 C.C.Q. is broad and it has been given an open and inclusive meaning.  See *Regent Taxi & Transport Co. v. Congrégation des Petits Frères de Marie*, [1929] S.C.R. 650, *per* Anglin C.J., at p. 655 (rev'd on other grounds, [1932] 2 D.L.R. 70 (P.C.)):

> . . . to narrow the *prima facie* scope of art. 1053 C.C. [now art. 1457] is highly dangerous and would necessarily result in most meritorious claims being rejected; many a wrong would be without a remedy.

This liberal interpretation was also affirmed and treated as settled by this Court in *Lister v. McAnulty*, [1944] S.C.R. 317, and *Hôpital Notre-Dame de l'Espérance v. Laurent*, [1978] 1 S.C.R. 605.

57        This interpretation can be harmoniously integrated with the wording of the CBCA. Indeed, unlike the statement of the fiduciary duty in s. 122(1)(*a*) of the CBCA, which specifies that directors and officers must act with a view to the best interests of the corporation, the statement of the duty of care in s. 122(1)(*b*) of the CBCA does not specifically refer to an identifiable party as the beneficiary of the duty. Instead, it provides that "[e]very director and officer of a corporation in exercising their powers and discharging their duties shall . . . exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances." Thus, the identity of the beneficiary of the duty of care is much more open-ended, and it appears obvious that it must include creditors. This result is clearly consistent with the civil law interpretation of the word "another". Therefore, if breach of the standard of care, causation and damages are established, creditors can resort to art. 1457 to have their rights vindicated. The only issue thus remaining is the determination of the "rules of conduct" likely to trigger extracontractual liability. On this issue, art. 1457 is explicit.

58        The first paragraph of art. 1457 does not set the standard of conduct. Instead, it incorporates by reference s. 122(1)(*b*) of the CBCA. The statutory duty of care is a "duty to abide by [a] rul[e] of conduct which lie[s] upon [them], according to the . . . law, so as not to cause injury to another". Thus, for the purpose of determining whether the Wise brothers can be held liable, only the CBCA is relevant. It is therefore necessary to outline the requirements of the duty of care embodied in s. 122(1)(*b*) of the CBCA.

59        That directors must satisfy a duty of care is a long-standing principle of the common law, although the duty of care has been reinforced by statute to become more demanding. Among the earliest English cases establishing the duty of care were *Dovey v. Cory*, [1901] A.C. 477 (H.L.); *In re Brazilian Rubber Plantations and Estates, Ltd.*, [1911] 1 Ch. 425; and *In re City Equitable Fire Insurance Co.*, [1925] 1 Ch. 407 (C.A.). In substance, these cases held that the standard of care was a reasonably relaxed, subjective standard. The common law required directors to avoid being grossly negligent with respect to the affairs of the corporation and judged them according to their own personal skills, knowledge, abilities and capacities. See McGuinness, *supra*, at p. 776: "Given the history of the case law in this area, and the prevailing standards of competence displayed in commerce generally, it is quite clear that directors were not expected at common law to have any particular business skill or judgment."

60          The 1971 report entitled *Proposals for a New Business Corporations Law for Canada* (1971) ("Dickerson Report") culminated the work of a committee headed by R. W. V. Dickerson which had been appointed by the federal government to study the need for new federal business corporations legislation.  This report preceded the enactment of the CBCA ⬈ by four years and influenced the eventual structure of the CBCA ⬈.

61          The standard recommended by the Dickerson Report was objective, requiring directors and officers to meet the standard of a "reasonably prudent person" (vol. II, at. p. 74):

**9.19**

(1)  Every director and officer of a corporation in exercising his powers and discharging his duties shall

. . .

(b)      exercise the care, diligence and skill of a reasonably prudent person.

The report described how this proposed duty of care differed from the prevailing common law duty of care (vol. I, at p. 83):

**242.**  The formulation of the duty of care, diligence and skill owed by directors represents an attempt to upgrade the standard presently required of them.  The principal change here is that whereas at present the law seems to be that a director is only required to demonstrate the degree of care, skill and diligence that could reasonably be expected from him, having regard to his knowledge and experience — *Re City Equitable Fire Insurance Co.*, [1925] Ch. 425 — under s. 9.19(1)(b) he is required to conform to the standard of a reasonably prudent man.  Recent experience has demonstrated how low the prevailing legal standard of care for directors is, and we have sought to raise it significantly.  We are aware of the argument that raising the standard of conduct for directors may deter people from accepting directorships.  The truth of that argument has not been demonstrated and we think it is specious.  The duty of care imposed by s. 9.19(1)(b) is exactly the same as that which the common law imposes on every professional person, for example, and there is no evidence that this has dried up the supply of lawyers, accountants, architects, surgeons or anyone else.  It is in any event cold comfort to a shareholder to know that there is a steady

supply of marginally competent people available under present law to manage his investment.  [Emphasis added.]

62          The statutory duty of care in s. 122(1)(*b*) of the CBCA emulates but does not replicate the language proposed by the Dickerson Report.  The main difference is that the enacted version includes the words "in comparable circumstances", which modifies the statutory standard by requiring the context in which a given decision was made to be taken into account.  This is not the introduction of a subjective element relating to the competence of the director, but rather the introduction of a contextual element into the statutory standard of care.  It is clear that s. 122(1)(*b*) requires more of directors and officers than the traditional common law duty of care outlined in, for example, *Re City Equitable Fire Insurance*, *supra*.

63          The standard of care embodied in s. 122(1)(*b*) of the CBCA was described by Robertson J.A. of the Federal Court of Appeal in *Soper v. Canada*, [1998] 1 F.C. 124, at para. 41, as being "objective subjective".  Although that case concerned the interpretation of a provision of the *Income Tax Act*, it is relevant here because the language of the provision establishing the standard of care was identical to that of s. 122(1)(*b*) of the CBCA.  With respect, we feel that Robertson J.A.'s characterization of the standard as an "objective subjective" one could lead to confusion.  We prefer to describe it as an objective standard.  To say that the standard is objective makes it clear that the factual aspects of the circumstances surrounding the actions of the director or officer are important in the case of the s. 122(1)(*b*) duty of care, as opposed to the subjective motivation of the director or officer, which is the central focus of the statutory fiduciary duty of s. 122(1)(*a*) of the CBCA.

64          The contextual approach dictated by s.122(1)(*b*) of the CBCA not only emphasizes the primary facts but also permits prevailing socio-economic conditions to be taken into consideration. The emergence of stricter standards puts pressure on corporations to improve the quality of board decisions. The establishment of good corporate governance rules should be a shield that protects directors from allegations that they have breached their duty of care. However, even with good corporate governance rules, directors' decisions can still be open to criticism from outsiders.  Canadian courts, like their counterparts in the United States, the United Kingdom, Australia and New Zealand, have tended to take an approach with respect to the enforcement of the duty of care that respects the fact that

directors and officers often have business expertise that courts do not.  Many decisions made in the course of business, although ultimately unsuccessful, are reasonable and defensible at the time they are made.  Business decisions must sometimes be made, with high stakes and under considerable time pressure, in circumstances in which detailed information is not available.  It might be tempting for some to see unsuccessful business decisions as unreasonable or imprudent in light of information that becomes available *ex post facto*.  Because of this risk of hindsight bias, Canadian courts have developed a rule of deference to business decisions called the "business judgment rule", adopting the American name for the rule.

65        In *Maple Leaf Foods Inc. v. Schneider Corp.* (1998), 42 O.R. (3d) 177, Weiler J.A. stated, at p. 192:

>        The law as it has evolved in Ontario and Delaware has the common requirements that the court must be satisfied that the directors have acted reasonably and fairly.  <u>The court looks to see that the directors made a *reasonable* decision *not a perfect* decision.  Provided the decision taken is within a range of reasonableness, the court ought not to substitute its opinion for that of the board even though subsequent events may have cast doubt on the board's determination.</u>  As long as the directors have selected one of several reasonable alternatives, deference is accorded to the board's decision.  This formulation of deference to the decision of the Board is known as the "business judgment rule".   The fact that alternative transactions were rejected by the directors is irrelevant unless it can be shown that a particular alternative was definitely available and clearly more beneficial to the company than the chosen transaction.  [Emphasis added; italics in original; references omitted.]

66        In order for a plaintiff to succeed in challenging a business decision he or she has to establish that the directors acted (i) in breach of the duty of care and (ii) in a way that caused injury to the plaintiff: W. T. Allen, J. B. Jacobs and L. E. Strine, Jr., "Function Over Form: A Reassessment of Standards of Review in Delaware Corporation Law" (2001), 26 *Del. J. Corp. L.* 859, at p. 892.

67        Directors and officers will not be held to be in breach of the duty of care under s. 122(1)(*b*) of the CBCA if they act prudently and on a reasonably informed basis. The decisions they make must be reasonable

business decisions in light of all the circumstances about which the directors or officers knew or ought to have known. In determining whether directors have acted in a manner that breached the duty of care, it is worth repeating that perfection is not demanded.  Courts are ill-suited and should be reluctant to second-guess the application of business expertise to the considerations that are involved in corporate decision making, but they are capable, on the facts of any case, of determining whether an appropriate degree of prudence and diligence was brought to bear in reaching what is claimed to be a reasonable business decision at the time it was made.

68        The trustee alleges that the Wise brothers breached their duty of care under s. 122(1)🔗(*b*) of the CBCA 🔗 by implementing the new procurement policy to the detriment of Peoples' creditors.  After considering all the evidence, we agree with the Court of Appeal that the implementation of the new policy was a reasonable business decision that was made with a view to rectifying a serious and urgent business problem in circumstances in which no solution may have been possible.  The trial judge's conclusion that the new policy led inexorably to Peoples' failure and bankruptcy was factually incorrect and constituted a palpable and overriding error.

69          In fact, as noted by Pelletier J.A., there were many factors other than the new policy that contributed more directly to Peoples' bankruptcy.  Peoples had lost $10 million annually while being operated by M & S.  Wise, which was only marginally profitable and solvent with annual sales of  $100 million (versus $160 million for Peoples), had hoped to improve the performance of its new acquisition.  Given that the transaction was a fully leveraged buyout, for Wise and Peoples to succeed, Peoples' performance needed to improve dramatically.  Unfortunately for both Wise and Peoples, the retail market in eastern Canada had become very competitive in the early 1990s, and this trend continued with the arrival of Wal-Mart in 1994.  At paras. 152 and 154 QL, Pelletier J.A. stated:

> [TRANSLATION]  In reality, it was that particularly unfavourable financial situation in which the two corporations found themselves that caused their downfall, and it was M. & S. that, to protect its own interests, sounded the charge in December, rightly or wrongly judging that Peoples Inc.'s situation would only worsen over time.  It is crystal-clear that the bankruptcy occurred at the most propitious time for M. & S.'s interests, when inventories were high and suppliers were unpaid.  In fact, M. & S. recovered the entire balance due on the selling price and almost all of the other debts it was owed.
>
> . . .
>
> . . . the trial judge did not take into account the fact that the brothers derived no direct benefit from the transaction impugned, that they acted in good faith and that their true intention was to find a solution to the

serious inventory management problem that each of the two corporations was facing. Because of an assessment error, he also ignored the fact that Peoples Inc. received a sizable consideration for the goods it delivered to Wise. Lastly, I note that the act for which the brothers were found liable, i.e. <u>the adoption of a new joint inventory procurement policy, is not as serious as the trial judge made it out to be and that, in opposition to his view, the act was also not the true cause of the bankruptcy of Peoples Inc.</u>  [Emphasis added.]

70        The Wise brothers treated the implementation of the new policy as a decision made in the ordinary course of business and, while no formal agreement evidenced the arrangement, a monthly record was made of the inventory transfers.  Although this may appear to be a loose business practice, by the autumn of 1993, Wise had already consolidated several aspects of the operations of the two companies.  Legally they were two separate entities.  However, the financial fate of the two companies had become intertwined.  In these circumstances, there was little or no economic incentive for the Wise brothers to jeopardize the interests of Peoples in favour of the interests of Wise.  In fact, given the tax losses that Peoples had carried forward, the companies had every incentive to keep Peoples profitable in order to reduce their combined tax liabilities.

71        Arguably, the Wise brothers could have been more precise in pursuing a resolution to the intractable inventory management problems, having regard to all the troublesome circumstances involved at the time the new policy was implemented.  But we, like the Court of Appeal, are not satisfied that the adoption of the new policy breached the duty of care under s. 122(1)(*b*) of the CBCA. The directors cannot be held liable for a breach of their duty of care in respect of the creditors of Peoples.

72        The Court of Appeal relied on two additional provisions of the CBCA that in its view could rescue the Wise brothers from a finding that they breached the duty of care: ss. 44(2) and 123(4).

73        Section 44 of the CBCA, which was in force at the time of the impugned transactions but has since been repealed, permitted a wholly-owned subsidiary to give financial assistance to its holding body corporate:

**44.** (1) Subject to subsection (2), a corporation or any corporation with which it is affiliated shall not, directly or indirectly, give financial assistance by means of a loan, guarantee or otherwise

. . .

(2) A corporation may give financial assistance by means of a loan, guarantee or otherwise

. . .

(*c*) to a holding body corporate if the corporation is a wholly-owned subsidiary of the holding body corporate;

74        While s. 44(2) as it then read qualified the prohibition under s. 44(1), it did not serve to supplant the duties of the directors under s. 122(1) ⤢ of the CBCA ⤢.  The Court of Appeal erred in concluding that s. 44(2) served as a blanket legitimization of financial assistance given by wholly-owned subsidiaries to parent corporations.  In our opinion, it is incumbent upon directors and officers to exercise their powers in conformity with the duties of s. 122(1).

75        Although s. 44(2) authorized certain forms of financial assistance between corporations, this cannot exempt directors and officers from potential liability under s. 122(1) for any financial assistance given by subsidiaries to the parent corporation.

76        When faced with the serious inventory management problem, the Wise brothers sought the advice of the vice-president of finance, David Clément.  The Wise brothers claimed as an additional argument that in adopting the solution proposed by Clément, they were relying in good faith on the judgment of a person whose profession lent credibility to his statement, in accordance with the defence provided for in s. 123(4)(*b*) (now s. 123(5)) of the CBCA ⤢.  The Court of Appeal accepted the argument.  We disagree.

77        The reality that directors cannot be experts in all aspects of the corporations they manage or supervise shows the relevancy of a provision such as s. 123(4)(*b*).  At the relevant time, the text of s. 123(4) read:

**123.** . . .

. . .

(4) A director is not liable under section 118, 119 or 122 if he relies in good faith on

(*a*)  financial statements of the corporation represented to him by an officer of the corporation or in a written report of the auditor of the corporation fairly to reflect the financial condition of the corporation; or

(*b*)  a report of a lawyer, accountant, engineer, appraiser or other person whose profession lends credibility to a statement made by him.

78        Although Clément did have a bachelor's degree in commerce and 15 years of experience in administration and finance with Wise, this experience does not correspond to the level of professionalism required to allow the directors to rely on his advice as a bar to a suit under the duty of care.  The named professional groups in s. 123(4)(*b*) were lawyers, accountants, engineers, and appraisers.  Clément was not an accountant, was not subject to the regulatory overview of any professional organization and did not carry independent insurance coverage for professional negligence.  The title of vice-president of finance should not automatically lead to a conclusion that Clément was a person "whose profession lends credibility to a statement made by him".  It is noteworthy that the word "profession" is used, not "position".  Clément was simply a non-professional employee of Wise.  His judgment on the appropriateness of the solution to the inventory management problem must be regarded in that light.  Although we might accept for the sake of argument that Clément was better equipped and positioned than the Wise brothers to devise a plan to solve the inventory management problems, this is not enough.  Therefore, in our opinion, the Wise brothers cannot successfully invoke the defence provided by s. 123(4)(*b*) of the CBCA but must rely on the other defences raised.

C.    *The Claim Under Section 100 of the BIA*

79        The trustee also claimed against the Wise brothers under s. 100 of the BIA.  That section reads:

**100.** (1) Where a bankrupt sold, purchased, leased, hired, supplied or received property or services in a reviewable transaction within the period beginning on the day that is one year before the date of the initial bankruptcy event and ending on the date of the bankruptcy, both dates included, the court may, on the application of the trustee, inquire into whether the bankrupt gave or received, as the case may be, fair market value in consideration for the property or services concerned in the transaction.

(2) Where the court in proceedings under this section finds that the consideration given or received by the bankrupt in the reviewable transaction was conspicuously greater or less than the fair market value of the property or services concerned in the transaction, the court may give judgment to the trustee against the other party to the transaction, against any other person being privy to the transaction with the bankrupt or against all those persons for the difference between the actual consideration given or received by the bankrupt and the fair market value, as determined by the court, of the property or services concerned in the transaction.

80          The provision has two principal elements.  First, subs. (1) requires the transaction to have been conducted within the year preceding the date of bankruptcy.  Second, subs. (2) requires that the consideration given or received by the bankrupt be "conspicuously greater or less" than the fair market value of the property concerned.

81          The word "may" is found in both ss. 100(1) ⧉ and 100(2) ⧉ of the BIA ⧉ with respect to the jurisdiction of the court.  In *Standard Trustco Ltd. (Trustee of) v. Standard Trust Co.* (1995), 26 O.R. (3d) 1, a majority of the Ontario Court of Appeal held that, even if the necessary preconditions are present, the exercise of jurisdiction under s. 100(1) to inquire into the transaction, and under s. 100(2) to grant judgment, is discretionary. Equitable principles guide the exercise of discretion. We agree.

82          Referring to s. 100(2) ⧉ of the BIA ⧉, in *Standard Trustco*, *supra*, at p. 23, Weiler J.A. explained that:

When a contextual approach is adopted it is apparent that although the conditions of the section have been satisfied the court is not obliged to grant judgment.  The court has a residual discretion to exercise.  The contextual approach indicates that the good faith of the parties, the intention with which the transaction took place, and whether fair value was given and received in the transaction are important considerations as to whether that discretion should be exercised.

We agree with Weiler J.A. and adopt her position; however, this appeal does not turn on the discretion to ultimately impose liability.  In our view, the Court of Appeal did not interfere with the trial judge's exercise of discretion in

reviewing the facts and finding a palpable and overriding error.

83        Within the year preceding the date of bankruptcy, Peoples had transferred inventory to Wise for which the trustee claimed Peoples had not received fair market value in consideration. The relevant transactions involved, for the most part, transfers completed in anticipation of the busy holiday season. Given the non-arm's length relationship between Wise and its wholly-owned subsidiary Peoples, there is no question that these inventory transfers could have constituted reviewable transactions.

84        We share the view of the Court of Appeal that it is not only the final transfers that should be considered. In fairness, the inventory transactions should be considered over the entire period from February to December 1994, which was the period when the new policy was in effect.

85        In *Skalbania (Trustee of) v. Wedgewood Village Estates Ltd.* (1989), 37 B.C.L.R. (2d) 88 (C.A.), the test for determining whether the difference in consideration is "conspicuously greater or less" was held to be not whether it is conspicuous to the parties at the time of the transaction, but whether it is conspicuous to the court having regard to all the relevant factors. This is a sound approach. In that case, a difference of $1.18 million between fair market value and the consideration received by the bankrupt was seen as conspicuous, where the fair market value was $6.6 million, leaving a discrepancy of more than 17 percent. While there is no particular percentage that definitively sets the threshold for a conspicuous difference, the percentage difference is a factor.

86        As for the factors that would be relevant to this determination, the court might consider, *inter alia*: evidence of the margin of error in valuing the types of assets in question; any appraisals made of the assets in question and evidence of the parties' honestly held beliefs regarding the value of the assets in question; and other circumstances adduced in evidence by the parties to explain the difference between the consideration received and fair market value: see L. W. Houlden and G. B. Morawetz, *Bankruptcy and Insolvency Law of Canada* (3rd ed. (loose-leaf)), vol. 2, at p. 4-114.1.

87          Over the lifespan of the new policy, Peoples transferred to Wise inventory valued at $71.54 million.  As of the date of bankruptcy, it had received $59.50 million in property or money from Wise.  As explained earlier, the trial judge adjusted the outstanding difference down to a balance of $4.44 million after taking into account, *inter alia*, the reallocation of general and administrative expenses, and adjustments necessitated by imported inventory transferred from Wise to Peoples.  Neither party disputed these figures before this Court.  We agree with the Court of Appeal's observation that these findings directly conflict with the trial judge's assertion that Peoples had received no consideration for the inventory transfers on the basis that the outstanding accounts were "neither collected nor collectible" from Wise.  Like Pelletier J.A., we conclude that the trial judge's finding in this regard was a palpable and overriding error, and we adopt the view of the Court of Appeal.

88          We are not satisfied that, with regard to all the circumstances of this case, a disparity of slightly more than 6 percent between fair market value and the consideration received constitutes a "conspicuous" difference within the meaning of s. 100(2) of the BIA.  Accordingly, we hold that the trustee's claim under the BIA also fails.

89          In addition to permitting the court to give judgment against the other party to the transaction, s. 100(2) of the BIA also permits it to give judgment against someone who was not a party but was "privy" to the transaction.  Given our finding that the consideration for the impugned transactions was not "conspicuously less" than fair market value, there is no need to consider whether the Wise brothers would have been "privy" to the transaction for the purpose of holding them liable under s. 100(2).  Nonetheless, the disagreement between the trial judge and the Court of Appeal on the interpretation of "privy" in s. 100(2) of the BIA warrants the following observations.

90          The trial judge in this appeal had little difficulty finding that the Wise brothers were privy to the transaction within the meaning of s. 100(2).  Pelletier J.A., however, preferred a narrow construction in finding that the Wise brothers were not privy to the transactions.  He held, at para. 135 QL, that:

[TRANSLATION] . . . the legislator wanted to provide for the case in which a person other than the co-contracting party of the bankrupt actually received all or part of the benefit resulting from the lack of equality between the respective considerations.

To support this direct benefit requirement, Pelletier J.A. also referred to the French version which uses the term *ayant intérêt*.  While he conceded that the respondent brothers received an indirect benefit from the inventory transfers as shareholders of Wise, Pelletier J.A. found this too remote to be considered "privy" to the transactions (paras. 139-40 QL).

91        The primary purpose of s. 100 ⬀ of the BIA ⬀ is to reverse the effects of a transaction that stripped value from the estate of a bankrupt person.  It makes sense to adopt a more inclusive understanding of the word "privy" to prevent someone who might receive indirect benefits to the detriment of a bankrupt's unsatisfied creditors from frustrating the provision's remedial purpose.  The word "privy" should be given a broad reading to include those who benefit directly or indirectly from and have knowledge of a transaction occurring for less than fair market value.  In our opinion, this rationale is particularly apt when those who benefit are the controlling minds behind the transaction.

92        A finding that a person was "privy" to a reviewable transaction does not of course necessarily mean that the court will exercise its discretion to make a remedial order against that person.  For liability to be imposed, it must be established that the transaction occurred:  (a) within the past year; (b) for consideration conspicuously greater or less than fair market value; (c) with the person's knowledge; and (d) in a way that directly or indirectly benefited the person.  In addition, after having considered the context and all the above factors, the judge must conclude that the case is a proper one for holding the person liable. In light of these conditions and of the discretion exercised by the judge, we find that a broad reading of "privy" is appropriate.

IV.   <u>Disposition</u>

93        For the foregoing reasons, we would dismiss the appeal with costs to the respondents.

*Appeal dismissed with costs.*


*Solicitors for the appellant:  Kugler Kandestin, Montréal.*


*Solicitors for the respondents Lionel Wise, Ralph Wise and Harold Wise:  de Grandpré Chait, Montréal.*


*Solicitors for the respondent Chubb Insurance Company of Canada:  Lavery, de Billy, Montréal.*

---

[*] Iacobucci J. took no part in the judgment.

## **TAB 5**

Canada Business Corporations Act, R.S.C. 1985 c C-44, § 122.

**Canada Business Corporations Act (R.S.C. (Revised Statutes of Canada), 1985, c. C-44)**
    Act current to 2025-08-21 and on 2024-07-20.

## PART X
# Directors and Officers (continued)

**Officers**

**121** Subject to the articles, the by-laws or any unanimous shareholder agreement,

   **(a)** the directors may designate the offices of the corporation, appoint as officers persons of full capacity, specify their duties and delegate to them powers to manage the business and affairs of the corporation, except powers to do anything referred to in subsection 115(3);

   **(b)** a director may be appointed to any office of the corporation; and

   **(c)** two or more offices of the corporation may be held by the same person.

   R.S., 1985, c. C-44, s. 121;  2001, c. 14, s. 49(F).

**Duty of care of directors and officers**

**122 (1)** Every director and officer of a corporation in exercising their powers and discharging their duties shall

   **(a)** act honestly and in good faith with a view to the best interests of the corporation; and

   **(b)** exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

**Best interests of the corporation**

**(1.1)** When acting with a view to the best interests of the corporation under paragraph (1)(a), the directors and officers of the corporation may consider, but are not limited to, the following factors:

   **(a)** the interests of

      **(i)** shareholders,

      **(ii)** employees,

      **(iii)** retirees and pensioners,

      **(iv)** creditors,

      **(v)** consumers, and

      **(vi)** governments;

**(b)** the environment; and

**(c)** the long-term interests of the corporation.

**Duty to comply**

**(2)** Every director and officer of a corporation shall comply with this Act, the regulations, articles, by-laws and any unanimous shareholder agreement.

**No exculpation**

**(3)** Subject to subsection 146(5), no provision in a contract, the articles, the by-laws or a resolution relieves a director or officer from the duty to act in accordance with this Act or the regulations or relieves them from liability for a breach thereof.

R.S., 1985, c. C-44, s. 122;  1994, c. 24, s. 13(F);  2001, c. 14, s. 135(E);  2019, c. 29, s. 141.

**Dissent**

**123 (1)** A director who is present at a meeting of directors or committee of directors is deemed to have consented to any resolution passed or action taken at the meeting unless

**(a)** the director requests a dissent to be entered in the minutes of the meeting, or the dissent has been entered in the minutes;

**(b)** the director sends a written dissent to the secretary of the meeting before the meeting is adjourned; or

**(c)** the director sends a dissent by registered mail or delivers it to the registered office of the corporation immediately after the meeting is adjourned.

**Loss of right to dissent**

**(2)** A director who votes for or consents to a resolution is not entitled to dissent under subsection (1).

**Dissent of absent director**

**(3)** A director who was not present at a meeting at which a resolution was passed or action taken is deemed to have consented thereto unless within seven days after becoming aware of the resolution, the director aware or the resolution, the director

**(a)** causes a dissent to be placed with the minutes of the meeting; or

**(b)** sends a dissent by registered mail or delivers it to the registered office of the corporation.

**Defence — reasonable diligence**

**(4)** A director is not liable under section 118 or 119, and has complied with his or her duties under subsection 122(2), if the director exercised the care, diligence and skill that a reasonably prudent person would have exercised in comparable circumstances, including reliance in good faith on

**(a)** financial statements of the corporation represented to the director by an officer of the corporation or in a written report of the auditor of the corporation fairly to reflect the financial condition of the corporation; or

**(b)** a report of a person whose profession lends credibility to a statement made by the professional person.

**Defence — good faith**

**(5)** A director has complied with his or her duties under subsection 122(1) if the director relied in good faith on

**(a)** financial statements of the corporation represented to the director by an officer of the corporation or in a written report of the auditor of the corporation fairly to reflect the financial condition of the corporation; or

**(b)** a report of a person whose profession lends credibility to a statement made by the professional person.

R.S., 1985, c. C-44, s. 123;   2001, c. 14, ss. 50, 135(E).

**Indemnification**

**124 (1)** A corporation may indemnify a director or officer of the corporation, a former director or officer of the corporation or another individual who acts or acted at the corporation's request as a director or officer, or an individual acting in a similar capacity, of another entity, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgment, reasonably incurred by the individual in respect of any civil, criminal, administrative, investigative or other proceeding in which the individual is involved because of that association with the corporation or other entity.

**Advance of costs**

**(2)** A corporation may advance moneys to a director, officer or other individual for the costs, charges and expenses of a proceeding referred to in subsection (1). The individual shall repay the moneys if the individual does not fulfil the conditions of subsection (3).

**Limitation**

**(3)** A corporation may not indemnify an individual under subsection (1) unless the individual

**(a)** acted honestly and in good faith with a view to the best interests of the corporation, or, as the case may be, to the best interests of the other entity for which the individual acted as director or officer or in a similar capacity at the corporation's request; and

**(b)** in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, the individual had reasonable grounds for believing that the individual's conduct was lawful.

**Indemnification in derivative actions**

**(4)** A corporation may with the approval of a court, indemnify an individual referred to in subsection (1), or advance moneys under subsection (2), in respect of an action by or on behalf of the corporation or other entity to procure a judgment in its favour, to which the individual is made a party because of the individual's association with the corporation or other entity as described in subsection (1) against all costs, charges and expenses reasonably incurred by the individual in connection with such action, if the individual fulfils the conditions set out in subsection (3).

**Right to indemnity**

**(5)** Despite subsection (1), an individual referred to in that subsection is entitled to indemnity from the corporation in respect of all costs, charges and expenses reasonably incurred by the individual in connection with the defence of any civil, criminal, administrative, investigative or other proceeding to which the individual is subject because of the individual's association with the corporation or other entity as described in subsection (1), if the individual seeking indemnity

**(a)** was not judged by the court or other competent authority to have committed any fault or omitted to do anything that the individual ought to have done; and

**(b)** fulfils the conditions set out in subsection (3).

**Insurance**

**(6)** A corporation may purchase and maintain insurance for the benefit of an individual referred to in subsection (1) against any liability incurred by the individual

**(a)** in the individual's capacity as a director or officer of the corporation; or

**(b)** in the individual's capacity as a director or officer, or similar capacity, of another entity, if the individual acts or acted in that capacity at the corporation's request.

**Application to court**

**(7)** A corporation, an individual or an entity referred to in subsection (1) may apply to a court for an order approving an indemnity under this section and the court may so order and make any further order that it sees fit.

**Notice to Director**

**(8)** An applicant under subsection (7) shall give the Director notice of the application and the Director is entitled to appear and be heard in person or by counsel.

**Other notice**

**(9)** On an application under subsection (7) the court may order notice to be given to any interested person and the person is entitled to appear and be heard in person or by counsel.

R.S., 1985, c. C-44, s. 124;   2001, c. 14, s. 51.

**Remuneration**

**125** Subject to the articles, the by-laws or any unanimous shareholder agreement, the directors of a corporation may fix the remuneration of the directors, officers and employees of the corporation.

1974-75-76, c. 33, s. 120;   1978-79, c. 9, s. 1(F).

## PART XI

# Insider Trading

**Definitions**

**126 (1)** In this Part,

***business combination*** means an acquisition of all or substantially all the property of one body corporate by another, or an amalgamation of two or more bodies corporate, or any similar reorganization between or among two or more bodies corporate;  (*regroupement d'entreprises*)

***distributing corporation***  [Repealed, 2001, c. 14, s. 52]

***insider*** means, except in section 131,

    **(a)** a director or officer of a distributing corporation;

    **(b)** a director or officer of a subsidiary of a distributing corporation;

    **(c)** a director or officer of a body corporate that enters into a business combination with a distributing corporation; and

    **(d)** a person employed or retained by a distributing corporation;  (*initié*)

***officer*** means the chairperson of the board of directors, the president, a vice-president, the secretary, the treasurer, the comptroller, the general counsel, the general manager, a managing director, of an entity, or any other individual who performs functions for an entity similar to those normally performed by an individual occupying any of those offices;  (*dirigeant*)

***share*** means a share carrying voting rights under all circumstances or by reason of the occurrence of an event that has occurred and that is continuing, and includes

    **(a)** a security currently convertible into such a share, and

**(b)** currently exercisable options and rights to acquire such a share or such a convertible security. (*action*)

**Further interpretation**

**(2)** For the purposes of this Part,

**(a)** a director or an officer of a body corporate that beneficially owns, directly or indirectly, shares of a distributing corporation, or that exercises control or direction over shares of the distributing corporation, or that has a combination of any such ownership, control and direction, carrying more than the prescribed percentage of voting rights attached to all of the outstanding shares of the distributing corporation not including shares held by the body corporate as underwriter while those shares are in the course of a distribution to the public is deemed to be an insider of the distributing corporation;

**(b)** a director or an officer of a body corporate that is a subsidiary is deemed to be an insider of its holding distributing corporation;

**(c)** a person is deemed to beneficially own shares that are beneficially owned by a body corporate controlled directly or indirectly by the person;

**(d)** a body corporate is deemed to own beneficially shares beneficially owned by its affiliates; and

**(e)** the acquisition or disposition by an insider of an option or right to acquire a share is deemed to be a change in the beneficial ownership of the share to which the option or right to acquire relates.

**(3) and (4)** [Repealed, 2001, c. 14, s. 52]

R.S., 1985, c. C-44, s. 126;  1994, c. 24, s. 14(F);  2001, c. 14, ss. 52, 135(E);  2018, c. 8, s. 14(F).

**127 to 129** [Repealed, 2001, c. 14, s. 53]

**Prohibition of short sale**

**130 (1)** An insider shall not knowingly sell, directly or indirectly, a security of a distributing corporation or any of its affiliates if the insider selling the security does not own or has not fully paid for the security to be sold.

**Calls and puts**

**(2)** An insider shall not knowingly, directly or indirectly, sell a call or buy a put in respect of a security of the corporation or any of its affiliates.

**Exception**

**(3)** Despite subsection (1), an insider may sell a security they do not own if they own another security convertible into the security sold or an option or right to acquire the security sold and, within ten days after the sale, they

**(a)** exercise the conversion privilege, option or right and deliver the security so acquired to the purchaser; or

**(b)** transfer the convertible security, option or right to the purchaser.

**Offence**

**(4)** An insider who contravenes subsection (1) or (2) is guilty of an offence and liable on summary conviction to a fine not exceeding the greater of one million dollars and three times the profit made, or to imprisonment for a term not exceeding six months or to both.
R.S., 1985, c. C-44, s. 130;  2001, c. 14, s. 54.

**Definitions**

**131 (1)** In this section, ***insider*** means, with respect to a corporation,

**(a)** the corporation;

**(b)** an affiliate of the corporation;

**(c)** a director or an officer of the corporation or of any person described in paragraph (b), (d) or (f);

**(d)** a person who beneficially owns, directly or indirectly, shares of the corporation or who exercises control or direction over shares of the corporation, or who has a combination of any such ownership, control and direction, carrying more than the prescribed percentage of voting rights attached to all of the outstanding shares of the corporation not including shares held by the person as underwriter while those shares are in the course of a distribution to the public;

**(e)** a person, other than a person described in paragraph (f), employed or retained by the corporation or by a person described in paragraph (f);

**(f)** a person who engages in or proposes to engage in any business or professional activity with or on behalf of the corporation;

**(g)** a person who received, while they were a person described in any of paragraphs (a) to (f), material confidential information concerning the corporation;

**(h)** a person who receives material confidential information from a person described in this subsection or in subsection (3) or (3.1), including a person described in this paragraph, and who knows or who ought reasonably to have known that the person giving the information is a person described in this subsection or in subsection (3) or (3.1), including a person described in this paragraph; and

**(i)** a prescribed person.

**Expanded definition of *security***

**(2)** For the purposes of this section, the following are deemed to be a security of the corporation:

> **(a)** a put, call, option or other right or obligation to purchase or sell a security of the corporation; and

> **(b)** a security of another entity, the market price of which varies materially with the market price of the securities of the corporation.

**Deemed insiders**

**(3)** For the purposes of this section, a person who proposes to make a take-over bid (as defined in the regulations) for securities of a corporation, or to enter into a business combination with a corporation, is an insider of the corporation with respect to material confidential information obtained from the corporation and is an insider of the corporation for the purposes of subsection (6).

**Deemed insiders**

**(3.1)** An insider of a person referred to in subsection (3), and an affiliate or associate of such a person, is an insider of the corporation referred to in that subsection. Paragraphs (1)(b) to (i) apply in determining whether a person is such an insider except that references to "corporation" in those paragraphs are to be read as references to "person described in subsection (3)".

**Insider trading — compensation to persons**

**(4)** An insider who purchases or sells a security of the corporation with knowledge of confidential information that, if generally known, might reasonably be expected to affect materially the value of any of the securities of the corporation is liable to compensate the seller of the security or the purchaser of the security, as the case may be, for any damages suffered by the seller or purchaser as a result of the purchase or sale, unless the insider establishes that

> **(a)** the insider reasonably believed that the information had been generally disclosed;

> **(b)** the information was known, or ought reasonably to have been known, by the seller or purchaser; or

> **(c)** the purchase or sale of the security took place in the prescribed circumstances.

**Insider trading — compensation to corporation**

**(5)** The insider is accountable to the corporation for any benefit or advantage received or receivable by the insider as a result of a purchase or sale described in subsection (4) unless the insider establishes the circumstances described in paragraph (4)(a).

**Tipping — compensation to persons**

**(6)** An insider of the corporation who discloses to another person confidential information with respect to the corporation that has not been generally disclosed and that, if generally known, might reasonably be expected to affect materially the value of any of the securities of the corporation is liable to compensate for damages any person who subsequently sells securities of the corporation to, or purchases securities of the corporation from, any person that received the information, unless the insider establishes

> **(a)** that the insider reasonably believed that the information had been generally disclosed;

> **(b)** that the information was known, or ought reasonably to have been known, by the person who alleges to have suffered the damages;

> **(c)** that the disclosure of the information was necessary in the course of the business of the insider, except if the insider is a person described in subsection (3) or (3.1); or

> **(d)** if the insider is a person described in subsection (3) or (3.1), that the disclosure of the information was necessary to effect the take-over bid or the business combination, as the case may be.

**Tipping — compensation to corporation**

**(7)** The insider is accountable to the corporation for any benefit or advantage received or receivable by the insider as a result of a disclosure of the information as described in subsection (6) unless the insider establishes the circumstances described in paragraph (6)(a), (c) or (d).

**Measure of damages**

**(8)** The court may assess damages under subsection (4) or (6) in accordance with any measure of damages that it considers relevant in the circumstances. However, in assessing damages in a situation involving a security of a distributing corporation, the court must consider the following:

> **(a)** if the plaintiff is a purchaser, the price paid by the plaintiff for the security less the average market price of the security over the twenty trading days immediately following general disclosure of the information; and

> **(b)** if the plaintiff is a seller, the average market price of the security over the twenty trading days immediately following general disclosure of the information, less the price that the plaintiff received for the security.

**Liability**

**(9)** If more than one insider is liable under subsection (4) or (6) with respect to the same transaction or series of transactions, their liability is joint and several, or solidary.

**Limitation**

**(10)** An action to enforce a right created by subsections (4) to (7) may be commenced only within two years after discovery of the facts that gave rise to the cause of action.

R.S., 1985, c. C-44, s. 131;  2001, c. 14, s. 54.

**Date modified:**

2025-08-28

## **TAB 6**

Province of British Columbia Limitation Act, S.B.C. 2012, c 13 (Can.)

Copyright © King's Printer,
Victoria, British Columbia, Canada

**Licence**
**Disclaimer**

This Act is current to August 26, 2025

See the Tables of Legislative Changes for this Act's legislative history, including any changes not in force.

# LIMITATION ACT

## [SBC 2012] CHAPTER 13

*Assented to May 14, 2012*

### *Contents*

**Part 1 — Interpretation**

**Division 1 — Definitions**

    1  Definitions

**Division 2 — Court Proceedings and Claims to Which This Act Does Not Apply**

    2  Exempted court proceedings

    3  Exempted claims

**Division 3 — Application**

    4  Conflict of laws

    5  Rules of equity not overridden

**Part 2 — Basic Limitation Period**

**Division 1 — Establishment of Basic Limitation Period**

    6  Basic limitation period

    7  Basic limitation period for court proceeding to enforce or sue on judgment

**Division 2 — Discovery of Claim**

    8  General discovery rules

    9  Special situations for persons of full capacity

    10  Special situations for minors

    11  Special situations for persons under disability

**Division 3 — Special Discovery Rules**

    12  Discovery rule for claims based on fraud or recovery of trust property

    13  Discovery rule for claims for future interest in trust property

    14  Discovery rule for claims for demand obligations

    15  Discovery rule for claims to realize or redeem security

    16  Discovery rule for claims for contribution or indemnity

    17  Discovery rules for successors, predecessors, principals and agents

    18  Discovery rule for minors

    19  Discovery rule for persons under disability

    20  Notice to proceed if basic limitation period postponed under section 18 or 19

**Part 3 — Ultimate Limitation Period**

    21  Ultimate limitation period

**Part 4 — Factors Affecting Limitation Periods**

   22  Counterclaim or other claim or proceeding

   23  Completion of enforcement process

   24  Limitation periods extended if liability acknowledged

**Part 5 — Suspension of Limitation Periods**

   25  Limitation periods suspended if claimant becomes person under disability

   26  Notice to proceed if limitation periods suspended under section 25

**Part 6 — General**

   27  Non-judicial remedies

   28  Adverse possession

   29  Power to make regulations

   30  Transition

   31  Repeal

 32-44  Consequential and Related Amendments

 45-46  Amendments to this Act

   47  Commencement

# Part 1 — Interpretation

## Division 1 — Definitions

**Definitions**

**1**  In this Act:

**"basic limitation period"**, in relation to a claim, means the limitation period applicable to the claim under Part 2;

**"caregiver"** means,

> (a) in relation to a minor, a parent, guardian or other person who usually has care and control of the minor, or

> (b) in relation to a person for whom a committee has been appointed under the *Patients Property Act*, the committee;

**"claim"** means a claim to remedy an injury, loss or damage that occurred as a result of an act or omission;

**"defendant"** includes a respondent;

**"discover"**, in relation to a claim, has the meaning set out in Divisions 2 and 3 of Part 2;

**"extraprovincial judgment"** means a judgment, order or award other than a local judgment;

**"judgment"** means an extraprovincial judgment or a local judgment;

**"limitation period"**, in relation to a claim, means the period after which a court proceeding must not be brought with respect to the claim;

**"local judgment"** means any of the following:

> (a) a judgment, order or award of
>
>> (i) the Supreme Court of Canada relating to an appeal from a British Columbia court,
>>
>> (ii) the British Columbia Court of Appeal,
>>
>> (iii) the Supreme Court of British Columbia,
>>
>> (iv) the Provincial Court of British Columbia, or
>>
>> (v) an arbitration to which the *Arbitration Act* applies;
>
> (b) an arbitral award to which the *Foreign Arbitral Awards Act* or the *International Commercial Arbitration Act* applies;

**"person under a disability"** means an adult who is incapable of or substantially impeded in managing the adult's affairs;

**"plaintiff"** includes a claimant and a petitioner;

**"secured party"** means a person who has a security interest;

**"security agreement"** means an agreement that creates or provides for a security interest;

**"security interest"** means an interest in collateral that secures payment or performance of an obligation;

**"ultimate limitation period"**, in relation to a claim, means the limitation period applicable to the claim under Part 3;

**"writ of execution"** includes an order for seizure and sale issued under the Small Claims Rules.

## Division 2 — Court Proceedings and Claims to Which This Act Does Not Apply

**Exempted court proceedings**

**2** (1) This Act does not apply to the following court proceedings and has no impact on when or if such court proceedings may be brought:

> (a) an appeal;
>
> (b) a judicial review application;
>
> (c) a court proceeding under the *Offence Act* to prosecute an offence;
>
> (d) a court proceeding in which the only relief sought is to obtain a declaration;
>
> (e) a court proceeding to enforce a local judgment for the possession of land;

(f) a court proceeding to enforce an injunction or a restraining order;

(g) a court proceeding to enforce an easement, restrictive covenant or profit à prendre.

(2) This Act does not apply to court proceedings based on existing aboriginal and treaty rights of the aboriginal peoples of Canada that are recognized and affirmed in the *Constitution Act, 1982*.

(3) Court proceedings referred to in subsection (2) are governed by the law that would have been in force with respect to limitation of actions if this Act had not been passed.

**Exempted claims**

**3** (1) This Act does not apply to the following:

(a) a claim that is subject to a limitation period established by an international convention or treaty that is adopted by an Act;

(b) a claim for possession of land if the person entitled to possession has been dispossessed in circumstances amounting to trespass;

(c) a claim for possession of land by a life tenant or person entitled to the remainder of an estate;

(d) a claim for possession of land by a person who has a right to enter for breach of a condition subsequent, or a right to possession arising under possibility of reverter of a determinable estate;

(e) a claim by a debtor in possession of collateral to redeem that collateral;

(f) a claim by a secured party in possession of collateral to realize on that collateral;

(g) a claim by a landlord to recover possession of land from a tenant who is in default or over holding;

(h) a claim for the title to property by any person in possession of that property;

(i) a claim relating to misconduct of a sexual nature, including, without limitation, sexual assault,

  (i) if the misconduct occurred while the claimant was a minor, and

  (ii) whether or not the claimant's right to bring the court proceeding was at any time governed by a limitation period;

(j) a claim relating to sexual assault, whether or not the claimant's right to bring the court proceeding was at any time governed by a limitation period;

(k) a claim relating to assault or battery, whether or not the claimant's right to bring the court proceeding was at any time governed by a limitation period, if the assault or battery occurred while the claimant

(i) was a minor, or

(ii) was living in an intimate and personal relationship with, or was in a relationship of financial, emotional, physical or other dependency with, a person who performed, contributed to, consented to or acquiesced in the assault or battery;

(l) a claim for arrears of child support or spousal support payable under

(i) a judgment, or

(ii) an agreement filed with the court under section 148 (2) or 163 (3) of the *Family Law Act*;

(m) fines or penalties under the *Offence Act*;

(n) [Not enacted.]

(o) fines or penalties under the *Securities Act* or a claim for an amount payable pursuant to an order made under section 155.1 (b), 157 (1) (b), 161 (1) (g) or 164.09 of that Act.

(2) This Act does not apply to a claim or court proceeding for which a limitation period has been established under another enactment, except to the extent provided for in the other enactment.

## Division 3 — Application

**Conflict of laws**

**4** (1) If the substantive law of another jurisdiction is to be applied by the court in deciding a claim, the law of that other jurisdiction respecting limitation periods must be applied in relation to the claim.

(2) Despite subsection (1) of this section, the court must apply section 3 (1) to any claim referred to in section 3 (1) (i), (j) or (k) whether or not the substantive law of another jurisdiction is to be applied by the court in deciding the claim.

**Rules of equity not overridden**

**5** Nothing in this Act interferes with any of the following:

(a) a rule of equity that refuses relief, on the ground of acquiescence, to a person whose right to commence a court proceeding in respect of a claim is not barred by this Act;

(b) a rule of equity that refuses relief, on the ground of inexcusable delay, to a person

(i) who claims equitable relief in aid of a legal right, and

(ii) whose right to commence a court proceeding in respect of a claim is not barred by this Act.

## Part 2 — Basic Limitation Period

## Division 1 — Establishment of Basic Limitation Period

**Basic limitation period**

**6** (1)  Subject to this Act, a court proceeding in respect of a claim must not be commenced more than 2 years after the day on which the claim is discovered.

(2)  The 2 year limitation period established under subsection (1) of this section does not apply to a court proceeding referred to in section 7.

**Basic limitation period for court proceeding to enforce or sue on judgment**

**7**  Subject to this Act, a court proceeding must not be commenced to enforce or sue on a judgment for the payment of money or the return of personal property,

(a)  if the judgment is a local judgment, more than 10 years after the day on which the judgment becomes enforceable, or

(b)  if the judgment is an extraprovincial judgment, after the earlier of the following:

(i)  the expiry of the time for enforcement in the jurisdiction where the extraprovincial judgment was made;

(ii)  the date that is 10 years after the judgment became enforceable in the jurisdiction where the extraprovincial judgment was made.

## Division 2 — Discovery of Claim

**General discovery rules**

**8**  Except for those special situations referred to in sections 9 to 11, a claim is discovered by a person on the first day on which the person knew or reasonably ought to have known all of the following:

(a)  that injury, loss or damage had occurred;

(b)  that the injury, loss or damage was caused by or contributed to by an act or omission;

(c)  that the act or omission was that of the person against whom the claim is or may be made;

(d)  that, having regard to the nature of the injury, loss or damage, a court proceeding would be an appropriate means to seek to remedy the injury, loss or damage.

**Special situations for persons of full capacity**

**9**  For a claim set out in section 12, 13, 14, 15, 16 or 17 of an adult person of full capacity, the discovery rules set out in that section apply.

**Special situations for minors**

**10**  For a claim of a minor, the discovery rules set out in section 18 apply.

**Special situations for persons under disability**

**11**  For a claim of a person under a disability, the discovery rules set out in section 19 apply.

## Division 3 — Special Discovery Rules

**Discovery rule for claims based on fraud or recovery of trust property**

**12**  (1)  In this section, **"fraud or trust claim"** means

> (a)  a claim based on fraud, or fraudulent breach of trust, to which a trustee was a party or privy,
>
> (b)  a claim to recover from a trustee trust property, or the proceeds from the trust property, if
>
>> (i)  that property is or those proceeds are in the possession of the trustee, or
>>
>> (ii)  that property was or those proceeds were previously received by the trustee and converted to the trustee's own use, or
>
> (c)  any other claim arising out of the fiduciary relationship between a trustee and a beneficiary if the trustee
>
>> (i)  wilfully conceals from the beneficiary the fact that
>>
>>> (A)  injury, loss or damage has occurred,
>>>
>>> (B)  the injury, loss or damage was caused by or contributed to by an act or omission, or
>>>
>>> (C)  the act or omission was that of the person against whom the claim is or may be made, or
>>
>> (ii)  wilfully misleads the beneficiary as to the appropriateness of a court proceeding as a means of remedying the injury, loss or damage.

(2)  A fraud or trust claim is discovered when the beneficiary becomes fully aware

> (a)  that injury, loss or damage had occurred,
>
> (b)  that the injury, loss or damage was caused by or contributed to by the
>
>> (i)  fraud,
>>
>> (ii)  fraudulent breach of trust,
>>
>> (iii)  conversion, or
>>
>> (iv)  other act or omission
>
> on which the claim is based,
>
> (c)  that the fraud, fraudulent breach of trust, conversion or other act or omission was that of the person against whom the claim is or may be made, and
>
> (d)  that, having regard to the nature of the injury, loss or damage, a court proceeding would be an appropriate means to seek to remedy the

injury, loss or damage.

(3) For the purposes of subsection (2), the burden of proving that a fraud or trust claim has been discovered rests on the trustee.

**Discovery rule for claims for future interest in trust property**

**13** A claim relating to a future interest in trust property is discovered on the later of the following:

> (a) the day on which the claim is discovered under section 8 or 12, as the case may be;

> (b) the day on which the interest becomes a present interest.

**Discovery rule for claims for demand obligations**

**14** A claim for a demand obligation is discovered on the first day that there is a failure to perform the obligation after a demand for the performance has been made.

**Discovery rule for claims to realize or redeem security**

**15** A claim to realize or redeem security is discovered on the first day that the right to enforce the security arises.

**Discovery rule for claims for contribution or indemnity**

**16** A claim for contribution or indemnity is discovered on the later of the following:

> (a) the day on which the claimant for contribution or indemnity is served with a pleading in respect of a claim on which the claim for contribution or indemnity is based;

> (b) the first day on which the claimant knew or reasonably ought to have known that a claim for contribution or indemnity may be made.

**Discovery rules for successors, predecessors, principals and agents**

**17** (1) A claim of a person claiming through a predecessor in right, title or interest is discovered on the earlier of the following:

> (a) the day on which the claim is discovered by the predecessor;

> (b) the day on which the claim is discovered by the person claiming.

(2) A claim of a principal, if the principal's agent had a duty to communicate to the principal knowledge of the matters referred to in section 8 (a) to (d), is discovered on the earlier of the following:

> (a) the day on which the claim is discovered by the principal's agent;

> (b) the day on which the claim is discovered by the principal.

**Discovery rule for minors**

**18** A claim of a minor is discovered,

(a) unless a notice to proceed is delivered under paragraph (b) before the minor attains the age of 19 years, on the later of the following:

(i) the day on which the minor attains the age of 19 years;

(ii) the day on which the claim is discovered under section 8, 12, 13, 14, 15, 16 or 17, as the case may be, or

(b) on the day on which a notice to proceed that complies with the requirements of section 20 (2) and any requirements prescribed under section 20 (5) is delivered in accordance with section 20 (1) and with any requirements prescribed under section 20 (5).

**Discovery rule for persons under disability**

**19**   A claim of a person under a disability is discovered,

(a) unless a notice to proceed is delivered under paragraph (b) before the person ceases to be a person under a disability, on the later of the following:

(i) the day on which the person ceases to be a person under a disability;

(ii) the day on which the claim is discovered under section 8, 12, 13, 14, 15, 16 or 17, as the case may be, or

(b) on the day on which a notice to proceed that complies with the requirements of section 20 (2) and any requirements prescribed under section 20 (5) is delivered in accordance with section 20 (1) and with any requirements prescribed under section 20 (5).

**Notice to proceed if basic limitation period postponed under section 18 or 19**

**20**   (1)   If the discovery rule under section 18 (a) or 19 (a) postpones the running of the basic limitation period applicable to a claim of a minor or a person under a disability and the minor or person under a disability has a caregiver, a person against whom the claim is or may be made may, for the purposes of section 18 (b) or 19 (b), deliver a notice to proceed to

(a) the caregiver, and

(b) the Public Guardian and Trustee.

(2)   A notice to proceed delivered under this section must meet all of the following requirements:

(a) it must be in writing;

(b) it must be addressed to the caregiver and to the Public Guardian and Trustee;

(c) it must specify the name of the minor or person under a disability;

(d) it must specify the circumstances out of which the claim arises or may be alleged to arise, with as much particularity as is necessary to enable

the caregiver to investigate whether the minor or person under a
disability has the claim;

(e) it must give warning that, because of the delivery of the notice, section
6 or 7, as the case may be, applies as if the claim was discovered on the
date of the delivery of the notice;

(f) it must give the following warning as applicable:

(i) if the person who may have the claim is a minor, that, because of
the delivery of the notice, section 21 (2) (d) (ii) applies to limit the
period within which a court proceeding may be commenced in
relation to the claim;

(ii) if the person who may have the claim is a person who was under
a disability at the time at which the act or omission on which the
claim is based took place, that, because of the delivery of the
notice, section 21 (2) (e) (ii) applies to limit the period within
which a court proceeding may be commenced in relation to the
claim;

(g) it must specify the name of the person on whose behalf the notice is
delivered;

(h) it must be signed by

(i) the person on whose behalf the notice is delivered, or

(ii) the person's solicitor.

(3) Section 18 (b) or 19 (b) operates to benefit only the person on whose behalf the
notice referred to in that section is delivered and only with respect to a claim
arising out of the circumstances specified in the notice.

(4) A notice to proceed delivered under this section is not an acknowledgement for
the purposes of section 24 and is not an admission for any purpose.

(5) The minister may make regulations prescribing the form, content and mode of
delivery of a notice to proceed under this section.

## Part 3 — Ultimate Limitation Period

### Ultimate limitation period

**21** (1) Subject to Parts 4 and 5, even if the limitation period established by any other
section of this Act in respect of a claim has not expired, a court proceeding must
not be commenced with respect to the claim more than 15 years after the day on
which the act or omission on which the claim is based took place.

(2) For the purposes of this section and subject to section 24 and subsection (3) of
this section, for any of the following claims, the day an act or omission on which
the claim is based takes place is as follows:

    (a) in the case of a claim arising out of a conversion, the day on which the property was first converted by any person;

    (b) in the case of a claim referred to in section 12, 13, 14 or 15, the day on which the claim is discovered in accordance with that section;

    (c) in the case of a claim for contribution or indemnity, the day on which the claimant for contribution or indemnity is served with a pleading in respect of a claim on which the claim for contribution or indemnity is based;

    (d) in the case of a claim of a minor, on the earlier of the following:

        (i) the day on which the minor attains the age of 19 years;

        (ii) the day on which the claim is discovered under section 18 (b);

    (e) in the case of a claim of a person who is under a disability at the time at which the act or omission on which the claim is based takes place, on the earlier of the following:

        (i) the day on which the person ceases to be a person under a disability;

        (ii) the day on which the claim is discovered under section 19 (b).

(3) If a person against whom a claim is or may be made

    (a) wilfully conceals from the claimant the fact that

        (i) injury, loss or damage has occurred,

        (ii) the injury, loss or damage was caused by or contributed to by an act or omission, or

        (iii) the act or omission was that of the person against whom the claim is or may be made, or

    (b) wilfully misleads the claimant as to the appropriateness of a court proceeding as a means of remedying the injury, loss or damage,

the act or omission on which the claim is based is deemed to have taken place on the day on which the claim is discovered under Part 2.


## Part 4 — Factors Affecting Limitation Periods

### Counterclaim or other claim or proceeding

**22** (1) If a court proceeding has been commenced in relation to a claim within the basic limitation period and ultimate limitation period applicable to the claim and there is another claim (the "related claim") relating to or connected with the first mentioned claim, the following may, in the court proceeding, be done with respect to the related claim even though a limitation period applicable to either or both of the claims has expired:

(a) proceedings by counterclaim may be brought, including the addition of a new party as a defendant by counterclaim;

(b) third party proceedings may be brought;

(c) claims by way of set off may be advanced;

(d) new parties may be added or substituted as plaintiffs or defendants.

(2) Nothing in subsection (1) gives a person a right to commence a court proceeding under subsection (1) (a) or (b) in relation to a claim for contribution or indemnity after the expiry of a limitation period applicable to that claim.

(3) Subsection (1) does not enable a person to make a claim against another person if a claim by the other person

(a) against the first mentioned person, and

(b) relating to or connected with the subject matter of the proceeding,

is or will be defeated by the first mentioned person pleading a provision of this Act as a defence.

(4) Subsection (1) does not interfere with any judicial discretion to refuse relief on grounds unrelated to the expiry of a limitation period.

(5) In any court proceeding, the court may, on terms as to costs or otherwise that the court considers just, allow the amendment of a pleading to raise a new claim even though, at the time of the amendment, a court proceeding could not, under section 6, 7 or 21, be commenced with respect to that claim.

**Completion of enforcement process**

23 (1) Despite any other provision of this Act, if, on the expiration of the limitation period established by section 7 with respect to proceedings on a judgment, an enforcement process is outstanding, the judgment creditor or the judgment creditor's successors may do any of the following:

(a) continue proceedings on an unexpired writ of execution, but the writ may not be renewed;

(b) commence or continue proceedings against land on a judgment registered under Part 5 of the *Court Order Enforcement Act*, but the registration may not be renewed unless those proceedings have been commenced;

(c) continue proceedings in which a charging order is claimed.

(2) If a court makes an order staying execution on a judgment, the running of the limitation periods established by this Act for proceedings on that judgment is postponed or suspended for so long as the order staying execution is in force.

**Limitation periods extended if liability acknowledged**

24 (1) If, before the expiry of either of the limitation periods that, under this Act, apply to a claim, a person acknowledges liability in respect of the claim,

>> (a) the claim must not be considered to have been discovered on any day earlier than the day on which the acknowledgement is made, and

>> (b) the act or omission on which the claim is based is deemed to have taken place on the day on which the acknowledgement is made.

(2) An acknowledgement of liability in respect of a claim for interest is also an acknowledgement of liability in respect of a claim for

>> (a) the outstanding principal, if any, and

>> (b) interest falling due after the acknowledgement is made.

(3) An acknowledgement of liability in respect of a claim to realize on or redeem collateral under a security agreement or to recover money in respect of the collateral, if made by a person in possession of the collateral, is an acknowledgement of liability in respect of the claim by any other person who later comes into possession of the collateral.

(4) An acknowledgement by a trustee of liability in respect of a claim is an acknowledgement of liability in respect of the claim by any other person who is or who later becomes a trustee of the same trust.

(5) An acknowledgement of liability in respect of a claim to recover or enforce an equitable interest in personal property, if made by a person in possession of the personal property, is an acknowledgement of liability in respect of the claim by any other person who later comes into possession of the personal property.

(6) Subsection (1) does not apply to an acknowledgement, other than an acknowledgement referred to in subsection (7), (8) or (9), unless the acknowledgement is

>> (a) in writing,

>> (b) signed, by hand or by electronic signature within the meaning of the *Electronic Transactions Act*,

>> (c) made by the person making the acknowledgement or the person's agent, and

>> (d) made to the person with the claim, the person's agent or an official receiver or trustee acting under the *Bankruptcy and Insolvency Act* (Canada).

(7) In the case of a claim for payment of a liquidated sum, part payment of the sum by the person against whom the claim is or may be made or by the person's agent is an acknowledgement by the person against whom the claim is or may be made of liability in respect of the claim.

(8) A debtor's performance of an obligation under or in respect of a security agreement is an acknowledgement by the debtor of liability in respect of a claim by the creditor for realization on the collateral under the security agreement.

(9) A creditor's acceptance of a debtor's payment or performance of an obligation under or in respect of a security agreement is an acknowledgement by the creditor of liability in respect of a claim by the debtor for redemption of the collateral under the security agreement.

(10) This section applies to an acknowledgement of liability in respect of a claim for payment of a liquidated sum even though the person making the acknowledgement refuses or does not promise to pay the sum or the balance of the sum still owing.

## Part 5 — Suspension of Limitation Periods

**Limitation periods suspended if claimant becomes person under disability**

**25** (1) Subject to section 26, if a person with a claim becomes a person under a disability, the basic limitation period and ultimate limitation period applicable to the claim do not run while the person continues to be a person under a disability.

(2) If the running of the basic limitation period applicable to a claim has been suspended by subsection (1), the basic limitation period resumes running when the person with the claim ceases to be a person under a disability, and that basic limitation period is the longer of the following:

    (a) the length of time that, when the person with the claim became a person under a disability, remained in the basic limitation period applicable to the claim;

    (b) one year from the time that the person with the claim ceased to be a person under a disability.

(3) If the running of the ultimate limitation period applicable to a claim has been suspended by subsection (1), the ultimate limitation period resumes running when the person with the claim ceases to be a person under a disability, and that ultimate limitation period is the longer of the following:

    (a) the length of time that, when the person with the claim became a person under a disability, remained in the ultimate limitation period applicable to the claim;

    (b) one year from the time that the person with the claim ceased to be a person under a disability.

**Notice to proceed if limitation periods suspended under section 25**

**26** (1) If, under section 25, the running of the basic limitation period applicable to a claim and the running of the ultimate limitation period applicable to the claim are suspended in relation to a person under a disability and that person has a caregiver, a person against whom the claim is or may be made may deliver a notice to proceed to

(a) the caregiver, and

(b) the Public Guardian and Trustee.

(2) A notice to proceed delivered under this section must meet all of the following requirements:

    (a) it must be in writing;

    (b) it must be addressed to the caregiver and to the Public Guardian and Trustee;

    (c) it must specify the name of the person under a disability;

    (d) it must specify the circumstances out of which the claim arises or may be alleged to arise, with as much particularity as is necessary to enable the caregiver to investigate whether the person under a disability has the claim;

    (e) it must give warning that the following apply to limit the period within which a court proceeding may be commenced in relation to the claim:

        (i) section 21;

        (ii) because of the delivery of the notice, section 25 (2) and (3);

    (f) it must specify the name of the person on whose behalf the notice is delivered;

    (g) it must be signed by

        (i) the person on whose behalf the notice is delivered, or

        (ii) the person's solicitor.

(3) If a notice to proceed

    (a) complies with the requirements of subsection (2) of this section and any requirements prescribed under subsection (6) of this section, and

    (b) is delivered in relation to a claim in accordance with subsection (1) of this section and with any requirements prescribed under subsection (6) of this section,

section 25 (2) and (3) applies to the limitation periods applicable to the claim as if the person with the claim ceased, on the date of the delivery of the notice, to be a person under a disability.

(4) Subsection (3) of this section operates to benefit only the person on whose behalf the notice referred to in that subsection is delivered and only with respect to a claim arising out of the circumstances specified in the notice.

(5) A notice to proceed delivered under this section is not an acknowledgement for the purposes of section 24 and is not an admission for any purpose.

(6) The minister may make regulations prescribing the form, content and mode of delivery of a notice to proceed under this section.

## Part 6 — General

**Non-judicial remedies**

**27** (1) In this section, **"non-judicial remedy"** means a remedy that a person is entitled, by law or by contract, to exercise in respect of a claim without court proceedings.

(2) If a claimant is prevented from commencing a court proceeding in relation to a claim as a result of the expiry of a limitation period under this Act, the claimant is not entitled to exercise against the person against whom the claim is or may be made, or against any other person, any non-judicial remedy that the claimant would, but for this section, be entitled to exercise in relation to the claim.

**Adverse possession**

**28** (1) Except as specifically provided by this or any other Act, no right or title in or to land may be acquired by adverse possession.

(2) Nothing in this Act interferes with any right or title to land acquired by adverse possession before July 1, 1975.

**Power to make regulations**

**29** The Lieutenant Governor in Council may make regulations referred to in section 41 of the *Interpretation Act*.

**Transition**

**30** (1) In this section:

**"effective date"** means the day on which this section comes into force;

**"former Act"** means the *Limitation Act*, R.S.B.C. 1996, c. 266, as that Act read immediately before the effective date;

**"former limitation period"** means, with respect to a pre-existing claim, a limitation period that applied to the pre-existing claim before the effective date;

**"pre-existing claim"** means a claim

(a) that is based on an act or omission that took place before the effective date, and

(b) with respect to which no court proceeding has been commenced before the effective date.

(2) A court proceeding must not be commenced with respect to a pre-existing claim if

(a) a former limitation period applied to that claim before the effective date, and

(b) that former limitation period expired before the effective date.

(3) Subject to subsection (2), if a pre-existing claim was discovered before the effective date, the former Act applies to the pre-existing claim as if the right to bring an action occurred at the time of the discovery of the pre-existing claim.

(4) Subject to subsection (2), if a pre-existing claim was not discovered before the effective date,

 (a) in the case of a pre-existing claim referred to in section 3 of this Act, that section applies to the pre-existing claim,

 (b) subject to paragraph (a) of this subsection, in the case of a pre-existing claim referred to in section 8 (1) (a) or (b) of the former Act, Part 2 of this Act and section 8 of the former Act apply to the pre-existing claim, or

 (c) in the case of any other pre-existing claim,

  (i) subject to subparagraph (ii) of this paragraph, this Act applies to the pre-existing claim, and

  (ii) Part 3 of this Act applies to the pre-existing claim as if the act or omission on which the pre-existing claim is based occurred on the later of

   (A) the effective date, and

   (B) the day the act or omission takes place under section 21 (2) of this Act.

(5) Nothing in this section restricts the right of a person to bring a court proceeding at any time in relation to a claim referred to in section 3 (1) (i), (j) or (k) of this Act, whether or not the claimant's right to bring the court proceeding was at any time governed by a limitation period.

### Repeal

Editorial Note

| Section(s) | Affected Act |
| --- | --- |
| *31* | *Limitation Act*, R.S.B.C. 1996, c. 266 |

### Consequential and Related Amendments

| Section(s) | Affected Act |
| --- | --- |
| *32* | *Adult Guardianship and Planning Statutes Amendment Act, 2007* |
| *33* | *Age of Majority Act* |
| *34* | *Apology Act* |
| *35* | *Business Practices and Consumer Protection Act* |
| *36* | *Environmental Management Act* |
| *37* | *Family Law Act* |
| *38* | *Financial Administration Act* |
| *39* | *Forest Act* |
| *40* | *Infants Act* |

| | |
|---|---|
| 41 | *Insurance Act* |
| 42 | *Insurance Amendment Act, 2009* |
| 43 | *Miscellaneous Statutes Amendment Act (No. 2), 2000* |
| 44 | *Settlement of International Investment Disputes Act* |

### Amendments to this Act

| Section(s) | Affected Act |
|---|---|
| *45-46* | *Limitation Act, S.B.C. 2012, c. 13* |

**Commencement**

**47** This Act comes into force by regulation of the Lieutenant Governor in Council.

---

Copyright © King's Printer, Victoria, British Columbia, Canada